**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

THE ESTATE OF CHARLES W. EDWARDS,
By its Personal Representative, Ms. Laurel Edwards Franczek,

and

THE CHARLES W. EDWARDS, D.D.S. AND MARY S. EDWARDS
REVOCABLE LIVING TRUST DATED JULY 6, 1994,
By its Trustee, Ms. Laurel Edwards Franczek,

Plaintiffs, Case No. 2:26-cv-1883

**v.**

CADMAN GLOBAL, LLC (f/k/a Venulum Capital, LLC),
CADMAN GLOBAL, LLC – SERIES II,
CADMAN GLOBAL, LLC – SERIES VI,
CADMAN GLOBAL, LLC – SERIES XX,
CADMAN GLOBAL, LLC – SERIES XXI,
GILES CADMAN, Individually,
MARK TROTTER, Individually,
VINTRADER, INC. (f/k/a Golden West International, Inc., d/b/a Golden West Wine),
CADMAN CAPITAL GROUP, and
CADMAN CAPITAL LIMITED,

Defendants.

---

**COMPLAINT**

---

NOW COME the Plaintiffs, the Estate of Charles W. Edwards and the Charles W. Edwards and Mary S. Edwards Irrevocable Living Trust, by their Personal Representative and Trustee, Ms. Laurel Edwards Franczek, through Counsel, Halling & Cayo, S.C., by Attorneys Sean M. Sweeney and David Seth Hill, and as and for their Complaint against the above-named Defendants, respectfully show to the Court and allege as follows:

## NATURE OF THE ACTION

1. This is an action involving systemic securities fraud, material omissions, common law fraud, structural breaches of contract, statutory civil theft, and alter-ego corporate abuse organized and executed by Giles Cadman under the unified global branding of the Cadman Capital Group.

2. The Defendants operated an intricate shell game, utilizing undercapitalized internal series silos organized under Delaware law to attempt to insulate themselves from liability while treating individual series assets as a centralized, comingled cash pool to float unrelated international projects and personal expenses.

3. The Plaintiffs bring this action to recover retirement and personal capital systematically stripped from the late Dr. Charles W. Edwards ("Dr. Edwards") through a series of predatory, non-performing investment instruments that were sold to Dr. Edwards during his lifetime.

4. The amount in controversy in this dispute exceeds $75,000, exclusive of interest and costs, there is complete diversity and alienage jurisdiction between the parties, and this Court maintains federal question jurisdiction.

## PARTIES

5. Prior to his passing on July 27, 2023, Dr. Edwards was an adult resident of the State of Wisconsin, residing at 3939 Monona Dr., #302, Monona, Wisconsin 53716. Prior to her passing on March 19, 2024, Ms. Mary Edwards was an adult resident of the State of Wisconsin, residing at 5395 E. Cheryl Parkway, Fitchburg, WI 53711.

6. The Plaintiff, the Estate of Charles W. Edwards is represented by its duly appointed Personal Representative, Ms. Laurel Edwards Franczek. Pursuant to an Order dated September 24,

2026, Ms. Laurel Edwards Franczek was granted the power "[t]o pursue any legal action in state and federal courts to pursue legal relief and/or damages on behalf of the Estate. This power includes the power to file, pursue, litigate, and settle any civil action, declaratory judgment or similar lawsuit on behalf of the Estate and to seek monetary damages."

7. The Plaintiff, the Charles W. Edwards and Mary S. Edwards Irrevocable Living Trust, is a validly existing trust under Wisconsin law, represented by its Trustee, Ms. Laurel Edwards Franczek. The trust is now irrevocable and has the following EIN Number: 99-6667382.

8. Defendant Cadman Global, LLC (formerly known as Venulum Capital, LLC) is a domestic series limited liability company organized under the laws of the State of Delaware, with its registered agent located at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

9. Cadman Global, LLC is also registered as a pooled investment fund under the U.S. Securities Act.

10. Defendants Cadman Global, LLC – Series II, Cadman Global, LLC – Series VI, Cadman Global, LLC – Series XX, and Cadman Global, LLC – Series XXI (collectively, the "Series Entities") are internal segregated sub-series organized under the master corporate umbrella of Cadman Global, LLC. Cadman Global, LLC is the parent entity, and all its Form D/Reg D filings list it as the issuer for each of these sub-series entities.

11. Upon in formation and belief, Defendant Mark Trotter is an individual residing in the Province of Ontario, Canada, who acts as an executive agent, director, and senior account solicitor for the Cadman Capital Group, maintaining a regular operational business address at c/o 36 Toronto Street, Suite 1000, Toronto, Ontario M5C 2C5, Canada.

12. At all times material to this Complaint, Defendant, Mark Trotter served as an authorized agent for Cadman Capital Group, Cadman Capital Limited, and/or Cadman Global, LLC.

13. Upon information and belief, Defendant Giles Cadman is an individual residing outside the United States, within the United Kingdom or the British Virgin Islands, who acts as the ultimate founder and chairman of Cadman Capital Group, Cadman Capital Limited, and/or Cadman Global, LLC.

14. Defendant Vintrader, Inc. (formerly known as Golden West International, Inc., doing business as Golden West Wine, hereinafter referred to as "Vintrader"). Vintrader is a domestic corporation organized under the laws of the State of California, maintaining a principal place of business at 2443 Fillmore Street, #348, San Francisco, CA 94115, and an office for its registered agent located at 2710 Gateway Oaks Drive, Sacramento, CA 95833. At all times relevant, Vintrader operated as a wholly controlled domestic subsidiary, alter ego, and operational clearinghouse for Defendant Giles Cadman and the related business entities, directly utilizing its alternative asset infrastructure to process and absorb investor capital.

15. Defendant Cadman Capital Group is a foreign parent holding company and management affiliate with a registered office address that is either located at 1-4 South Lodge Offices 100 Wellingborough Road, Ecton, Northampton, Northamptonshire, England, NN6 0QR or at 4th Floor, Rodus Building, Road Reef Plaza, Sir Francis Drake Highway, Road Town, Tortola, British Virgin Islands, VG1110.

16. Defendant Cadman Capital Limited is a foreign parent holding company and management affiliate organized under the laws of the United Kingdom, with a registered office

address at 1-4 South Lodge Offices 100 Wellingborough Road, Ecton, Northampton, Northamptonshire, England, NN6 0QR.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction) because certain claims assert violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18. This Court maintains alternate subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) (Diversity/Alienage Jurisdiction) because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of a State (Wisconsin) and citizens or subjects of a foreign state (Delaware, California, the United Kingdom, and/or the British Virgin Islands).

19. This Court has supplemental jurisdiction over the state law statutory and common-law claims under 28 U.S.C. § 1367.

20. Venue properly lies in the U.S. District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, misleading omissions, and core transactions giving rise to these claims targeted a resident within this judicial district.

## SUBSTANTIVE FACTUAL ALLEGATIONS

21. The roots of the fraudulent scheme began on November 4, 2011, when Defendants Giles Cadman and Mark Trotter induced Dr. Edwards to execute Purchase Contract No. 19320-A under the corporate umbrella of Venulum Ltd.

22. Within the documents included with the 2011 contract, Defendant Giles Cadman formally announced the acquisition of Golden West International, Inc. (now Defendant Vintrader,

Inc.) and instructed Dr. Edwards to route all future luxury fine wine investment purchases through Golden West directly through his designated wealth management advisor, Defendant Mark Trotter.

23. This initial contract in 2011 established the baseline pattern of control under which Defendants Giles Cadman and Mark Trotter eventually integrated Vintrader, Inc. into the solicitation framework, representing to Dr. Edwards that his capital was secured by physical, high-value global wine allocations warehoused in bonded facilities.

24. Cadman Capital lists on its website "The Cadman Capital Group grew both organically and through acquisition in 2011, when it acquired Golden West Wines to expand its direct-to-consumer wine operations and gain market share in the American retail wine market."

25. At all times relevant to this action, Defendant Giles Cadman served as the founder, managing member, and primary promoter of Cadman Global, LLC and its Series Entities, exercising complete operational control over the offerings.

26. Defendant Mark Trotter acted as a primary solicitor and promoter on behalf of Defendant Giles Cadman and Cadman Global, LLC, directly soliciting investments from Dr. Edwards.

27. Prior to soliciting Dr. Edwards, Defendant Giles Cadman had been the subject of multiple federal and state securities enforcement actions. Specifically, on February 27, 2012, a Final Judgment and Permanent Injunction was entered against Cadman in the United States District Court for the Northern District of Texas in *Securities and Exchange Commission v. Venulum Ltd., et al.*, Case No. 3:12-cv-00477-N, permanently enjoining him from violating Section 5 of the Securities Act. Additionally, Mr. Cadman was the subject of a Final Administrative Order entered on September 25, 2013, by the Securities Commissioner of South Carolina, as well as a Final Order

and Consent to Entry entered on September 30, 2013, by the Oregon Department of Consumer and Business Services, Case No. S-12-0058, enjoining him from violating state securities statutes.

28. Prior to soliciting Dr. Edwards, Defendant Mark Trotter had likewise been the subject of a permanent Summary Order of Prohibition issued by the Wisconsin Securities Commission for transacting business as an unlicensed, unregistered securities agent within the State of Wisconsin.

29. When soliciting Dr. Edwards' investments, Defendants completely failed to disclose Defendant Mark Trotter's permanent Wisconsin Order of Prohibition in any offering document; failed to provide written disclosure of Defendant Giles Cadman's regulatory disciplinary history in connection with any of the Promissory Notes; and unlawfully claimed Rule 506 registration exemptions for offerings that were disqualified as a matter of law.

30. On or about February 13, 2013, Dr. Edwards was induced to execute a Subscription Agreement for Notes issued by Caribbean Sustainable Fisheries, Corp., committing an investment of $10,000. This subscription was subsequently accepted by the company on February 19, 2013. A true and correct copy of the Subscription Agreement is attached hereto as Exhibit A.

31. The Caribbean Sustainable Fisheries Subscription Agreement expressly represented that the offering of the Notes was not registered under the Securities Act of 1933, but was purportedly being conducted pursuant to private placement exemptions under Section 4(2) of the Securities Act and Regulation D promulgated thereunder.

32. Although Caribbean Sustainable Fisheries, Corp. was designated as the nominal issuer, Defendant Giles Cadman and Defendant Venulum Ltd. acted as active promoters, affiliated managers, and statutory sellers in the distribution and administration of the subscription.

33. Specifically, the official Subscription Instructions accompanying the agreement directed Dr. Edwards to remit his completed legal and investment documents directly to the issuer "c/o Venulum Ltd., P.O. Box 765, 4th Floor Rodus Building, Road Reef Plaza, Tortola, British Virgin Islands, Attn: Graham Sedgwick."

34. Defendant Venulum Ltd. and its principal, Defendant Giles Cadman, served as the operational clearinghouse, administrative conduit, and primary soliciting enterprise for the Caribbean Sustainable Fisheries offering.

35. The solicitation, issuance, and acceptance of Dr. Edwards' subscription in February 2013 occurred less than one year after the February 27, 2012 entry of the Final Judgment and Consent Injunction in *Securities and Exchange Commission v. Venulum Ltd., Venulum Inc., and Giles Cadman*, Case No. 3:12-cv-00477-N, in the United States District Court for the Northern District of Texas.

36. That 2012 federal injunction permanently restrained and enjoined both Giles Cadman and Venulum Ltd. from directly or indirectly violating Section 5 of the Securities Act by offering or selling unregistered securities within the United States.

37. In soliciting and processing Dr. Edwards' Caribbean Sustainable Fisheries note subscription through Venulum Ltd., the Subscription Agreement executed by Dr. Edwards and accepted by the issuer contained zero disclosure of the February 27, 2012 federal permanent injunction entered against Giles Cadman and Venulum Ltd. in *SEC v. Venulum Ltd.* Upon information and belief, Defendants failed to deliver a referenced November 1, 2012, Private Placement Memorandum to Dr. Edwards prior to securing his funds, or alternatively, the memorandum failed to provide full and fair disclosure of the ongoing regulatory prohibitions against Giles Cadman and Venulum Ltd. In either event, Defendants solicited and processed the

unregistered offering directly through Venulum Ltd. less than one year after Cadman and Venulum Ltd. were permanently enjoined by a federal court from offering or selling unregistered securities in violation of Section 5 of the Securities Act.

38. On or about September 27

39. , 2017, Defendants solicited and induced Dr. Edwards to execute a Subscription Agreement and Supplement to Operating Agreement for Class B Membership Interests in Cadman Global, LLC, Series II. A true and correct copy of the Series II Subscription Agreement Supplement is attached hereto as Exhibit B.

40. The Cadman Global, LLC Series II ("Series II") offering materials expressly stated that the membership units were not registered with the Securities and Exchange Commission and were offered pursuant to purported private placement exemptions under Section 4(2) of the Securities Act and Regulation D.

41. On October 26, 2017, Defendant Giles Cadman personally executed the acceptance of Dr. Edwards' subscription as Director of Cadman Capital Management Limited, the Managing Member of Cadman Global, LLC.

42. At the time Defendant Cadman executed the acceptance in October 2017, Cadman Global, LLC was disqualified from relying on the Rule 506 safe harbor by virtue of the final state administrative orders entered against Cadman by the Securities Commissioner of South Carolina on September 25, 2013, and the Oregon Department of Consumer and Business Services on September 30, 2013.

43. Defendants completely concealed that Defendant Mark Trotter was subject to a permanent Summary Order of Prohibition issued by the Wisconsin Securities Commission barring him from transacting securities in Wisconsin. Furthermore, the September 2013 state

administrative fraud orders entered against Defendant Giles Cadman and his affiliated entities, made it unlawful for the Defendants to market and sell the Series II membership interests in reliance upon an exemption from registration that was not available to them.

44. Defendant Cadman Capital Management Limited conducted its operations from the identical physical address and utilized the identical telephone number as Defendant Venulum Ltd., specifically 4th Floor Rodus Building, Road Reef, Road Town, Tortola, British Virgin Islands, Tel: +1 416 640 5411, demonstrating the unified identity, commingling, and continuous enterprise operated by Defendant Giles Cadman across both entities.

45. The Series II Subscription Agreement executed and accepted by Defendants contains facial accounting errors that demonstrate reckless or fraudulent recordkeeping regarding investor funds. Specifically, the agreement itemized Dr. Edwards' investment as a cash commitment of $185,505.75 and a fine wine property contribution valued at $321,933.60, which combined to equal $507,439.35. Notwithstanding that the true sum of the contributions was $507,439.35, the signature and acceptance pages drafted by Defendants and executed by Defendant Cadman arbitrarily stated that the total accepted commitment was $692,945.10, double-counting the $185,505.75 cash contribution and creating an unexplained discrepancy of $185,505.75 in the reported capital account.

46. The fine wine property contribution represented the rolled-over value of prior notes or interests issued by Cadman-controlled entities. Upon information and belief, the fine wine property contribution assigned to Dr. Edwards that was included in the Series II investment included wine cases purchased and held through Defendant Vintrader, Inc. (f/k/a Golden West International, Inc., d/b/a Golden West Wine).

47. To prevent Dr. Edwards from discovering the enterprise's true financial condition and/or to prevent Dr. Edwards from seeking the return of his capital, Defendants subjected the Series II interests to a mandatory twenty-four-month lockup during which redemptions were prohibited, followed by steep redemption penalties of up to twenty percent extending for up to six years after investment.

48. On or about April 4, 2019, Defendants solicited and procured from Dr. Edwards an additional investment of $50,000.00, evidenced by an Unsecured Promissory Note issued by Series VI of Cadman Global, LLC (the "Series VI Note"). A true and correct copy of the Series VI Promissory Note is annexed hereto as Exhibit B.

49. Under the terms of the Series VI Note, Series VI of Cadman Global, LLC promised to pay Dr. Edwards a total sum of $55,721.84 over a twenty-four-month term, maturing on April 1, 2021, reflecting an annual return on his investment of eight percent.

50. The Series VI Note was executed on behalf of the issuer by Cadman Capital Management Limited as Managing Member, acting through its Authorized Signatory, Faisal Ghanchi.

51. Faisal Ghanchi previously executed the February 19, 2013, Acceptance of Subscription for Dr. Edwards' Caribbean Sustainable Fisheries note, evidencing the unbroken operational continuity, common control, and personnel shared between the Caribbean Sustainable Fisheries offering and the Cadman Global series entities.

52. In Section 9(e) of the Series VI Note, Defendants explicitly claimed that the note was exempt from federal and state registration requirements pursuant to Section 4(2) of the Securities Act and Regulation D promulgated thereunder.

53. At the time the Series VI Note was offered and sold in April 2019, Cadman Global, LLC, Series VI, and Cadman Capital Management Limited were disqualified from relying on the Rule 506 safe harbor, or alternatively, failed to satisfy the condition precedent of full written disclosure under Rule 506(e), by virtue of the September 2013 final state administrative enforcement orders entered against Defendant Giles Cadman and his affiliated entities in South Carolina and Oregon,

54. In connection with the solicitation and sale of the Series VI Note, Defendants failed to provide written disclosure of Defendant Mark Trotter's permanent Wisconsin Order of Prohibition, and failed to disclose that the Series VI Note was an undercapitalized shell reliant on commingled funds from outside ventures to meet its debt obligations.

55. In an unlawful attempt to evade federal securities laws, Defendants inserted Section 8 into the Series VI Note, asserting that the proceeds would be used for commercial purposes and stipulating that the transaction was a commercial loan rather than an investment security.

56. Notwithstanding Defendants' unilateral contractual designation, the Series VI Note constitutes an investment security, because it was sold to raise enterprise capital, was purchased by Dr. Edwards with the expectation of earning a profit, was marketed as an investment opportunity, and was uncollateralized and uninsured.

57. The Series VI Note also incorporated exculpatory and remedy-stripping clauses that are void and unenforceable, including Section 7, which sought to eliminate all liability for affiliate entities and directors, and Section 4, which purported to strip Dr. Edwards of the right to demand payment, accelerate obligations, or initiate legal proceedings following an Event of Default (and/or Insolvency Event).

58. The face of the Series VI Note expressly designates Dr. Edwards' address in Monona, Wisconsin, confirming that Defendants solicited, negotiated, and completed the sale of this unregistered security directly within the State of Wisconsin.

59. Defendants failed to register the Series VI Note with the Wisconsin Department of Financial Institutions, Division of Securities; claimed exemptions that were legally unavailable to them; and, upon information and belief, solicited and transacted the instrument through Dr. Edwards' designated account advisor, Defendant Trotter, while Trotter was subject to an active Wisconsin Order of Prohibition barring him from transacting securities in the state, in direct violation of Wisconsin Statutes Chapter 551

60. On or about August 27, 2020, Defendants solicited and procured from Dr. Edwards two additional investments totaling $59,628.80 in principal, both documented by Unsecured Promissory Notes issued by Series VI of Cadman Global, LLC ("the May 2020 Series VI Notes"). A true and correct copy of the May 2020 Series VI Notes are attached to this complaint as Exhibit C.

61. Although both notes bear a typed execution date of May 26, 2020, and designated a retroactive loan commencement date of July 1, 2020, each note bears an identical handwritten notation on its cover page dated August 27, 2020, stating "Personal Loan NOT IRA checks will be mailed to me," demonstrating that both instruments were simultaneously issued, executed, and delivered in August 2020 as part of a coordinated transaction.

62. Under the terms of the first of the May 2020 Series VI Notes, Series VI of Cadman Global, LLC promised to pay Dr. Edwards the principal amount of $34,221.47 over an eighteen-month term maturing on January 1, 2022, with an annual interest rate of 8.00% and total scheduled

payments of $38,067.49, payable in five quarterly installments of $1,574.19 and a final balloon payment of $30,196.54.

63. Under the terms of the second of the May 2020 Series VI Notes, Series VI of Cadman Global, LLC promised to pay Dr. Edwards the principal amount of $25,407.33 over a twenty-four-month term maturing on July 1, 2022, with an annual interest rate of 6.50% and total scheduled payments of $28,452.62, payable in seven quarterly installments of $965.48 and a final balloon payment of $21,694.26.

64. The unusual and specific principal amounts of $34,221.47 and $25,407.33, combined with the conflicting May, July, and August 2020 dates related to the May 2020 Series VI Notes, reflect that the Notes were papered rollovers, transfers, or reinvestments of capital from earlier maturing investments within the Cadman enterprise, utilized by Defendants to avoid paying cash distributions and to unlawfully retain custody of Dr. Edwards' funds.

65. Defendant Giles Cadman personally executed the May 2020 Series VI Notes as Authorized Representative of Cadman Capital Management Limited in its capacity as Managing Member of Cadman Global, LLC, Series VI.

66. By personally signing both promissory notes, Defendant Cadman directly engaged in the offer, sale, and distribution of the securities, establishing his status as a statutory seller under the Securities Act and demonstrating his direct operational control over Series VI and Cadman Capital Management Limited.

67. In Section 9(e) of the May 2020 Series VI Notes, Defendants expressly represented that the instrument was exempt from federal and state registration requirements pursuant to Section 4(2) of the Securities Act and Regulation D promulgated thereunder.

68. At the time the May 2020 Series VI Notes were offered and executed, Cadman Global, LLC, Series VI, and Cadman Capital Management Limited were disqualified from claiming the Rule 506 private offering safe harbor, or alternatively, failed to satisfy the condition precedent of mandatory written disclosure under Rule 506(e), by virtue of the September 2013 final state administrative enforcement orders entered against Defendant Giles Cadman in South Carolina and Oregon.

69. In soliciting and securing Dr. Edwards' investment in the May 2020 Series VI Notes, Defendants failed to provide written disclosure in the note instruments of the regulatory enforcement history of the enterprise, and completely concealed that Defendant Mark Trotter was subject to an active Wisconsin Order of Prohibition barring him from transacting securities in the state.

70. To evade statutory oversight, Defendants inserted Section 8 into the May 2020 Series VI Notes, asserting that the loan proceeds would be used for commercial purposes and directing that the instrument be construed as a commercial loan rather than an investment security. However, the May 2020 Series VI Notes constitute securities because they were offered to obtain enterprise capital, was acquired by Dr. Edwards for investment yield, was marketed as an investment vehicle, and lacked any commercial collateral or government insurance.

71. The May 2020 Series VI Note also incorporated exculpatory and remedy-stripping clauses that are void and unenforceable as against public policy, including Section 7, which sought to eliminate all liability for affiliate entities and directors, and Section 4, which purported to strip Dr. Edwards of the right to demand payment, accelerate obligations, or initiate legal proceedings following an Event of Default (and/or Insolvency Event).

72. The May 2020 Series VI Notes explicitly recite Dr. Edwards' residence in Monona, Wisconsin, confirming that Defendants offered, issued, and delivered these instruments directly within the State of Wisconsin. Defendants never registered the May 2020 Series VI Notes with the Wisconsin Department of Financial Institutions, Division of Securities, and, upon information and belief, transacted these securities through Dr. Edwards' primary account advisor, Defendant Mark Trotter, while Trotter was subject to an active Wisconsin Order of Prohibition barring him from transacting securities in the state, in violation of Wisconsin Statutes Chapter 551.

73. On or about April 29, 2022, Dr. Edwards was sold a subscription for Class B Membership Interests in Cadman Global, LLC (the "Series XXI Subscription"). The investment, upon information and belief, was sold to Dr. Edwards within his traditional self-directed IRA in the amount of $194,845.07, through New Direction Trust Company ("NDTCO"). Defendants formally acknowledged receipt of Dr. Edwards' retirement capital in an official Subscription Confirmation transmitted by Cadman Capital Management on July 21, 2022. A true and correct copy of the Subscription Confirmation is attached hereto as Exhibit D.

74. Upon information and belief, the Series XXI Subscription was "paid" by executing unauthorized or forced internal book-entry rollovers of unpaid principal and maturity proceeds from Dr. Edwards' prior maturing investments in Cadman's network of entities, thereby withholding the return of his capital and compounding his exposure across the enterprise.

75. Defendants specifically solicited this investment from Dr. Edwards' tax-deferred retirement savings, causing the transaction to be funded through his self-directed individual retirement account custodian, NDTCO, designated under investor name "New Direction Trust Company FBO Charles Edwards, IRA XXX5763".

76. Immediately upon booking the $194,845.07 investment, Defendants extracted a $14,613.38 Placement Fee directly from Dr. Edwards' retirement funds, representing an exact 7.5% deduction taken off the top of the transaction. Defendants never provided specific advance disclosure that the maximum fee would be shaved directly off Dr. Edwards' retirement principal and concealed the true destination of the charge—specifically that it was being extracted to fund transaction-based compensation to unlicensed promoters. This deduction immediately diluted Dr. Edwards' credited subscription value down to $180,231.69 and resulted in the issuance of only 180.2317 membership interests at a stated net asset value of $1,000.00 per unit.

77. Upon information and belief, the 7.5% placement fee represented transaction-based compensation paid directly or indirectly to Defendant Mark Trotter or affiliated promoters for soliciting the Series XXI Subscription, in direct violation of federal broker-dealer registration requirements under Section 15(a) of the Securities Exchange Act and in violation of Defendant Trotter's permanent Wisconsin order prohibiting him from transacting business as an unregistered securities agent within the State of Wisconsin.

78. At the time Defendants offered and sold the Series XXI Subscription in April 2022, Cadman Global, LLC, Series XXI, and Cadman Capital Management Limited were disqualified from relying on any Rule 506 private placement safe harbor under Regulation D pursuant to 17 C.F.R. § 230.506(d)(1)(iii), or alternatively, failed to satisfy the mandatory condition precedent of full written disclosure under Rule 506(e), because the September 2013 final state administrative enforcement orders entered against Defendant Giles Cadman in South Carolina and Oregon remained within their active ten-year statutory lookback period.

79. Defendants never filed a registration statement with the Securities and Exchange Commission or the Wisconsin Department of Financial Institutions for the Series XXI offering. In

soliciting and issuing the April 2022 Series XXI securities, Defendants failed to furnish Dr. Edwards or his custodian with any offering memorandum or written disclosure detailing Defendant Giles Cadman's 2012 federal injunction or 2013 state regulatory enforcement orders as required and completely concealed that Defendant Mark Trotter was subject to an active Wisconsin Order of Prohibition barring him from transacting securities in the state.

80. Because Cadman Global, LLC and its series entities were disqualified under Rule 506(d) and/or failed to satisfy the mandatory disclosure condition of Rule 506(e), and because no other statutory exemption from registration applied, the offer and sale of the Series XXI Subscription constituted an unlawful, unregistered distribution of securities in violation of Section 5 of the Securities Act.

81. On May 5, 2023, Dr. Edwards was sold an unsecured promissory note into Series VI (the "2023 Series VI Note") in the principal amount of $49,487.80. A true and correct copy of the 2023 Series VI Note is attached hereto as Exhibit E.

82. Under the terms of the 2023 Series VI Note, Cadman Global, LLC promised to pay Dr. Edwards total principal and interest amounting to $57,256.96 over a twenty-four-month term maturing on May 12, 2025, reflecting an annual interest rate of 8%, payable in seven quarterly installments of $1,245.15 and a final balloon payment of $48,540.91.

83. The specific principal amount of $49,487.80 reflected the continuation of Defendants' debt-rollover scheme, whereby unpaid principal and balloon balances from Dr. Edwards' earlier maturing promissory notes—specifically the May 2020 Series VI Notes that had matured in 2022—were rolled over and locked up for an additional two-year term rather than the funds being paid to Dr. Edwards upon maturity.

84. The DocuSign Certificate of Completion confirms that Defendant Mark Trotter personally served as the Envelope Originator who prepared and electronically transmitted the 2023 Series VI Note and associated offering documents directly to Dr. Edwards.

85. Defendant Trotter solicited, prepared, and knowingly delivered these investment documents directly into the State of Wisconsin while subject to a permanent Summary Order of Prohibition issued by the Wisconsin Securities Commission barring him from transacting business as an unregistered securities agent, in direct violation of Wisconsin Statutes Chapter 551.

86. Defendant Giles Cadman personally executed the 2023 Series VI Note via DocuSign on May 9, 2023, acting as Authorized Representative of Cadman Capital Management Limited in its capacity as Managing Member of Cadman Global, LLC, Series VI.

87. By personally executing the Note, Defendant Cadman directly engaged in the offer, sale, and issuance of the security, functioning as a statutory seller and exercising active control person authority over Series VI and Cadman Capital Management Limited.

88. In Section 9(e) of the Note and page 1 of the accompanying Confidential Investor Questionnaire, Defendants explicitly represented to Dr. Edwards that the offering was exempt from federal and state registration requirements pursuant to Section 4(2) of the Securities Act and Regulation D, expressly citing Rule 506 of the Securities and Exchange Commission.

89. At the time Defendants offered, transmitted, and executed the 2023 Series VI Note, Cadman Global, LLC, Series VI, Cadman Capital Management Limited, Giles Cadman, and solicitor Mark Trotter were disqualified from relying on the Rule 506 safe harbor.

90. Alternatively, prior to securing Dr. Edwards' electronic signature, Defendants failed to satisfy the mandatory written disclosure detailing Defendant Giles Cadman's 2012 federal

injunction, his 2013 state regulatory fraud orders, or Defendant Mark Trotter's permanent Wisconsin licensing ban.

91. To evade regulatory scrutiny, Defendants inserted Section 8 into the Note, asserting that the loan proceeds would be used for commercial purposes and directing that the instrument be construed as a commercial loan rather than an investment security. However, the 2023 Series VI Note is a security because it was offered to obtain enterprise capital, was acquired by Dr. Edwards for investment yield, was marketed as an investment vehicle, and lacked any commercial collateral or government insurance.

92. The 2023 Series VI Note also incorporated exculpatory and remedy-stripping clauses that are void and unenforceable as against public policy, including Section 7, which sought to eliminate all liability for affiliate entities and directors, and Section 4, which purported to strip Dr. Edwards of the right to demand payment, accelerate obligations, or initiate legal proceedings following an Event of Default (and/or Insolvency Event).

93. The face, notice, and questionnaire provisions of the 2023 Series VI Note explicitly identify Dr. Edwards' residence in Monona, Wisconsin, confirming that Defendants solicited, issued, and delivered the 2023 Series VI Note directly into Wisconsin while Defendant Trotter remained subject to a permanent state order prohibiting him from transacting securities.

94. On or about April 27, 2023, Defendants solicited and procured from Dr. Edwards an additional investment in the principal amount of $250,000.00, documented by an Unsecured Promissory Note issued by Series XX of Cadman Global, LLC (the "Series XX Note"). A true and correct copy of the Series XX Note is attached hereto as Exhibit F.

95. Under the terms of the Series XX Note—executed on or about April 27, 2023, with a stated term commencing May 5, 2023, and maturing May 5, 2025—Series XX of Cadman Global,

LLC promised to pay Dr. Edwards total principal and interest amounting to $319,372.96 over a twenty-four-month period.

96. Defendants structured the Series XX Note with an aggressive, above-market annual interest rate of 14.00%—promising total interest of $69,372.96 on top of the $250,000.00 principal—payable in seven quarterly installments of $9,346.22 followed by a final balloon payment of $253,949.42 at maturity, to fraudulently induce Dr. Edwards into committing substantial capital to the enterprise.

97. The DocuSign Certificate of Completion confirms that Defendant Mark Trotter personally served as the Envelope Originator and Holder of the record who prepared and electronically transmitted the Series XX Note and accompanying Confidential Investor Questionnaire directly to Dr. Edwards on April 27, 2023.

98. Defendant Trotter originated, processed, and transmitted these securities offering materials directly to Dr. Edwards in Wisconsin while subject to a permanent Summary Order of Prohibition issued by the Wisconsin Securities Commission barring him from transacting business as an unregistered securities agent within the State of Wisconsin, in direct violation of Wisconsin Statutes Chapter 551.

99. Defendant Giles Cadman personally executed the Series XX Note via DocuSign on April 28, 2023, acting as Authorized Representative of Cadman Capital Management Limited in its capacity as Managing Member of Cadman Global, LLC, Series XX.

100. By personally executing the Series XX Note, Defendant Cadman directly engaged in the issuance and sale of the security, acted as the maker of the promises and representations contained therein, and exercised active control person authority over Series XX, Cadman Global, LLC, and Cadman Capital Management Limited.

101. In Section 9(e) of the Note and page 1 of the accompanying Confidential Investor Questionnaire, Defendants explicitly represented to Dr. Edwards that the transaction was exempt from federal and state securities registration requirements pursuant to Section 4(2) of the Securities Act and Regulation D, expressly invoking Rule 506 of the Securities and Exchange Commission.

102. At the time Defendants offered, solicited, and executed the Series XX Note in late April and early May 2023, Cadman Global, LLC, Series XX, Cadman Capital Management Limited, Giles Cadman, and solicitor Mark Trotter were disqualified from relying on the Rule 506 safe harbor, or alternatively, failed to satisfy the mandatory condition precedent of full written disclosure under Rule 506(e), by virtue of the active Wisconsin Order of Prohibition barring Defendant Mark Trotter and the September 2013 final state administrative enforcement orders entered against Defendant Giles Cadman, which remained active within their ten-year statutory lookback period.

103. In soliciting and securing Dr. Edwards' execution of the Series XX Note and the commitment of his $250,000.00 in capital, Defendants failed to provide any offering memorandum, prospectus, or written regulatory disclosure detailing Defendant Giles Cadman's regulatory enforcement history as required to claim an exemption under Rule 506(e), and completely concealed that Defendant Mark Trotter was subject to an active Wisconsin Order of Prohibition barring him from transacting securities in the state.

104. The Series XX Note constitutes an investment security because it was issued to raise enterprise capital, was acquired by Dr. Edwards with the expectation of investment profit, was marketed as an investment opportunity pursuant to Regulation D and lacked commercial collateral or government insurance.

105. The Series XX Note also incorporated exculpatory and remedy-stripping clauses that are void and unenforceable as against public policy, including Section 7, which sought to eliminate all liability for affiliate entities and directors, and Section 4, which purported to strip Dr. Edwards of the right to demand payment, accelerate obligations, or initiate legal proceedings following an Event of Default (and/or Insolvency Event).

106. The Series XX Note expressly recites Dr. Edwards' address in Monona, Wisconsin, confirming that Defendants directed the offer, issuance, and delivery of this unregistered security into Wisconsin, and transacted the sale through Defendant Mark Trotter while Trotter was subject to an active Wisconsin Order of Prohibition barring him from transacting securities in the state, in violation of Wisconsin Statutes Chapter 551.

107. Once Dr. Edwards made an initial investment and his capital was successfully captured inside the interwove Cadman network of entities, it became entirely impossible to withdraw, liquidate, or extract cash from the ecosystem.

108. When Dr. Edwards requested a liquidation or attempted to realize the cash value of his holdings, the Defendants flatly refused, representing that the underlying accounts were completely illiquid, and that cash payouts could not be accommodated under existing series rules.

109. To prevent the discovery of their baseline insolvency and to avoid liquid asset extractions, the Defendants executed a systemic pattern of rollover maneuvers whereby notes that remained unpaid would be rolled into new Notes.

110. Upon information and belief, Defendant Mark Trotter informed Dr. Edwards that he could not receive his money back or liquidate his capital accounts unless he agreed to execute consecutive, supplementary promissory notes within separate corporate sub-series entities.

111. Defendant Mark Trotter knowingly targeted Dr. Edwards within the State of Wisconsin via email and telephone transmissions.

112. Defendant Mark Trotter used the threat of total structural asset forfeiture and permanent illiquidity to coerce the investor into allowing mature contract balances to be captured as accounting credits or were transferred directly into new unsecured debt obligations.

113. Dr. Edwards was systematically trapped by Mark Trotter in a perpetual cycle of forced contractual reinvestment; he was, upon information and belief, repeatedly told that his exclusive pathway to protect his legacy principal and eventually achieve a liquid exit was to advance fresh capital and satisfy consecutive note obligations.

114. The investor maintained absolutely no right, operational power, or practical capability to manage, select, store, or commercially trade the assets that were supposedly purchased through the Notes; Dr. Edwards was completely dependent upon the specialized expertise, market sourcing, and logistics network controlled by the Defendants.

115. The master *Fourth Amended and Restated Limited Liability Company Agreement of Cadman Global, LLC* and its governing Series Supplements strictly required the corporate operators to maintain full and true books of account for each series in accordance with U.S. Generally Accepted Accounting Principles, and to compute and report true, good-faith Net Asset Value (NAV) valuations and financial statements to investors on an annual basis.

116. The Defendants entirely failed to provide verifiable, independent NAV calculations or transparent asset audits to Dr. Edwards, further actively concealing the underlying diversion of his money while siphoning capital pools into subsequent ventures.

117. At all times relevant, the hollow Series Entities and Defendant Vintrader, Inc. (f/k/a Golden West) were structured, managed, and controlled as the mere instrumentalities, shells, and

alter egos of Giles Cadman, Mark Trotter, Cadman Capital Group, and Cadman Capital Limited, sharing an identity of interest, commingled assets, and unified operational control.

118. Defendants maintained a unified, centralized control network that systematically disregarded the statutory separateness required under Delaware law, routinely commingling investor capital across series boundaries, domestic operating entities, and foreign affiliates—including Cadman Capital Management Limited and Cadman Capital Group—through unsegregated accounts and non-cash book-entry rollovers to mask rolling structural defaults, fabricate liquidity, and to obscure the dissipation of assets.

## CAUSES OF ACTION

## COUNT I

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, Cadman Global, LLC - Series VI, Cadman Global, LLC - Series XX, and Cadman Global, LLC - Series XXI in Connection with Post-2021 Notes and Subscriptions)**

119. Plaintiffs incorporate all preceding paragraphs by reference as though fully set forth herein.

120. This Count is brought under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), against Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, Cadman Global, LLC - Series VI, Cadman Global, LLC - Series XX, and Cadman Global, LLC - Series XXI in connection with the offer, sale, and issuance of post-2021 securities, specifically including the Series XXI Subscription, the Series XX Note, and the 2023 Series VI Note.

121. The Series XXI membership interests sold under the Series XXI Subscription, the Series XX Note, and the 2023 Series VI Note constitute notes, investment contracts, and securities within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

122. Between April 2022 and May 2023, Defendants, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and electronic communication systems—including interstate DocuSign transmissions and email solicitations directed to Dr. Edwards at his residence in Monona, Wisconsin—knowingly or recklessly employed a device, scheme, or artifice to defraud; made untrue statements of material fact; and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

123. In violation of Rule 10b-5(a) and (c), Defendants engaged in a fraudulent rollover and capital-capture scheme whereby maturing debt obligations were rolled into newly formed series silos to mask default, fictitious capital accounts were reported, and funds were commingled across domestic and foreign accounts rather than maintained in segregated, solvent portfolios.

124. In violation of Rule 10b-5(b), Defendants knowingly or recklessly made untrue statements of material fact and omitted material facts necessary to make their statements not misleading in connection with the purchase and sale of securities, including by: falsely representing that the 2022 and 2023 securities offerings complied with Regulation D private placement exemptions while mandatory disclosure of disqualifications under Rule 506(d) were withheld; concealing that solicitor Defendant Mark Trotter was subject to an active Wisconsin Order of Prohibition barring him from securities transactions; falsely representing that invested capital was backed by segregated, performing assets; and concealing that an unauthorized 7.50% placement fee of $14,613.38 was immediately deducted from Dr. Edwards' retirement contribution in connection with the Series XXI Subscription to fund transaction-based compensation to an unregistered promoter.

125. These representations were materially false when made because Defendants knew, or recklessly disregarded, that the series entities were undercapitalized and insolvent; that redemptions could not be honored without executing forced rollovers or siphoning fresh capital; that Defendants were legally disqualified from relying on Rule 506 safe harbors due to pre-existing regulatory orders; and that an undisclosed 7.5% placement fee of $14,613.38 was immediately deducted from Dr. Edwards' retirement contribution in connection with the Series XXI Subscription.

126. Defendants breached an independent duty of disclosure by intentionally concealing that Defendant Giles Cadman was permanently enjoined under a 2012 federal consent judgment in *SEC v. Venulum Ltd.* from selling unregistered securities, that Cadman was subject to 2013 state administrative fraud orders in South Carolina and Oregon, and that Defendant Mark Trotter was subject to a permanent Wisconsin prohibition order barring him from acting as an unregistered securities agent.

127. Defendants acted with scienter, possessing actual knowledge of their regulatory injunctions and state bars, coordinating the transmission of the post-2021 offering instruments to Dr. Edwards, and intentionally suppressing their disciplinary histories to induce his investment.

128. Defendants' deceptive conduct was made in connection with the purchase and sale of securities, directly inducing Dr. Edwards to commit $194,845.07 under the Series XXI Subscription in April 2022, $250,000.00 under the Series XX Note in April 2023, and $49,487.80 under the 2023 Series VI Note in May 2023.

129. Dr. Edwards justifiably relied upon Defendants' misrepresentations and the apparent legitimacy of the offering materials.

130. Defendants' fraudulent misrepresentations and omissions directly and proximately caused Dr. Edwards' economic loss, as the concealed insolvency of the enterprise materialized in total defaults upon maturity, rendering the post-2021 instruments illiquid and worthless.

131. As a direct result of Defendants' violations of Section 10(b) and Rule 10b-5, Plaintiffs sustained actual economic damages in an amount to be proven at trial, including lost principal, unpaid interest, and statutory interest, for which Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, Cadman Global, LLC - Series VI, Cadman Global, LLC - Series XX, and Cadman Global, LLC - Series XXI are jointly and severally liable.

## COUNT II

**Violations of Section 20(a) of the Exchange Act (Control Person Liability)**
**(Against Defendant Giles Cadman)**

132. Plaintiffs incorporate all preceding paragraphs by reference as though fully set forth herein.

133. Section 20(a) of the Securities Exchange Act of 1934 imposes joint and several secondary liability on any person who, directly or indirectly, controls any person or entity liable for a primary violation of the Exchange Act.

134. To establish control person liability under Section 20(a), a plaintiff must prove: (1) a primary securities law violation by a controlled entity; (2) that the defendant treats the entity under general operational control; and (3) that the defendant possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated.

135. As alleged in Count I, Cadman Global, LLC and its series entities committed primary violations of Section 10(b) of the Exchange Act and Rule 10b-5.

136. Defendant Giles Cadman possessed and exercised specific control over the transactions giving rise to the primary violations, personally executing the subscription acceptances and promissory notes, including the Series XX Note and the 2023 Series VI Note.

137. Defendant Giles Cadman, directly and indirectly, possessed and exercised the power to control and influence the management, policies, and specific transactional operations of Cadman Global, LLC, the Series Entities, Cadman Capital Management Limited, and the promotional and solicitation activities of Defendant Mark Trotter, rendering Defendant Giles Cadman jointly and severally liable under Section 20(a) of the Exchange Act for the underlying Section 10(b) violations committed by each controlled person and entity.

138. Defendant Cadman did not act in good faith and directly or indirectly induced the acts constituting the primary securities violations, rendering him jointly and severally liable under Section 20(a) to the same extent as the controlled corporate entities.

## COUNT III

**Wisconsin Uniform Securities Law Violations – Wis. Stat. §§ 551.501 and 551.509 (Against Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, Cadman Global, LLC - Series VI, Cadman Global, LLC - Series XX, and Cadman Global, LLC - Series XXI in Connection with Post-2021 Transactions)**

139. Plaintiffs incorporate all preceding paragraphs by reference as though fully set forth herein.

140. To establish liability under the Wisconsin Uniform Securities Law, a plaintiff must prove that the defendant, in connection with the offer or sale of a security in this state, directly or indirectly employed a device, scheme, or artifice to defraud, or made a material misrepresentation or omission. Unlike federal standards, the plaintiff is not required to prove scienter or reliance as affirmative elements; rather, transaction causation is established automatically upon proof of the statutory violation.

141. Plaintiffs explicitly limit the statutory claims and relief sought under this Count to those securities offered, sold, and purchased after 2021, consisting of the April 29, 2022 Series XXI Subscription, the April 27, 2023 Series XX Note, and the May 5, 2023 Series VI Note. The promissory notes and Class B membership interests issued by Defendants—specifically including the Series XXI Subscription, the Series XX Note, and the 2023 Series VI. All of these subscriptions, membership interests, and/or promissory notes constitute securities under Wisconsin law.

142. Defendants offered and sold securities within the State of Wisconsin through Defendant Mark Trotter, who was neither licensed nor exempt from licensing, and who acted in direct defiance of an active Order of Prohibition issued by the Wisconsin Department of Financial Institutions. Defendants Giles Cadman, Cadman Capital Management Limited, and Mark Trotter directly or indirectly controlled the sellers, served as executive officers or managing agents, and materially aided in the unlawful offer and sale of securities to Dr. Edwards, rendering each jointly and severally liable with the issuing entities.

143. In connection with the offer and sale of these securities, Defendants employed a device, scheme, or artifice to defraud; making untrue statements of material fact; and omitting material facts necessary to make the statements made not misleading, including concealing the 2012 federal injunction against Defendant Giles Cadman, the 2013 South Carolina and Oregon administrative fraud orders, and Defendant Mark Trotter's permanent Wisconsin prohibition order.

144. Dr. Edwards did not know of the untruth of the representations or the existence of the omitted regulatory bars at the times he entered into the transactions.

145. Pursuant to Wis. Stat. § 551.509(2), Defendant Cadman Global, LLC and its series entities are liable to Plaintiffs for statutory rescission of the consideration paid, together with

interest at the legal rate under Wis. Stat. § 138.04 from the dates of payment, costs, and reasonable attorneys' fees or for actual damages.

146. Pursuant to Wis. Stat. § 551.509(7), Defendants Giles Cadman and Mark Trotter are jointly and severally liable with and to the same extent as the issuing entities as controlling persons, executive officers, managing members, and agents who materially aided in the fraudulent sales.

**<u>COUNT IV</u>**

**Common Law Fraud / Fraudulent Omission**
**(Against Defendants Giles Cadman, Mark Trotter, and Cadman Global, LLC)**

147. Plaintiffs incorporate all preceding paragraphs by reference as though fully set forth herein.

148. To state a cognizable claim for common law fraud under Wisconsin law, a plaintiff must establish five elements: (1) the defendant made a representation of fact; (2) the representation was untrue; (3) the defendant knew the representation was untrue or made it recklessly; (4) the defendant made the representation with intent to deceive and induce action; and (5) the plaintiff justifiably relied on the statement to their detriment.

149. Where fraud is based on an omission, the plaintiff must prove as a threshold question of law that the defendant was under a binding legal duty to disclose the concealed fact.

150. The Defendants maintained a clear common law duty to disclose their background securities fraud injunctions and state registration bars because: (1) those enforcement records were material to the investment transactions; (2) the Defendants knew Dr. Edwards was acting under a complete mistake of fact; (3) the regulatory records and internal fund insolvency metrics were peculiarly and exclusively within the knowledge of the corporate operators; and (4) the

circumstances of trapping an investor's principal inside a non-performing shell series is of sufficient materiality that it should be disclosed prior to completion of a sale.

151. Defendants Giles Cadman, Mark Trotter, and Cadman Global, LLC made affirmative representations of fact to Dr. Edwards, stating that the series entities were valid, compliant commercial enterprises, that the investments were backed by alternative assets, that quarterly interest would be paid, and that capital could be liquidated through successive notes.

152. These representations were false when made, and Defendants omitted material facts regarding their active federal injunctions, state securities fraud orders, unlicensed status, structural fund insolvency, and unconsented fee extractions.

153. Defendants owed a common law duty to disclose these facts under Wisconsin law because the regulatory bars and enterprise insolvency were facts basic to the transactions, were exclusively within Defendants' knowledge, and were intentionally concealed while knowing Dr. Edwards was acting under a mistake of fact.

154. Defendants' fraudulent misrepresentations and omissions were extraneous to the underlying contracts, constituting fraud in the inducement.

155. Defendants made these false representations and omissions knowingly or with reckless disregard for the truth, with the intent to deceive and induce Dr. Edwards to invest his funds in the Cadman entity ecosystem.

156. Dr. Edwards justifiably relied upon Defendants' representations and omissions, which reliance induced him to execute the investment instruments and commit over $1,121,401.02 to the enterprise, resulting in the total loss of his invested capital.

**COUNT V**

**Breach of Contract – 2013 Caribbean Sustainable Fisheries Note**
**(Against Defendant Cadman Global, LLC, as Successor to Venulum Ltd., and Giles Cadman)**

157. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

158. Under the controlling principles of Wisconsin contract law, a valid and enforceable contract requires an offer, an acceptance, and independent legal consideration. To state a claim for breach, a plaintiff must prove the existence of this valid contract, a material violation of its specific terms by the defendant, and resulting expectation damages.

159. On or about February 13, 2013, a valid and binding contract was formed when Caribbean Sustainable Fisheries, Corp., through its operational conduit, promoter, and managing facility Venulum Ltd. (now known as Cadman Global, LLC), accepted the Subscription Agreement for Notes executed by Dr. Edwards for the principal sum of $10,000.00.

160. Dr. Edwards fully performed all obligations required of him under the agreement by remitting the required $10,000.00 capital transfer.

161. Defendant breached the contract by failing to perform the debt obligations undertaken, failing to remit required interest payments, and failing to repay the principal upon maturity.

162. As a direct result of this breach, Plaintiffs sustained actual expectation damages in an amount equal to the unpaid principal and accrued interest.

163. Pursuant to the doctrines of alter ego and enterprise liability set forth in Count XVIII, Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited are jointly, severally, and personally liable for the contractual breach and resulting damages.

## COUNT VI

**Breach of Contract – 2017 Series II Agreements**
**(Against Defendants Cadman Global, LLC and Cadman Global, LLC - Series II)**

164. Plaintiffs incorporate all preceding paragraphs by reference as though fully set forth herein.

165. On or about September 22, 2017, a valid and binding contract was executed when Cadman Global, LLC and Cadman Global, LLC - Series II accepted Dr. Edwards' Subscription Agreement and Supplement to Operating Agreement for Class B Membership Interests in Cadman Global, LLC - Series II.

166. Dr. Edwards fully performed his obligations by surrendering $321,933.60 in property and transferring $185,505.75 in liquid cash consideration.

167. Defendants Cadman Global, LLC and Cadman Global, LLC - Series II committed a material breach of the agreements by siphoning Series II capital reserves into separate business lines, failing to maintain and calculate annual U.S. GAAP Net Asset Value valuations, double-counting cash contributions, and refusing to honor liquid capital redemption provisions.

168. As a direct result of Defendants' breach, Plaintiffs sustained actual expectation damages under the benefit of the bargain standard in an amount equal to the full value of the Series II investment, including unpaid distributions and retained capital.

169. Pursuant to the doctrines of alter ego and enterprise liability set forth in Count XVIII, Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited are jointly, severally, and personally liable for the contractual breaches and resulting damages of Cadman Global, LLC and Cadman Global, LLC - Series II.

## COUNT VII

### Breach of Contract – 2019 Series VI Note
### (Against Defendants Cadman Global, LLC and Cadman Global, LLC - Series VI)

170. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

171. On or about April 4, 2019, a valid and binding contract was executed whereby Cadman Global, LLC - Series VI promised to pay Dr. Edwards a principal sum of $50,000.00, together with interest, totaling $55,721.84 over a twenty-four-month term maturing on April 1, 2021.

172. Dr. Edwards fully performed his obligations under the contract by advancing the $50,000.00 principal sum.

173. Defendants Cadman Global, LLC and Cadman Global, LLC - Series VI committed a material breach of the contract by failing to make mandated quarterly installment payments, failing to pay the mature contractual balloon sum of $55,721.84 due on April 1, 2021, and failing to cure the default within twenty-eight calendar days.

174. As a direct result of Defendants' breach, Plaintiffs sustained direct expectation damages under the benefit of the bargain standard in the amount of $55,721.84, plus accrued interest.

175. Pursuant to the doctrines of alter ego and enterprise liability set forth in Count XVIII, Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited are jointly, severally, and personally liable for the contractual breaches and resulting damages of Cadman Global, LLC and Cadman Global, LLC - Series VI.

## COUNT VIII

### Breach of Contract – 2020 Series VI Personal Loan Note (Against Defendants Cadman Global, LLC and Cadman Global, LLC - Series VI)

176. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

177. A valid and binding written promissory note contract—the first note comprising the May 2020 Series VI Notes—was entered into whereby Cadman Global, LLC - Series VI promised

to pay Dr. Edwards the principal amount of $34,221.47, together with interest at 8.00%, totaling $38,067.49 on or before January 1, 2022.

178. Dr. Edwards fully performed his obligations by providing the required capital consideration.

179. Defendants Cadman Global, LLC and Cadman Global, LLC - Series VI committed a material breach of the contract by defaulting on all five required quarterly installments, failing to pay the mature contractual balloon sum of $38,067.49 on January 1, 2022, and failing to cure the default within twenty-eight calendar days.

180. As a direct result of Defendants' breach, Plaintiffs sustained actual expectation damages in the amount of $38,067.49, plus accrued interest.

181. Pursuant to the doctrines of alter ego and enterprise liability set forth in Count XVIII, Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited are jointly, severally, and personally liable for the contractual breaches and resulting damages of Cadman Global, LLC and Cadman Global, LLC - Series VI.

## COUNT IX

### Breach of Contract – 2020 Series VI Individual Cash Note
### (Against Defendants Cadman Global, LLC and Cadman Global, LLC - Series VI)

182. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

183. A valid and binding written promissory note contract—the second note comprising the May 2020 Series VI Notes—was entered into whereby Cadman Global, LLC - Series VI promised to pay Dr. Edwards the principal amount of $25,407.33, together with interest at 6.50%, totaling $28,452.62 on or before July 1, 2022.

184. Dr. Edwards fully performed his obligations by providing the required capital consideration.

185. Defendants Cadman Global, LLC and Cadman Global, LLC - Series VI committed a material breach of the contract by failing to make any of the seven mandated quarterly installments, failing to pay the mature contractual balloon sum of $28,452.62 on July 1, 2022, and failing to cure the default within twenty-eight calendar days.

186. As a direct result of Defendants' breach, Plaintiffs sustained actual expectation damages under the benefit of the bargain standard in the amount of $28,452.62, plus accrued interest.

187. Pursuant to the doctrines of alter ego and enterprise liability set forth in Count XVIII, Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited are jointly, severally, and personally liable for the contractual breaches and resulting damages of Cadman Global, LLC and Cadman Global, LLC - Series VI.

## COUNT X

**Breach of Contract – Series XXI Subscription**
**(Against Defendants Cadman Global, LLC and Cadman Global, LLC - Series XXI)**

188. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

189. On or about April 29, 2022, a valid and binding contract was formed when Cadman Global, LLC and Cadman Global, LLC - Series XXI accepted Dr. Edwards' Series XXI Subscription for Class B Membership Interests in the principal amount of $194,845.07, processed through New Direction Trust Company.

190. Dr. Edwards fully performed his obligations by transferring the capital commitment through his authorized custodian.

191. Defendants Cadman Global, LLC and Cadman Global, LLC – Series XXI committed a material breach of the governing contracts by improperly extracting a $14,613.38 placement fee directly from Dr. Edwards' retirement principal to compensate an unlicensed promoter, failing to remit required distributions or amortization adjustments, commingling funds across series boundaries, failing to account for the assets under U.S. GAAP standards, and failing to deliver required annual financial reports.

192. As a direct result of Defendants' breach, Plaintiffs sustained actual expectation damages under the benefit of the bargain standard in the amount of $194,845.07, plus lost earnings and interest.

193. Pursuant to the doctrines of alter ego and enterprise liability set forth in Count XVIII, Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited are jointly, severally, and personally liable for the contractual breaches and resulting damages of Cadman Global, LLC and Cadman Global, LLC - Series XXI.

## COUNT XI

**Breach of Contract – 2023 Series VI Note**
**(Against Defendants Cadman Global, LLC and Cadman Global, LLC - Series VI)**

194. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

195. On or about May 5, 2023, a valid and binding contract was executed when Cadman Global, LLC - Series VI issued the 2023 Series VI Note in the principal amount of $49,487.80, promising to pay Dr. Edwards total principal and interest of $57,256.96 on or before May 12, 2025, at an 8.00% annual interest rate.

196. Dr. Edwards fully performed his obligations by delivering the capital consideration and surrendering legacy instruments as consideration for the note.

197. Defendants Cadman Global, LLC and Cadman Global, LLC - Series VI committed a material breach of the contract by failing to pay any of the seven mandated quarterly installments of $1,245.15 and repudiating their obligations to pay the balloon sum of $48,540.91 at maturity.

198. As a direct result of Defendants' breach, Plaintiffs sustained direct expectation damages measured by the benefit of the bargain standard in the amount of $57,256.96, plus accrued interest.

199. Pursuant to the doctrines of alter ego and enterprise liability set forth in Count XVIII, Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited are jointly, severally, and personally liable for the contractual breaches and resulting damages of Cadman Global, LLC and Cadman Global, LLC - Series VI.

## COUNT XII

### Breach of Contract – 2023 Series XX Note
### (Against Defendants Cadman Global, LLC and Cadman Global, LLC - Series XX)

200. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

201. On or about April 27, 2023, a valid and binding contract was formed when Cadman Global, LLC - Series XX issued the Series XX Note for the principal sum of $250,000.00 at a 14.00% fixed annual interest rate, promising to pay Dr. Edwards total principal and interest of $319,372.96 on or before May 5, 2025.

202. Dr. Edwards fully performed his obligations by advancing the complete $250,000.00 principal sum.

203. Defendants Cadman Global, LLC and Cadman Global, LLC - Series XX committed a material breach of the contract by defaulting on all quarterly payments of $9,346.22, failing to

deliver the final balloon payment of $253,949.42 upon maturity, and failing to cure the default within twenty-eight calendar days.

204. As a direct result of Defendants' non-performance, Plaintiffs sustained actual expectation damages measured by the complete denial of the benefit of the bargain in the amount of $319,372.96, plus accrued interest.

205. Pursuant to the doctrines of alter ego and enterprise liability set forth in Count XVIII, Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited are jointly, severally, and personally liable for the contractual breaches and resulting damages of Cadman Global, LLC and Cadman Global, LLC - Series XX.

## COUNT XIII

**Breach of Fiduciary Duty**
**(Against Defendants Giles Cadman, Mark Trotter, and Cadman Global, LLC)**

206. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

207. Under Wisconsin law, a claim for breach of fiduciary duty requires proof of three elements: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach caused the plaintiff's damage. A breach of the fiduciary duty of loyalty is classified as an intentional tort.

208. Pursuant to Section 14.1 of the Fourth Amended and Restated Limited Liability Company Agreement of Cadman Global, LLC, the Manager, its managing affiliates, and its executive officers assumed formal fiduciary obligations to Dr. Edwards, creating binding duties of good faith, care, and loyalty to manage the Series assets prudently and in the best interests of the Members.

209. Defendants Giles Cadman and Cadman Capital Management Limited owed formal fiduciary duties of loyalty, care, and good faith to Dr. Edwards arising from their status as managers, controlling persons, and investment fiduciaries under Section 14.1 of the Fourth Amended and Restated Limited Liability Company Agreement of Cadman Global, LLC and under relevant law; and Defendant Mark Trotter owed independent fiduciary duties of undivided loyalty, full disclosure, and good faith to Dr. Edwards arising under common law and the law of agency by virtue of his role as Dr. Edwards' designated financial advisor and account manager.

210. Defendants intentionally breached their fiduciary duty of loyalty by engaging in self-dealing, executing unconsented book-entry note replacements, withholding U.S. GAAP-compliant Net Asset Value summaries, commingling segregated series funds into centralized pools, and siphoning Dr. Edwards' capital to float unhedged offshore parent ventures.

211. Defendants' conduct connotes active disloyalty and bad faith rather than mere negligence, directly breaching the core standards of the duty of loyalty under Wisconsin law.

212. As a direct result of these intentional fiduciary breaches, Dr. Edwards' capital accounts were depleted, causing Plaintiffs actual damages exceeding $1,121,401.02, for which Defendants are personally, jointly, and severally liable.

## COUNT XIV

### Statutory Civil Theft – Wis. Stat. §§ 895.446 and 943.20
### (Against Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Global, LLC, Cadman Capital Group, and Cadman Capital Limited)

213. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

214. To establish a valid civil cause of action for statutory theft under Wis. Stat. § 895.446, a plaintiff must prove by a preponderance of the evidence that the defendant intentionally engaged in conduct prohibited under the criminal theft statute, Wis. Stat. § 943.20, and that the

plaintiff suffered a loss as a result. Under § 943.20(1)(b), a theft occurs when a person, by virtue of their business office or status as a trustee, maintains possessory custody of money belonging to another, and intentionally transfers or retains it without consent and contrary to authority, with intent to convert it to their own use.

215. Dr. Edwards maintained an absolute, proprietary ownership interest in specific, identifiable funds and luxury wine property allocations held in designated escrow lines, warehouse repositories, and segregated series accounts.

216. By virtue of their corporate offices, management roles, and operational clearinghouse functions, Defendants held possessory custody and administrative control over these specific, identifiable capital and wine allocations, with Defendant Vintrader, Inc. specifically maintaining physical and operational control over the wine inventory.

217. Between 2021 and 2023, Defendants intentionally, repeatedly, and without consent executed unconsented book-entry sweeps, liquidations, and transfers, siphoning these specific funds and wine proceeds out of their designated accounts and converting them to their own use and the use of outside international ventures, in violation of Wis. Stat. § 943.20(1)(b).

218. Defendants knew Dr. Edwards did not consent to the permanent diversion, liquidation, or offshore retention of his wealth, and Defendants' intentional refusal to deliver these specific funds and property upon lawful demand constitutes prima facie evidence of intent to convert the property to their own use.

219. Pursuant to Wis. Stat. § 895.446(3), Plaintiffs are entitled to judgment for actual damages, all costs of investigation and litigation, and exemplary damages equal to three times the actual damages sustained.

## COUNT XV

**Deceptive Trade Practices – Wis. Stat. § 100.18**

**(Against Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, and Vintrader, Inc.)**

220. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

221. The Wisconsin Deceptive Trade Practices Act, private right of action codified at Wis. Stat. § 100.18(11)(b)2, requires a private plaintiff to prove three elements: (1) the defendant made a representation to the public with the intent to induce a contract or obligation; (2) the representation was untrue, deceptive, or misleading; and (3) the representation materially induced a pecuniary loss.

222. The Defendants, through their senior executives Giles Cadman and Mark Trotter, actively distributed, circulated, and placed before the public—specifically targeting Dr. Edwards within the State of Wisconsin—written advertisements, confidential offering memoranda, and executive portfolio summaries within the last six years.

223. These marketing and offering documents provided within the last six years, contained positive, affirmative statements of fact regarding the structural operation of the investment, explicitly representing that the Class B membership units were backed by tangible, high-value premium wine inventories warehoused in compliant, government-bonded facilities and that the promissory notes carried short-term liquidity backed by verified GAAP-compliant asset accounts.

224. These affirmative representations of fact were entirely untrue, deceptive, and misleading when published; the underlying series silos were unbacked, un-audited shells, and the physical wine properties had been utilized as a transactional conduit to absorb equity values while the cash was systematically comingled and stripped.

225. These deceptive representations materially induced Dr. Edwards to transfer his liquid wealth and wine property into the series entities, causing a pecuniary loss exceeding $1,121,401.02, entitling Plaintiffs to recover compensatory damages, costs, and actual reasonable attorneys' fees under Wis. Stat. § 100.18(11)(b)2.

## COUNT XVI

### Enhanced Civil Forfeiture for Exploitation of the Elderly – Wis. Stat. § 100.264 (Against Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, and Vintrader, Inc.)

226. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

227. Wis. Stat. § 100.264 establishes a formal penalty enhancement framework that imposes a supplemental civil forfeiture not to exceed $10,000.00 per violation when a defendant violates an enumerated consumer protection predicate offense and the court finds that the conduct was perpetrated against an elderly person.

228. As set forth in Count XV of this Complaint, the Defendants have committed a primary, qualifying predicate violation of Wis. Stat. § 100.18, which is an explicitly enumerated predicate offense under Wis. Stat. § 100.264(2).

229. At all times relevant to the late-stage 2022 and 2023 transaction tracks, the target of the Defendants' deceptive trade practices, Dr. Edwards, was an adult resident of the State of Wisconsin who was over 62 years of age, satisfying the absolute statutory definition of an "elderly person" under Wis. Stat. § 100.264(1)(b).

230. Defendants knew or should have known that their predatory rollover solicitations were being perpetrated against an elderly individual under Wis. Stat. § 100.264(2)(a), and their conduct caused Dr. Edwards to suffer a permanent loss of more than 25% of the property set aside

within his traditional retirement account for his personal care and maintenance under Wis. Stat. § 100.264(2)(b)3.

231. Plaintiffs request that this Court impose a supplemental civil forfeiture of $10,000.00 for each separate violation, with restitution paid directly to the estate before any state forfeiture collection pursuant to Wis. Stat. § 100.264(3).

## COUNT XVII

**Unjust Enrichment / Money Had and Received**
**(Against Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited)**
**(Cause of Action is in the Alternative to**
**Counts V through XII)**

232. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

233. Under Wisconsin law, unjust enrichment and money had and received are mirror-image, quasi-contractual remedies governed by a unified three-element test: (1) a benefit was conferred upon the defendant by the plaintiff; (2) the defendant had appreciation or knowledge of the benefit; and (3) the defendant accepted or retained the benefit under circumstances making it inequitable to do so without paying its value.

234. This claim is pled strictly in the alternative to the breach of contract claims (Counts V through XII) should the Court find that no valid express contract governs these non-signatory defendants.

235. By virtue of the wine property assignments managed through Defendant Vintrader, Inc. and the subsequent series cash sweeps, Dr. Edwards conferred a tangible monetary and property benefit exceeding $1,121,401.02 upon Defendants Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited.

236. These defendants maintained actual knowledge and appreciation of the benefits received, as these siphoned investor capital lines and wine assets were absorbed into their corporate accounts to clear holding liabilities and acquire venture assets.

237. These defendants accepted and retained this capital enrichment under circumstances that are inequitable and unfair, resulting in a pattern of swindling at the direct expense of a retirement estate.

238. Plaintiffs are entitled to an equitable decree compelling Defendants Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited to completely disgorge the value of the economic benefits unjustly received, restoring the estate to its former position.

## COUNT XVIII

**Enterprise Liability / Corporate Alter Ego**
**(Against All Defendants)**

239. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein

240. Under the well-settled laws of the State of Delaware and the State of Wisconsin, the corporate veil of limited liability will be completely pierced and disregarded where a corporation or a designated sub-series is structured and operated as a mere shell, instrumentality, and fraudulent alter ego of its controlling principals.

241. At all times relevant, Defendant Cadman Global, LLC and each of its sub-series silos—specifically including Cadman Global, LLC - Series II, Cadman Global, LLC - Series VI, Cadman Global, LLC - Series XX, and Cadman Global, LLC - Series XXI—possessed no independent corporate mind, no distinct capital backing, and no genuine operational autonomy from each other, from Vintrader, Inc., or from their parent holding companies, Cadman Capital Group and Cadman Capital Limited.

242. Defendants Giles Cadman, Mark Trotter, Cadman Capital Management Limited, Cadman Capital Group, Vintrader, Inc. (f/k/a Golden West), Cadman Global, LLC, and its hollow Series Entities operated as a single, unified business enterprise and mutual alter egos, sharing common ownership, management, and commingled assets. Because Defendants failed to maintain separate, GAAP-compliant books and records for Series II, Series VI, Series XX, and Series XXI, and systematically commingled funds across series silos and foreign corporate affiliates, thereby forfeiting any internal series limited liability shield and rendering each Defendant jointly and severally liable for the debts, obligations, and liabilities of the entire enterprise.

243. Defendants Giles Cadman and Mark Trotter exercised complete unity of interest and pervasive dominion over all defendant entities, deploying the multi-layered corporate structure as a single business enterprise to perpetrate securities fraud, breach contractual obligations, and evade statutory compliance.

244. Adhering to the fiction of separate corporate identities and series silo entities would sanction fraud and promote severe injustice, entitling Plaintiffs to an equitable decree piercing the corporate veils horizontally across all entities and vertically to the controlling principals, holding all Defendants jointly, severally, and personally liable across all preceding counts.

**<u>COUNT XIX</u>**

**Civil Conspiracy**
**(Against All Defendants)**

245. Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein

246. Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited formed and operated a civil conspiracy by combining and acting in concert to accomplish an unlawful purpose.

247. Specifically, the Defendants colluded to execute a systemic scheme to defraud Dr. Edwards of his retirement capital through the sale of unregistered, nonperforming securities and the execution of unauthorized capital rollovers.

248. Pursuant to this conspiracy, the Defendants committed numerous wrongful and overt acts.

249. These overt acts include Defendant Trotter soliciting Dr. Edwards within Wisconsin while subject to a permanent regulatory prohibition, Defendant Cadman executing notes for insolvent series entities while concealing his federal securities injunction, and Vintrader, Inc. operating as a captive subsidiary to absorb and comingle investor funds.

250. The Defendants acted jointly to trap Dr. Edwards' principal within successive corporate shells and block his ability to liquidate his accounts.

251. As a direct and proximate result of the wrongful acts committed pursuant to this conspiracy, Plaintiffs suffered severe financial damage. The overt acts of the Defendants caused the total loss of Dr. Edwards' invested capital.

252. Plaintiffs are entitled to judgment against all Defendants, jointly and severally, for all resulting damages in an amount exceeding $1,121,401.02.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, the Estate of Dr. Edwards and the Charles W. Edwards and Mary S. Edwards Irrevocable Living Trust Dated July 6, 1994, respectfully demand judgment against the Defendants, jointly and severally, as follows:

**On the Federal and State Securities Fraud Claims (Counts I, II, and III):**

1. On COUNT I (Federal Securities Fraud under Section 10(b) and Rule 10b-5), entering judgment against Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, Cadman Global, LLC - Series VI, Cadman Global, LLC - Series XX, and Cadman Global, LLC -

Series XXI, jointly and severally, awarding Plaintiffs actual compensatory damages in an amount to be proven at trial, but not less than $1,121,401.02, or alternatively, declaring full statutory rescission of all post-2021 note and subscription containers under Section 29(b) of the Securities Exchange Act of 1934.

2. On COUNT II (Control Person Liability under Section 20(a) of the Exchange Act), finding Defendant Giles Cadman jointly and severally liable with and to the same extent as the primary corporate violators for all economic losses sustained under Count I.

3. On COUNT III (Wisconsin Uniform Securities Law Violations under Wis. Stat. §§ 551.501 and 551.509), entering an order against Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, Cadman Global, LLC - Series VI, Cadman Global, LLC - Series XX, and Cadman Global, LLC - Series XXI, jointly and severally, for full statutory rescission of the total capital deployed within the State of Wisconsin, plus pre-judgment interest at the legal rate under Wis. Stat. § 138.04 from the exact dates of purchase, full statutory court costs, and reasonable actual attorneys' fees pursuant to Wis. Stat. § 551.509.

**On the Common Law Tort and Fiduciary Claims (Counts IV and XIII):**

4. On COUNT IV (Common Law Fraud and Fraudulent Inducement), entering judgment against Defendants Giles Cadman, Mark Trotter, and Cadman Global, LLC, jointly and severally, awarding full compensatory and consequential damages as necessary to make the estate and trust completely whole for all out-of-pocket and indirect portfolio losses suffered as a result of Defendants' material misrepresentations and omissions, in an amount exceeding $1,121,401.02.

5. On COUNT XIII (Breach of Fiduciary Duty), entering judgment against Defendants Giles Cadman, Mark Trotter, and Cadman Global, LLC, jointly and severally, awarding extensive compensatory and restitutionary damages for their intentional disloyalty, bad-faith self-dealing, and conversion of specialized alternative assets, in an amount exceeding $1,121,401.02.

**On the Breach of Contract Claims (Counts V through XII) Pled Alternately to Count XVII:**

6. On the Breach of Contract counts (COUNT V through COUNT XII), or, in the alternative to COUNT XVII should the Court find that a valid, enforceable contract does not exist or govern the subject matter of these transactions, awarding Plaintiffs full contractual recovery and expectation damages under the benefit of the bargain standard against the respective contracting Defendants—namely, against Defendant Cadman Global, LLC and Giles Cadman on COUNT V; against Defendants Cadman Global, LLC and Cadman Global, LLC - Series II on COUNT VI; against Defendants Cadman Global, LLC and

Cadman Global, LLC - Series VI on COUNTS VII, VIII, IX, and XI; against Defendants Cadman Global, LLC and Cadman Global, LLC - Series XXI on COUNT X; and against Defendants Cadman Global, LLC and Cadman Global, LLC - Series XX on COUNT XII—and, through the application of COUNT XVIII, jointly, severally, and personally against all Defendants under doctrines of enterprise liability and corporate alter ego, in an amount sufficient to place Plaintiffs in the position they would have occupied had each underlying agreement and promissory note been fully performed, including all unpaid principal balances, accrued regular and default interest yields, late fees, and reasonable collection costs and attorneys' fees as provided under the express terms of each contract.

**On the Statutory Consumer Protection and Theft Claims (Counts XIV, XV, and XVI):**

7. On COUNT XIV (Statutory Civil Theft under Wis. Stat. §§ 895.446 and 943.20), entering judgment against Defendants Giles Cadman, Mark Trotter, Vintrader, Inc., Cadman Global, LLC, Cadman Capital Group, and Cadman Capital Limited, jointly and severally, awarding actual damages for the intentional embezzlement and conversion of identifiable escrow funds and wine allocations, all costs of investigation and litigation, and exemplary damages equal to three times the actual damages sustained by Plaintiffs pursuant to Wis. Stat. § 895.446(3)(c).

8. On COUNT XV (Wisconsin Deceptive Trade Practices Act under Wis. Stat. § 100.18), entering judgment against Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, and Vintrader, Inc., jointly and severally, awarding full pecuniary losses flowing directly and consequentially from deceptive marketing materials and offering circulars, plus all statutory costs and actual, reasonable attorneys' fees pursuant to Wis. Stat. § 100.18(11)(b)2.

9. On COUNT XVI (Supplemental Civil Forfeiture for Exploitation of the Elderly under Wis. Stat. § 100.264), imposing a supplemental civil forfeiture against Defendants Giles Cadman, Mark Trotter, Cadman Global, LLC, and Vintrader, Inc. of $10,000.00 for each separate consumer protection violation perpetrated against a protected elderly individual, with restitution paid directly to the estate before any state forfeiture collection pursuant to Wis. Stat. § 100.264(3).

**On the Equitable Restitution Claim (Count XVII) Pled Alternatively to Counts V through XII:**

10. On COUNT XVII (Unjust Enrichment / Money Had and Received), pled strictly in the alternative to the Breach of Contract claims (Counts V through XII) should the Court find that no valid express contract governs these non-signatory defendants, entering an equitable decree compelling Defendants Vintrader, Inc., Cadman Capital Group, and

Cadman Capital Limited to completely disgorge and remit to the trust estate all siphoned cash, wine property, and economic benefits that they unjustly appreciated and retained, in an amount exceeding $1,121,401.02.

**On the Enterprise Liability, Veil Piercing, and Civil Conspiracy Claims (Count XVIII and XIX):**

11. On COUNT XVIII (Enterprise Liability, Corporate Alter Ego, and Horizontal Veil Piercing), entering a binding judicial declaration that Cadman Global, LLC, Cadman Global, LLC - Series II, Cadman Global, LLC - Series VI, Cadman Global, LLC - Series XX, Cadman Global, LLC - Series XXI, Vintrader, Inc., Cadman Capital Group, and Cadman Capital Limited functioned as a single business enterprise and the mere alter egos of one another and of Giles Cadman and Mark Trotter, thereby horizontally and vertically piercing all corporate veils to declare that all Defendants are jointly, severally, and personally liable across all preceding counts and judgments entered herein.

12. On COUNT XIX (Civil Conspiracy) entering judgment against all Defendants, jointly and severally, awarding Plaintiffs full compensatory and consequential damages for all financial losses sustained as a direct and proximate result of the concerted scheme and overt wrongful acts executed by the Defendants, in an amount to be proven at trial but not less than $1,121,401.02.

**On All Counts Generally:**

13. Awarding Plaintiffs' pre-judgment and post-judgment interest at the maximum legal rate, all allowable statutory costs and formal disbursements, and such other and further legal or equitable relief as this Court deems just, equitable, and proper.

## JURY DEMAND

THE PLAINTIFFS HEREBY DEMAND A TRIAL BY A JURY OF TWELVE (12) ON ALL ACTIONS AND ISSUES SO TRIABLE.

Dated this 9th day of October, 2026.

Respectfully submitted,
HALLING & CAYO, S.C.
Attorneys for the Plaintiffs

By: *Electronically signed by*
*Sean M. Sweeney / David Seth Hill*
Sean M. Sweeney
State Bar No. 1063452
David Seth Hill
State Bar No. 1081356

320 E. Buffalo Street, Suite 700
Milwaukee, WI 53202
Telephone: (414) 271-3400
Facsimile: (414) 271-3841
sms@hallingcayo.com
dsh@hallingcayo.com

# EXHIBIT A

# Caribbean Sustainable Fisheries, Corporation

## SUBSCRIPTION AGREEMENT FOR NOTES

The offering of Notes described herein have not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or other jurisdiction, nor is such registration contemplated. The Notes will be offered and sold under the exemption provided by Section 4(2) of the Securities Act, Regulation D promulgated under the Securities Act and other exemptions of similar import in the laws of the states and other jurisdictions where the offering will be made. Accordingly, these Notes will be sold only to those investors that meet certain minimum suitability qualifications set forth herein.

The distribution of this Subscription Agreement and the offer and sale of the Notes in certain jurisdictions may be restricted by law. This Subscription Agreement does not constitute an offer to sell or the solicitation of an offer to buy any securities in any state or other jurisdiction where such offer, sale or solicitation is unlawful or unauthorized. The Notes described herein are offered subject to the right of the Directors, on behalf of Caribbean Sustainable Fisheries, Corp., to reject any subscription in whole or in part.

Each acquirer of a Note must be prepared to bear the economic risk of an investment for an indefinite period of time and is encouraged to seek independent legal, accounting, investment and tax advice.

# CARIBBEAN SUSTAINABLE FISHERIES, CORPORATION

## SUBSCRIPTION INSTRUCTIONS

In order to subscribe to Notes issued by Caribbean Sustainable Fisheries, Corp. (the "Company"), a prospective investor must complete and execute a subscription agreement (the "Subscription Agreement") and the investor questionnaire (the "Investor Questionnaire"), collectively referred to, as the subscription documents ("Subscription Documents"), in accordance with these instructions. Each prospective investor must sign his/her name exactly the same way in each applicable signature block. For purposes of the applicable Subscription Documents, the investor (the "Investor") is the person or entity for whose account the Note or Notes are being purchased. A person with investment authority may execute the Subscription Documents on behalf of the Investor, but should indicate the capacity in which it is doing so and the name of the Investor. Once completed the Subscription Documents should be returned to the Company at:

c/o Venulum Ltd. P.O. Box 765
4th Floor Rodus Building, Road Reef Plaza,
Tortola, British Virgin Islands
Tel +1 (416) 640-5411 Fax +1 (416) 640-5412
Attn: Graham Sedgwick

Subscriptions from suitable prospective Investors will be accepted in the sole discretion of the Company's Directors after receipt of the fully completed and executed Subscription Documents. If a prospective Investor has any questions concerning the completion of any of the Subscription Documents, please contact the Company's Director at the above-referenced phone number.

**I. Subscription Agreement:**

A. Fill in the amount of the Investor's capital commitment on the signature page.

B. Date, print the name of the Investor and sign the signature page where indicated.

C. Complete the appropriate acknowledgment form.

**II. Investor Questionnaire**

A. In Section A, the Investor should fill in its name, address, tax identification or social security number (if applicable), telephone and facsimile numbers, and electronic mail address and provide all other requested information.

B. The Investor should check the appropriate category or categories in Section B under which the Investor qualifies as an "accredited investor" pursuant to the United States Securities Act of 1933, as amended.

C. Entities (including grantor trusts) should provide the information and respond to the questions in Section C. Natural persons and grantor trusts should provide the information requested in Section D.

D. The Investor should check the appropriate category or categories in Section E under which the Investor qualifies as a "qualified purchaser" pursuant to the United States Investment Company Act of 1940, as amended.

E. The Investor should check the appropriate category or categories in Section F under which the Investor qualifies as a "qualified client" pursuant to the United States Investment Advisers Act of 1940, as amended.

F. The Investor should respond to the questions and provide the information requested in Sections G, H, I, and J.

G. Print the name of the Investor and sign on the signature page to the Investor Questionnaire.

## SUBSCRIPTION AGREEMENT

1. **Subscription.** The undersigned Investor (the "Investor"), desiring to purchase a Note or Notes issued by Caribbean Sustainable Fisheries, Corp. a company formed under the laws of the The British Virgin Islands (the "Company"), hereby subscribes for and agrees to purchase a Note or Notes in the Company with a capital commitment in the amount accepted by the Company as set forth on the signature page below, which amount may be less (but not more) than the amount so indicated by the Investor. The Investor acknowledges that this subscription (i) is irrevocable, and (ii) is conditioned upon acceptance by the Company and may be accepted or rejected in whole or in part by the Company in its sole discretion. The Investor agrees to be bound by the terms of the Note issued by the Company.

2. **Representations, Warranties and Covenants of the Investor.** The Investor represents and warrants as follows:

a. The Investor has been furnished and has read (i) the Confidential First Amended and Restated Private Placement Memorandum dated November 1, 2012 relating to the Company together with all supplements thereto (the "Memorandum"), and (ii) the Note. The Investor is familiar with and understands the Memorandum and the Note, including the risk factors and other considerations set forth in the Memorandum under the captions "Certain Risk Factors" and "Conflicts of Interest."

b. The Investor has been afforded an opportunity to ask questions of representatives of the Company relating to the Company, the offering of the Note or any statement in the Memorandum, and has received answers to such questions that are fully satisfactory. The Investor has obtained from the Company any and all information requested by the Investor to verify the accuracy of the information furnished to the Investor regarding the Company or the offering of the Note or Notes.

c. The Investor is not relying on the Company or any of its representatives for legal, accounting, investment or tax advice. The Investor has sought independent legal, accounting, investment and tax advice to the extent the Investor has deemed necessary or appropriate in connection with the decision to invest in the Note or Notes, and on that basis believes that an investment in the Note or Notes is suitable and appropriate for the Investor. The Investor acknowledges that neither the Company nor any of its respective agents, representatives or affiliates, is acting as an investment adviser to the Investor in connection with the offering of the Note or Notes.

d. The Investor has such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued Note or Notes, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Note or Notes. The Investor can bear the economic risk of holding the Note or Notes for an indefinite period, and the Investor can afford to suffer the complete loss of its investment in the Note or Notes.

e. In connection with its investment in the Note or Notes, the Investor has not relied upon any representations, warranties or agreements other than those set forth in this Subscription Agreement, the Memorandum and any side letter between the Investor and the Company entered into in connection with the Investor's investment.

f. The Note or Notes being acquired will be governed by the terms and conditions of the Note, which the Investor accepts and by which the Investor agrees to be legally bound.

g. The Note or Notes being acquired will be acquired for the Investor's own account for investment purposes only without a view to public distribution or resale. The Investor has no contract, undertaking, agreement or arrangement to sell, pledge, assign or otherwise transfer or dispose of any Note or Notes or any portion thereof to any other person or entity.

h. All information that the Investor has provided to the Company, including the information in the Investor Questionnaire attached hereto or previously provided to the Company, is true, correct and complete as of the date hereof and will be true upon acceptance of this subscription. The Investor agrees to notify the Company promptly in the event that any such information shall cease to be true, correct and complete.

i. The Investor understands that the Note or Notes have not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state thereof, or of any country or jurisdiction, nor is any such registration contemplated. The Investor understands and agrees that the Note or Notes may not be offered, resold, pledged or otherwise transferred unless they are registered under the Securities Act and any applicable state or other securities laws or unless an exemption from such registration is available, and the Company does not intend to take any action (including the filing of reports or the publication of information as required by Rule 144 under the Securities Act) which would make available any exemption from the registration requirements of any such laws. In addition, the Note or Notes are subject to substantial restrictions on transfer as described in the Notes. The Investor further understands that legends stating that the Note or Notes have not been registered under the Securities Act and any applicable state or other securities laws and setting out or referring to the restrictions on transferability and resale of the Note or Notes will be placed on all documents evidencing the Note or Notes.

j. The Investor understands that the Company will not be registered as an investment company under the Investment Company Act of 1940, as amended.

k. The Investor acknowledges that there is not a public market for the Note or Notes and that no such market is expected to develop; consequently, it may not be possible for the Investor to liquidate its investment in the Note or Notes. The Investor's capital commitment to the Company and other investments that are not readily marketable are not disproportionate to the Investor's net worth, and the Investor has no need for immediate liquidity in the Investor's investment in the Note or Notes.

l. It the Investor is an entity, (i) the Investor is duly formed, validly existing and in good standing under the laws of its jurisdiction of organization; (ii) the Investor has the power and authority to execute and deliver this Subscription Agreement and each of the other Subscription Documents and instruments executed and delivered by the Investor in connection with its investment in the Note or Notes; (iii) the execution and delivery of each of the Subscription Documents, the performance of the Investor's obligations thereunder, and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate or other action on the Investor's behalf; (iv) each of the Subscription Documents has been duly executed and delivered by a person so authorized; and (v) the Subscription Documents to which the Investor is a party are the Investor's legal, valid and binding obligations, enforceable against the Investor in accordance with their respective terms.

m. If the Investor is an individual, the Investor has all requisite legal capacity (i) to acquire and hold the Note or Notes, (ii) to execute and deliver the Subscription Documents, and (iii) to perform his or her obligations under the Subscriptions Documents.

n. The execution and delivery of the Subscription Documents, the consummation of the transactions contemplated thereby, and the performance by the Investor of its obligations thereunder do not and will not conflict with, or result in any violation of or default under, any provision of any agreement or other instrument to which the Investor is a party or by which the Investor or any of its properties are bound, or any permit, franchise, judgment, decree, statute, order, rule or regulation applicable to the Investor or to the Investor's business or properties, or (if the Investor is not a natural person), any certificate of incorporation, bylaws, memorandum and articles of association, trust agreement, partnership agreement or other organizational or governing instrument applicable to the Investor.

o. All material consents, approvals, orders or authorization of or registrations, declarations or filings with, or other actions with respect to or by, any governmental authorities or other third parties that are required in connection with the valid execution, delivery and performance by the Investor of the Subscription Documents have been obtained and are in full force and effect.

p. If the Investor is, or is acting on behalf of, a Plan (as defined below) which is subject to Title I of the United States Employee Retirement Income Security Act of 1974, as amended ("ERISA"), Section 4975 of the United States Internal Revenue Code of 1986, as amended (the "Code"), or any provisions of any federal, state, local, non-U.S. or other laws or regulations that are similar to those provisions contained in such portions of ERISA or the Code (collectively, "Other Plan Laws"): (i) the decision to invest in the Company was made by a fiduciary (within the meaning of Section 3(21) of ERISA and the regulations thereunder, or as defined under applicable Other Plan Laws) of the Plan which is unrelated to the Company or any of its employees, representatives or affiliates and which is duly authorized to make such an investment decision on behalf of the Plan (the "Plan Fiduciary"); (ii) the Plan Fiduciary has taken into consideration its fiduciary duties under ERISA or any applicable Other Plan Law, including the diversification requirements of Section 404(a)(1)(C) or ERISA (if applicable), in authorizing the Plan's investment is prudent; (iii) the Plan's subscription to invest in the Partnership and the purchase of the Note or Notes contemplated thereby is in accordance with the terms of the Plan's governing instruments and complies with all applicable requirements of ERISA, the Code and all applicable Other Plan Laws and does not constitute a non-exempt prohibited transaction under ERISA or Section 4975 of the Code or a similar violation under any applicable Other Plan Laws; and (iv) the Plan Fiduciary acknowledges and agrees that neither the Company nor any its employees, representatives or affiliates will be a fiduciary with respect to the Plan as a result of the Plan's investment in the Company, pursuant to the provisions of ERISA or any applicable Other Plan Laws, or otherwise, and the Plan Fiduciary has not relied on, and is not relying on, the investment advice of any such person with respect to the Plan's investment in the Company. "Plan" includes (a) an employee benefit plan (within the meaning of Section 3(3) of ERISA), whether or not such plan is subject to Title I or ERISA; (b) a plan, individual retirement

account or other arrangement that is described in Section 4975 of the Code; (c) an insurance company using general account assets, is such general account assets are deemed to include assets of any of the foregoing types of plans, accounts or arrangements, for the purposes of Title I of ERISA or Section 4975 of the Code, under Section 401(c) of ERISA or the regulations promulgated thereunder; and, (d) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements, pursuant to ERISA or otherwise. In addition, if the Investor is (directly or indirectly) investing the assets of a Plan which is not subject to Title I of ERISA or Section 4975 of the Code but is subject to any other federal, state, local, non-U.S. or other laws or regulations that could cause the underlying assets of the Company to be treated as assets of the Plan by virtue of its investment in the Company and thereby subject the Company, its manager or its investment manager (or other persons or entities responsible for the investment operation of the Company's assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transactions provisions contained in Title I of ERISA or Section 4975 of the Code ("Similar Laws"), the Plan Fiduciary acknowledges and agrees that the Company's assets will not constitute the assets of such Plan under the provisions of any applicable Similar Law.

q. The Investor was offered the Note or Notes through private negotiations, not through any general solicitation or general advertising. The Investor was offered the Note or Notes in the state indicated by the Investor in the Investor Questionnaire and intends that the securities laws of that state govern the Investor's subscription.

r. The Investor understands that no securities commission or authority has approved or disapproved the Note or Notes, passed upon or endorsed the merits of this offering or the accuracy or adequacy of the Memorandum, or made any finding or determination as to the fairness of the Note or Notes for public investment.

s. The Investor acknowledges that, pursuant to applicable anti-money laundering laws and regulations to which the Company, its manager and its investment manager may be subject, the Company may be required to collect further documentation verifying the Investor's identity and the source of funds used to purchase the Note or Notes before, and from time to time after, acceptance of the Investor's subscription. The Investor agrees to provide the Company any information as the Company determines to be necessary or appropriate to comply with applicable anti-money laundering laws and regulations of any jurisdiction.

t. The Investor understands that the Note or Notes are being offered and sold in reliance on specific exemptions from the registration requirements of federal and state laws and that the Company is relying upon the truth and accuracy of the representations, warranties, agreements, acknowledgements and understandings set forth herein in order to determine the suitability of the Investor to acquire the Note or Notes.

u. The Investor agrees to furnish the Company with any information, representations and forms (including IRS Form 8821, which authorizes the Company to request from the Internal Revenue Service proof that the Investor has filed a U.S. federal tax return in order to enable the

Company to claim benefits under certain tax treaties) as shall reasonably be requested from time to time to assist it in (i) complying with any applicable law or tax requirements, or (ii) determining the extent of , and in fulfilling, its withholding obligations. The Investor agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist in obtaining any exemption, reduction, or refund of any withholding or other taxes imposed by any taxing authority or other governmental authority upon the Company with a completed and executed Form W-9 or an applicable Form W-8 as appropriate, and agrees to furnish the Company with such Form upon expiration of any prior Form or upon request.

v. The Investor understands and acknowledges that Morgan Adler represents only the Company and its affiliated entities, and not the Investor or any other shareholder or potential shareholder of the Company, in connection with the offer and sale of the Note or Notes.

w. The Investor agrees that, if the Investor is acquiring the Interests in a fiduciary capacity, (i) the above representations, warranties, agreements, acknowledgements and understandings shall be deemed to have been made on behalf of the person or persons for whose benefit such Note or Notes are being acquired, and (ii) such further information as the Company deems appropriate shall be furnished regarding such person or persons.

x. The Investor agrees that the Company may present the information contained herein to such persons as it deems appropriate if called upon to verify the information provided or to establish the availability of an exemption from registration under Section 4(2) of the Securities Act, Regulation D promulgated under the Securities Act or any state or other securities statutes or regulations or if the contents are relevant to any issue in any action, suit, investigation, or proceeding to which the Company or an affiliate of the Company involved in the offering of the Interest may be a party.

3, **Representations and Warranties of the Company.** The Company represents and warrants as follows:

a. (i) The Company is duly formed, validly existing and in good standing under the laws of the British Virgin Islands; (ii) the Company has the power and authority to execute and deliver the Subscription Documents to which it is a party; (iii) the execution and delivery of each of the Subscription Documents, the performance of the Company's obligations thereunder, and the consummation of the transactions contemplated thereby have been duly authorized by all necessary action on the Company's behalf; (iv) each of the Subscription Documents has been duly executed and delivered by a person so authorized; and (v) the Subscription Documents to which the Company is a party are the Company's legal, valid and binding obligations, enforceable against the Company in accordance with their respective terms.

b. The execution and delivery of the Subscription Documents, the consummation of the transactions contemplated thereby, and the performance by the Company of its obligations thereunder do not, and will not, conflict with, or result in any violation of or default under, any

provision of any agreement or other instrument to which the Company is a party or by which the Company or any of its properties are bound, or any permit, franchise, judgment, decree, statute, order, rule or regulation applicable to the Company or the Company's business or properties, or the Operating Agreement of the Company.

c. Neither the Company nor anyone acting on its behalf has taken or will take any action that would subject the offer, issuance and sale of the Note or Notes to the registration requirements of the Securities Act.

4. **Indemnity.** The Investor understands that the information provided herein will be relied upon by the Company and its manager for the purpose of determining the eligibility of the Investor to purchase the Note or Notes. The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase the Note or Notes. To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Company, its agents and representatives from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in the Subscription Agreement (including the Investor Questionnaire attached hereto) or in any other document provided by the Investor to the Company or in any of the Subscription Documents executed by the Investor with the Company or its agents and representatives in connection with the Investor's investment in the Note or Notes. Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under the Note or Notes or applicable securities laws.

5. **USA Patriot Act.**

a. The Investor understands that (i) the Company will ask for the Investor's name, address, date of birth (for individuals) and an identification number such as a taxpayer identification number; (ii) the Company may ask the Investor to provide identifying documents, such as a passport, a driver's license, certified articles of incorporation, a government-issued business license, or a partnership or trust agreement, so that the Company may verify the Investor's identity; and (iii) the Company may screen the Investor's name against various databases to verify the Investor's identity.

b. Federal regulations and Executive Orders administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals[1] The list of OFAC prohibited countries, territories, persons, and entities can be found on the OFAC website at www.treas.gov/ofac. In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

in certain countries regardless of whether such individuals or entities appear on the OFAC lists. The Investor should check the OFAC website before making the following representations:

(i) The Investor represents that the amounts contributed by it to the Company were not, are not and will not be directly or indirectly derived from activities that may contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.

(ii) The Investor represents and warrants that, to the best of its knowledge, none of:

(A) the Investor;
(B) any person controlling or controlled by the Investor;
(C) if the Investor is a privately held entity, any person having a beneficial interest in the Investor; or
(D) any person for whom the Investor is acting as agent or nominee in connection with this investment (clauses (B) through (D) collectively, the "Related Person"),

is a country, territory, individual or entity named on an OFAC list, nor is a person or entity prohibited under the OFAC Programs.

The Investor acknowledges that the Company shall not be obligated to accept any amounts from a prospective Investor if such prospective Investor cannot make the representations set forth in the preceding paragraph. If an existing Investor cannot make these representations, the Company may require the withdrawal of the Investor's Interest.

(iii) The Investor acknowledges and agrees that any distribution to it will be paid to the account specified in Section A of the Investor Questionnaire, which will be the same account from which payments will be made by the Investor to the Company, unless the Company agrees otherwise.

(iv) If the Investor or beneficial owner of the investment in the Note or Notes in a non-U.S. banking institution (a "Foreign Bank"), the Investor represents and warrants to the Company that it is not a prohibited "shell bank" as defined by the USA Patriot Act Regulations.

(v) Except as otherwise indicated in response to Questions 12 through 14 in Section A of the Investor Questionnaire, the Investor represents and warrants that (A) it is not (x) a politically exposed person (a "PEP"),[2] (y) an immediate family member[3] of a PEP, or

[2] A "politically exposed person" is defined as a current or former senior official in the executive, legislative, administrative, military or judicial branches of a government (whether elected or not), a senior official of a major political party, or a senior executive of a government-owned corporation. In addition, a "politically exposed

(z) a close associate[4] of a PEP as such terms are defined in the footnotes below, and (B) either each Related Person does not meet the criteria of clauses (x), (y) and (z) above or the Investor has performed enhanced due diligence on any Related Person that does not meet the criteria of clauses (x), (y) and (z) above, and (C) the Investor has determined that the funds being invested by the Investor in the Company do not come from corruption.

(vi) The Investor represents and warrants that the Investor (i) has conducted thorough due diligence with respect to all of its beneficial owners, (ii) has established the identities of all beneficial owners and the source of each of the beneficial owner's funds and (iii) will retain evidence of any such identities, any such source of funds and any such due diligence. The Investor further represents that the Investor does not know or have reason to suspect (x) the monies used to fund the Investor's investment in the Note or Notes have been or will be derived from or related to any illegal activities, including but not limited to, money laundering activities, and (y) the proceeds from the Investor's investment in the Note or Notes will be used to finance any illegal activities.

c. The Investor agrees to notify the Company promptly should the Investor become aware of any change in the information set forth in these representations. The Investor acknowledges that, by law, the Company may be obligated to "freeze the account" of such Investor, either by prohibiting additional investments from the Investor, declining any withdrawal requests and/or segregating the assets in the account in compliance with governmental regulations, and the Company may also be required to report such action and any transactions that raise suspicions of money laundering or OFAC violations and to disclose the Investor's identity to OFAC. The Investor further acknowledges that the Company may, by written notice to the Investor, suspend the payment of withdrawal proceeds to such Investor or take such other actions as are permitted by applicable law if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company and any of its affiliates.

6. **Miscellaneous.** Neither this Subscription Agreement nor any of the Investor's rights or Note or Notes herein or hereunder is transferable or assignable by the Investor without the prior written consent of the Company, which may be granted or withheld in the Company's sole discretion. The representations, warranties, covenants, agreements and confirmations made by the Investor in this Subscription Agreement (including the Investor Questionnaire) shall survive the closing of the transactions contemplated

person" includes any corporation, business or other entity that has been formed by, or for the benefit of, a political figure.

[3] "Immediate family member" of a PEP typically includes the figure's parents, siblings, spouse, children and in-laws.

[4] A "close associate" of a PEP is a person who is widely and publicly known to maintain an unusually close relationship with the PEP, and includes a person who is in a position to conduct substantial financial transactions on behalf of the PEP.

hereby and any investigation made by the Company. The Investor Questionnaire, including without limitation, the representations and warranties contained therein, is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein. This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed and interpreted in accordance with the laws of the British Virgin Islands, without regard to conflicts of law principles. Any action or proceeding against the parties relating in any way to this Subscription Agreement or the Subscription Document may be brought and enforced in the state courts of the British Virgin Islands, to the extent subject matter jurisdiction exists therein, and the parties irrevocably submit to the nonexclusive jurisdiction of this court in respect to any action or proceeding; provided that, with regard to any actions brought against the Company, its employees or affiliates, such jurisdiction shall be exclusive unless otherwise expressly agreed to in writing by the Company.

7. **Amendments and Waiver.** The Subscription Agreement may be amended and the observance of any provision hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Investor and the Company.

[Remainder of page left intentionally blank]

**IN WITNESS WHEREOF,** the undersigned has duly executed this Subscription Agreement as of the date set forth below, and this Subscription Agreement shall be a binding agreement between the Company and the Investor as of the date below indicated.

Date: Feb. 13, 2013

Amount of Capital Commitment: $ 10,000

Individual Investor

Charles W. Edwards
(Signature)

Charles W. Edwards
(Print Name)

Joint Account Investor (if applicable):

______________________________
(Signature)

______________________________
(Print Name)

Partnership, Corporation, Limited Liability Company, Trust, Custodial Account, Other Investor:

________________________________________

(Print Name of Entity)

By: ________________________________________

________________________________________

(Print Name and Title)

**ACCEPTANCE OF SUBSCRIPTION**
(to be completed by the Company)

The Company hereby accepts the subscription for Note or Notes on behalf of the Company.

CARIBBEAN SUSTAINABLE FISHERIES, CORP.

Amount of Capital Commitment Accepted:

By: Ghanchi Faisal

$10,000/-

Faisal Ghanchi
Authorized Signatory
(Print Name and Title)

Feb 19, 2013
(Date)

# EXHIBIT B

## CADMAN GLOBAL, LLC

### SERIES II SUPPLEMENT TO FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT AND CLASS B MEMBER SIGNATURE PAGE
**("Supplement to Operating Agreement")**

1. <u>Formation of Series.</u> The Managing Member pursuant to Sections 1.2 and 1.4 of the Fourth Amended and Restated Limited Liability Company Agreement of Cadman Global, LLC (the "Operating Agreement") has caused Cadman Global, LLC (the "Company") to establish Series II as evidenced by the formation certificate dated June 29, 2012.

2. <u>Business of Series.</u> Series II is a vehicle that will reinvest the investment of the Series II Members into assets as described in the "Segregated Portfolio II Investment Objective and Investment Strategy" section of the Fifth Amended and Restated Confidential Private Placement Memorandum ("PPM") and the Portfolio Supplement Cadman Global, LLC Series II ("Portfolio Supplement").

3. <u>Lockup Period of Series.</u> The membership interests of the Company issued to the Class B Member related to Series II are subject to a mandatory lockup period that shall begin from the Company's receipt of the Contribution of the Class B Member for a period of twenty-four (24) months thereafter (the "Initial Lockup Period"). During the Initial Lockup Period, the Class B Member has no right to redeem its Class B Interests related to Series II and no right or claim to the assets or property of Series II, unless otherwise agreed to in writing and executed by both the Managing Member and the Class B Member.

After the Initial Lockup Period, the Class B Member may elect to redeem its membership interests of the Company in accordance with Section 10.2 of the Operating Agreement upon the payment of the redemption fees that are based upon the holding period of the Class B Member of the Class B Interests related to Series II. After the Initial Lockup Period and through the thirty-sixth (36) month, the Class B Interests may be redeemed upon the payment of a redemption fee of twenty percent (20%); for months thirty-seven (37) through forty-eight (48), the redemption fee is fifteen percent (15%); for months forty-nine (49) through sixty (60), the redemption fee is ten percent (10%); for months sixty-one (61) through seventy-two (72), the redemption fee is five percent (5%); and for any redemptions thereafter no redemption fee will be chargeable to the Class B Member. The redemption fee will be based upon the aggregate Net Asset Value of the membership interests of the Company related to Series II as calculated pursuant to the Operating Agreement.

NOW THEREFORE, in witness of the acceptance of the terms and conditions of the Fourth Amended and Restated Operating Agreement of Cadman Global, LLC by the Class B Member, the parties, by themselves or by their duly authorized representatives, have duly executed and dated this Supplement to Operating Agreement as evidenced below:

**MANAGING MEMBER:**

Cadman Capital Management Limited

By:______________________

Name: Giles D. Cadman

Title: Director

Dated: October 26th, 2017

**CLASS B MEMBER:**

Charles Edwards, Individually

By: Charles W. Edwards

Dated: Sept. 27, 2017

# EXHIBIT C

Mary S. Edwards

Promissory Note
8-27-2022

Personal Loan
not IRA
checks will be mailed
to me

CADMAN GLOBAL

# UNSECURED PROMISSORY NOTE

BY AND BETWEEN

SERIES VI OF CADMAN GLOBAL, LLC,
A DELAWARE SERIES LIMITED LIABILITY COMPANY

AND

Charles W. Edwards

Cadman Global, LLC Initials: ________ Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

Mary S. Edwards

NEITHER CADMAN GLOBAL, LLC, SERIES VI (THE "BORROWER") NOR THE PROMISSORY NOTES OF THE BORROWER (THE "NOTES") DESCRIBED HEREIN AND IN THE MEMORANDUM (AS DEFINED HEREIN) HAVE BEEN OR WILL BE REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF THE UNITED STATES ("U.S.") OR ANY OTHER JURISDICTION. THIS NOTE SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOTES, NOR SHALL THERE BE ANY SALE OF IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. THE DIRECT OR INDIRECT OWNERSHIP OF NOTES BY "NON-ELIGIBLE PERSONS," AS DEFINED IN THE MEMORANDUM, IS PROHIBITED EXCEPT IN ACCORDANCE THEREWITH.

THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND OTHERWISE IN ACCORDANCE WITH THE MEMORANDUM. EACH LENDER WILL BE REQUIRED TO REPRESENT THAT IT IS ACQUIRING THE NOTES PURCHASED BY IT FOR INVESTMENT AND NOT WITH A VIEW TO RESALE OR DISTRIBUTION. THERE IS NO PUBLIC MARKET FOR THE NOTES AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.

Cadman Global, LLC Initials: ________ Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

Mary S. Edwards

**PROMISSORY NOTE**

USD $25,407.33

Dated: 5-26-2020

1. FOR VALUE RECEIVED, SERIES VI OF CADMAN GLOBAL, LLC, series of a series limited liability company that is an entity in good standing under the laws of the State of Delaware (the "Borrower"), hereby promises to pay to Charles W. Edwards, having an address of 3939 Monona Dr. #302 Monona Wi 53716 (the "Lender"), on or before the Maturity Date (hereinafter defined), in lawful money of the United States of America, the principal sum of TWENTY FIVE THOUSAND, FOUR HUNDRED AND SEVEN DOLLARS 33/100 USD ($25,407.33) (the "Principal Amount"), together with interest on the Principal Amount from the Commencement Date of this Note to maturity, (the agreed relevant rate as specified in Exhibit A on the unpaid Principal Amount ), payable as set forth in paragraph 3.

2. This unsecured promissory note (the "Note") evidences the obligation to make repayment of a loan or loans (collectively, the "Loan") of the Principal Amount made by the Lender to the Borrower pursuant to this Note.

3. The Principal Amount, together with any interest accrued thereon shall be due and payable, by way of cheque, wire transfer or as otherwise agreed to, in accordance with Exhibit A over the TWENTY FOUR (24) month term in the total amount of TWENTY EIGHT THOUSAND, FOUR HUNDRED AND FIFTY TWO DOLLARS 62/100 USD ($28,452.62). The payment or payments shall be due and payable in accordance with Exhibit A on or before 1st of July, 2022 ("Maturity Date"). Unless expressly prohibited under Exhibit A, the Principal Amount may be prepaid, in whole or in part, at anytime in the sole discretion of the Borrower, together with all accrued but unpaid interest due thereon. There shall be no prepayment penalty or other payment required in connection with the prepayment of amounts owing under this Note.

4. The Lender agrees that, in the event of the occurrence of either of the Events of Default specified under paragraphs 6(b) and 6(c) (each an "Insolvency Event"), the repayment of the Principal Amount and all interest and other existing obligations under this Note (the "Note Obligations") shall thereupon become subordinated in right of payment to all obligations owed by the Borrower under any secured loan (the "Senior Debt") provided always that, and for the avoidance of doubt, repayment of the Note Obligations shall thereafter be made in priority to any distributions or other payments that may be due or owing to any member having an economic interest in the Borrower. The Lender further agrees that following an Insolvency Event: (1) it will not demand or receive from the Borrower (and Borrower will not pay to Lender) all or any part of the Note Obligations, by way of payment, prepayment, setoff, lawsuit or otherwise, and (2) it will not exercise any remedy with respect to the Note Obligations, accelerate the Note

Cadman Global, LLC Initials: [signature] Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

Obligations, or commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against the Borrower, until such time any Senior Debt is paid in full (or the repayment of the Senior Debt is otherwise waived and the agreements related thereto are terminated).

5. The Lender has reviewed all financial and non-financial information necessary to make an informed decision regarding this Note, including the Borrower's Third Amended and Restated Information Memorandum, as it may be further amended, restated and/or supplemented from time to time (the "Memorandum"), the Portfolio Supplement for Cadman Global, LLC, Series VI and other documents related to entering into this Note (collectively, the "Offering Documents") and has been afforded the opportunity to ask questions and receive answers concerning the Lender's credit decision.

6. The occurrence of any one or more of the following events with respect to the Borrower shall constitute an event of default hereunder ("Event of Default"):

(a) If the Borrower shall fail to pay when due any payment of principal or interest on this Note and does not subsequently pay the same within twenty-eight (28) calendar days' written notice thereof from the Lender.

(b) If, pursuant to or within the meaning of the bankruptcy law or the solvency laws of any applicable jurisdiction (a "Bankruptcy Law"), the Borrower shall (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official; (iv) make an assignment for the benefit of his creditors; or (v) admit in writing its inability to pay its debts as they become due.

(c) If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for the Borrower or substantially all of the Borrower's properties, or (iii) orders the liquidation of the Borrower, and in each case the order or decree is not dismissed within 90 days.

(d) If the Borrower shall fail to comply with its undertaking in paragraph 3 or Exhibit A of this Note.

7. No direct or indirect shareholder or other Affiliate (as defined below) of the Borrower shall have any liability for payment of the Note Obligations, interest thereon, or any other costs, expenses, or other charges due to the Lender as provided by this Note and, in the event of any Event of Default, the Lender's sole recourse shall be against the Borrower. For the purposes of this paragraph 7:

Cadman Global, LLC Initials: [signature] Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

(a) "Affiliate" shall mean any Senior Employee, director or Relevant Shareholder of any member of the Group and any person who is connected with or controls any of the foregoing persons or entities;

(b) "Group" shall mean the Borrower and the Subsidiaries;

(c) "Relevant Shareholder" means any person who holds 50 per cent or more of the issued share capital of the relevant company;

(d) "Senior Employee" shall mean any management employee of the Group who has executive responsibilities in relation to a significant business unit of the Group or who is capable of influencing the policy and direction of the Group; and

(e) "Subsidiaries" shall mean a subsidiary undertaking of the Borrower within the meaning of section 1162 of the Companies Act 2006 of England and Wales.

8. The Borrower represents and warrants that all of the proceeds received by the Borrower in connection with this Note shall be used for commercial purposes, and the Borrower stipulates that the Loan shall be construed for all purposes as a commercial loan.

9. The Lender represents and warrants that it understands and acknowledges the following:

(a) The Lender has such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued Notes, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Notes, and the Lender can bear the economic risk of holding the Notes until the Maturity Date.

(b) The Note being acquired will be acquired for the Lender's own account for investment purposes only without a view to public distribution or resale; and there is no contract, undertaking, agreement, or arrangement to sell, pledge, assign, or otherwise transfer or dispose of the Note or any portion thereof to any other person or entity.

(c) This Note has not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state thereof, or of any country or other jurisdiction, nor is any such registration contemplated, and that the Notes may not be offered, resold, pledged or otherwise transferred unless they are registered under the Securities

Cadman Global, LLC Initials: ________ Lender Initials: CWE

Act and any applicable state or other securities laws unless an exemption from such registration is available.

(d) There is not a public market for the Notes and that no such market is expected to develop.

(e) The Notes are being offered and sold in reliance on specific exemptions from the registration requirements of federal and state securities laws, specifically Section 4(2) of the Securities Act, Regulation D promulgated under the Securities Act, and that the Company is relying upon the truth and accuracy of the representations of the Lender in order to determine the suitability of the Lender to acquire the Notes and the applicability of the exemptions.

(f) If the Lender is an individual: the Lender has the requisite legal capacity (i) to acquire and hold the Notes, and (ii) to execute and deliver the Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note.

(g) If the Lender is an entity: (i) the Lender is duly formed, validly existing and in good standing under the laws of its jurisdiction of organization; (ii) the Lender has the power and authority to execute and deliver this Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note; (iii) the execution and delivery of each of the Note, , and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate or other action on the Lender's behalf; and (iv) the Note and other documents to which the Lender is a party are the Lender's legal, valid and binding obligations.

10. If any provision (or any part of any provision) contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note, but this Note shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal, or unenforceable.

11. No provision of this Note shall require the payment or permit the collection of interest in excess of the maximum permitted by law. If any such excess interest is so provided for, or adjudicated to be so provided for, in this Note, Borrower shall not be obligated to pay such interest in excess of the amount permitted by law, the right to demand the payment of any such excess shall be and is hereby waived, and this provision shall control over any other provision of this Note.

12. All notices, demands, and other communications between the Borrower and the Lender required or desired to be given in connection with this Note, shall be in

Cadman Global, LLC Initials: ______ Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

writing and shall be deemed to have been given when personally delivered, or one day after the date sent by recognized overnight courier or transmitted by facsimile, which transmission by facsimile has been confirmed or three (3) days after the date sent by registered or certified mail, postage prepaid, as follows:

If to Borrower, addressed to the Borrower at:

Cadman Global, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

If to Lender, addressed to:

3939 Monona Dr. #302
Monona Wi 53716

13. This Note contains the entire agreement of the Borrower and the Lender with respect to the matters set forth herein, and all prior statements, discussions, negotiations, and agreements, oral or written, are superseded by this Note, and merged herein. All amendments to this Note must be in writing and signed by the Borrower and the Lender. The relationship between the Lender and the Borrower shall be only that of creditor and debtor. No relationship of agency, partnership, or joint- or co-venture shall be created by or inferred from this Note. The Borrower shall indemnify, save, defend, and hold the Lender harmless from and against any and all claims and demands asserted against the Lender as being the agent, partner, or joint- or co-venturer of the Borrower, and attorneys' fees, expenses, and court costs associated therewith. Any dispute or controversy arising under or in connection with this Note shall be submitted to binding arbitration in accordance with the Federal Arbitration Act and under the Commercial Rules of the American Arbitration Association. All arbitration proceedings shall be conducted in the State of Delaware, City of Wilmington before a mediator certified by the American Arbitration Association, and the arbitrator shall apply the laws of the State of Delaware (without regard to the conflicts of law). The arbitrator shall render a decision on any dispute based upon the laws of the State of Delaware within one hundred twenty (120) days after the arbitrator has been selected. Each party to an arbitration proceeding under this Section shall pay an equal portion of all arbitrators' expenses and fees, together with other expenses of arbitration, except that the parties shall bear their own respective expert witness, professional and attorneys' fees.

***[End of Agreement]***

[Signatures on following page]

Cadman Global, LLC Initials: [signature] Lender Initials: [initials]

Mary S. Edwards

IN WITNESS WHEREOF, the Borrower has caused this Unsecured Promissory Note to be duly executed and delivered and shall take effect on the date written above.

**CADMAN GLOBAL, LLC, SERIES VI**

By: Cadman Capital Management Limited
Its: Managing Member

By: Giles Cadman
Its: Authorized Representative

Accepted and Agreed to:

LENDER

Charles W. Edwards

Charles W. Edwards, Individually

Print Name

Cadman Global, LLC Initials: ______ Lender Initials: CWE



[Signature Page to Series VI, Cadman Global, LLC Promissory Note]

E & O Excepted

54 Park Place
Appleton, Wisconsin 54915
414-735-9499

*Mary S. Edwards*

EXHIBIT A

**Payment Terms for Note**

| **Amount of Loan (USD)** | **Commencement Date of Loan** | **Term** | **Installments** | **Annual Rate of Interest** | **Repayment Terms** |
|---|---|---|---|---|---|
| $25,407.33 | 1st of July, 2020 | 24 months | 8 | 6.50% | First Payment Date: 1st of October, 2020<br><br>Maturity Date: 1st of July, 2022<br><br>[No repayments during first three months of term; 7 equal quarterly payments of Principal Amount and Interest thereafter, amounting to $965.48, payable at the end of each three month period, with the final balloon payment of $21,694.26, payable at the Maturity Date] |

x 7

final payment

Cadman Global, LLC Initials: [signature] Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

Promissory Note
8-27-2020

Personal Loan
NOT IRA
checks will be
mailed to me

# CADMAN GLOBAL

UNSECURED PROMISSORY NOTE

BY AND BETWEEN

SERIES VI OF CADMAN GLOBAL, LLC,
A DELAWARE SERIES LIMITED LIABILITY COMPANY

AND

Charles W. Edwards

Cadman Global, LLC Initials: ______ Lender Initials: CWE

NEITHER CADMAN GLOBAL, LLC, SERIES VI (THE "BORROWER") NOR THE PROMISSORY NOTES OF THE BORROWER (THE "NOTES") DESCRIBED HEREIN AND IN THE MEMORANDUM (AS DEFINED HEREIN) HAVE BEEN OR WILL BE REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF THE UNITED STATES ("U.S.") OR ANY OTHER JURISDICTION. THIS NOTE SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOTES, NOR SHALL THERE BE ANY SALE OF IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. THE DIRECT OR INDIRECT OWNERSHIP OF NOTES BY "NON-ELIGIBLE PERSONS," AS DEFINED IN THE MEMORANDUM, IS PROHIBITED EXCEPT IN ACCORDANCE THEREWITH.

THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND OTHERWISE IN ACCORDANCE WITH THE MEMORANDUM. EACH LENDER WILL BE REQUIRED TO REPRESENT THAT IT IS ACQUIRING THE NOTES PURCHASED BY IT FOR INVESTMENT AND NOT WITH A VIEW TO RESALE OR DISTRIBUTION. THERE IS NO PUBLIC MARKET FOR THE NOTES AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.

Cadman Global, LLC Initials: ________ Lender Initials: CWE

**PROMISSORY NOTE**

USD $34,221.47 Dated: 5-26-2020

1. FOR VALUE RECEIVED, SERIES VI OF CADMAN GLOBAL, LLC, series of a series limited liability company that is an entity in good standing under the laws of the State of Delaware (the "Borrower"), hereby promises to pay to Charles W. Edwards, having an address of 3939 Monona Dr. #302 Monona Wi 53716 (the "Lender"), on or before the Maturity Date (hereinafter defined), in lawful money of the United States of America, the principal sum of THIRTY FOUR THOUSAND, TWO HUNDRED AND TWENTY ONE DOLLARS 47/100 USD ($34,221.47) (the "Principal Amount"), together with interest on the Principal Amount from the Commencement Date of this Note to maturity, (the agreed relevant rate as specified in Exhibit A on the unpaid Principal Amount ), payable as set forth in paragraph 3.

2. This unsecured promissory note (the "Note") evidences the obligation to make repayment of a loan or loans (collectively, the "Loan") of the Principal Amount made by the Lender to the Borrower pursuant to this Note.

3. The Principal Amount, together with any interest accrued thereon shall be due and payable, by way of cheque, wire transfer or as otherwise agreed to, in accordance with Exhibit A over the EIGHTEEN (18) month term in the total amount of THIRTY EIGHT THOUSAND, SIXTY SEVEN DOLLARS 49/100 USD ($38,067.49). The payment or payments shall be due and payable in accordance with Exhibit A on or before 1st of January, 2022 ("Maturity Date"). Unless expressly prohibited under Exhibit A, the Principal Amount may be prepaid, in whole or in part, at anytime in the sole discretion of the Borrower, together with all accrued but unpaid interest due thereon. There shall be no prepayment penalty or other payment required in connection with the prepayment of amounts owing under this Note.

4. The Lender agrees that, in the event of the occurrence of either of the Events of Default specified under paragraphs 6(b) and 6(c) (each an "Insolvency Event"), the repayment of the Principal Amount and all interest and other existing obligations under this Note (the "Note Obligations") shall thereupon become subordinated in right of payment to all obligations owed by the Borrower under any secured loan (the "Senior Debt") provided always that, and for the avoidance of doubt, repayment of the Note Obligations shall thereafter be made in priority to any distributions or other payments that may be due or owing to any member having an economic interest in the Borrower. The Lender further agrees that following an Insolvency Event: (1) it will not demand or receive from the Borrower (and Borrower will not pay to Lender) all or any part of the Note Obligations, by way of payment, prepayment, setoff, lawsuit or otherwise, and (2) it will not exercise any remedy with respect to the Note Obligations, accelerate the Note Obligations, or commence, or cause to commence, prosecute or participate in any

Cadman Global, LLC Initials: [signature] Lender Initials: CWE

administrative, legal or equitable action against the Borrower, until such time any Senior Debt is paid in full (or the repayment of the Senior Debt is otherwise waived and the agreements related thereto are terminated).

5. The Lender has reviewed all financial and non-financial information necessary to make an informed decision regarding this Note, including the Borrower's Third Amended and Restated Information Memorandum, as it may be further amended, restated and/or supplemented from time to time (the "Memorandum"), the Portfolio Supplement for Cadman Global, LLC, Series VI and other documents related to entering into this Note (collectively, the "Offering Documents") and has been afforded the opportunity to ask questions and receive answers concerning the Lender's credit decision.

6. The occurrence of any one or more of the following events with respect to the Borrower shall constitute an event of default hereunder ("Event of Default"):

(a) If the Borrower shall fail to pay when due any payment of principal or interest on this Note and does not subsequently pay the same within twenty-eight (28) calendar days' written notice thereof from the Lender.

(b) If, pursuant to or within the meaning of the bankruptcy law or the solvency laws of any applicable jurisdiction (a "Bankruptcy Law"), the Borrower shall (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official; (iv) make an assignment for the benefit of his creditors; or (v) admit in writing its inability to pay its debts as they become due.

(c) If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for the Borrower or substantially all of the Borrower's properties, or (iii) orders the liquidation of the Borrower, and in each case the order or decree is not dismissed within 90 days.

(d) If the Borrower shall fail to comply with its undertaking in paragraph 3 or Exhibit A of this Note.

7. No direct or indirect shareholder or other Affiliate (as defined below) of the Borrower shall have any liability for payment of the Note Obligations, interest thereon, or any other costs, expenses, or other charges due to the Lender as provided by this Note and, in the event of any Event of Default, the Lender's sole recourse shall be against the Borrower. For the purposes of this paragraph 7:

Cadman Global, LLC Initials: [signature] Lender Initials: CWE

(a) "Affiliate" shall mean any Senior Employee, director or Relevant Shareholder of any member of the Group and any person who is connected with or controls any of the foregoing persons or entities;

(b) "Group" shall mean the Borrower and the Subsidiaries;

(c) "Relevant Shareholder" means any person who holds 50 per cent or more of the issued share capital of the relevant company;

(d) "Senior Employee" shall mean any management employee of the Group who has executive responsibilities in relation to a significant business unit of the Group or who is capable of influencing the policy and direction of the Group; and

(e) "Subsidiaries" shall mean a subsidiary undertaking of the Borrower within the meaning of section 1162 of the Companies Act 2006 of England and Wales.

8. The Borrower represents and warrants that all of the proceeds received by the Borrower in connection with this Note shall be used for commercial purposes, and the Borrower stipulates that the Loan shall be construed for all purposes as a commercial loan.

9. The Lender represents and warrants that it understands and acknowledges the following:

(a) The Lender has such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued Notes, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Notes, and the Lender can bear the economic risk of holding the Notes until the Maturity Date.

(b) The Note being acquired will be acquired for the Lender's own account for investment purposes only without a view to public distribution or resale, and there is no contract, undertaking, agreement, or arrangement to sell, pledge, assign, or otherwise transfer or dispose of the Note or any portion thereof to any other person or entity.

(c) This Note has not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state thereof, or of any country or other jurisdiction, nor is any such registration contemplated, and that the Notes may not be offered, resold, pledged or otherwise transferred unless they are registered under the Securities Act and any applicable state or other securities laws unless an exemption from

Cadman Global, LLC Initials: [signature] Lender Initials: CWE

after the date sent by recognized overnight courier or transmitted by facsimile, which transmission by facsimile has been confirmed or three (3) days after the date sent by registered or certified mail, postage prepaid, as follows:

If to Borrower, addressed to the Borrower at:

Cadman Global, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

If to Lender, addressed to:

3939 Monona Dr. #302
Monona Wi 53716

13. This Note contains the entire agreement of the Borrower and the Lender with respect to the matters set forth herein, and all prior statements, discussions, negotiations, and agreements, oral or written, are superseded by this Note, and merged herein. All amendments to this Note must be in writing and signed by the Borrower and the Lender. The relationship between the Lender and the Borrower shall be only that of creditor and debtor. No relationship of agency, partnership, or joint- or co-venture shall be created by or inferred from this Note. The Borrower shall indemnify, save, defend, and hold the Lender harmless from and against any and all claims and demands asserted against the Lender as being the agent, partner, or joint- or co-venturer of the Borrower, and attorneys' fees, expenses, and court costs associated therewith. Any dispute or controversy arising under or in connection with this Note shall be submitted to binding arbitration in accordance with the Federal Arbitration Act and under the Commercial Rules of the American Arbitration Association. All arbitration proceedings shall be conducted in the State of Delaware, City of Wilmington before a mediator certified by the American Arbitration Association, and the arbitrator shall apply the laws of the State of Delaware (without regard to the conflicts of law). The arbitrator shall render a decision on any dispute based upon the laws of the State of Delaware within one hundred twenty (120) days after the arbitrator has been selected. Each party to an arbitration proceeding under this Section shall pay an equal portion of all arbitrators' expenses and fees, together with other expenses of arbitration, except that the parties shall bear their own respective expert witness, professional and attorneys' fees.

***[End of Agreement]***

[Signatures on following page]

Cadman Global, LLC Initials: [signature]

Lender Initials: CWE

IN WITNESS WHEREOF, the Borrower has caused this Unsecured Promissory Note to be duly executed and delivered and shall take effect on the date written above.

**CADMAN GLOBAL, LLC, SERIES VI**

By: Cadman Capital Management Limited
Its: Managing Member

By: Giles Cadman
Its: Authorized Representative

Accepted and Agreed to:

LENDER

Charles W. Edwards

Charles W. Edwards, Individually
Print Name

Cadman Global, LLC Initials: Lender Initials: CWE



[Signature Page to Series VI, Cadman Global, LLC Promissory Note]
E & O Excepted

EXHIBIT A

**Payment Terms for Note**

| **Amount of Loan (USD)** | **Commencement Date of Loan** | **Term** | **Installments** | **Annual Rate of Interest** | **Repayment Terms** |
|---|---|---|---|---|---|
| $34,221.47 | 1st of July, 2020 | 18 months | 6 | 8.00% | First Payment Date: 1st of October, 2020<br><br>Maturity Date: 1st of January, 2022<br><br>[No repayments during first 3 months of term; 5 equal quarterly payments of Principal Amount and Interest thereafter, amounting to $1,574.19, payable at the end of each three month period, with the final balloon payment of $30,196.54, payable at the Maturity Date] x5 |

Cadman Global, LLC Initials: [signature]

Lender Initials: CWE



E & O Excepted

*[Exhibit A to Series VI, Cadman Global, LLC Promissory Note]*

such registration is available.

(d) There is not a public market for the Notes and that no such market is expected to develop.

(e) The Notes are being offered and sold in reliance on specific exemptions from the registration requirements of federal and state securities laws, specifically Section 4(2) of the Securities Act, Regulation D promulgated under the Securities Act, and that the Company is relying upon the truth and accuracy of the representations of the Lender in order to determine the suitability of the Lender to acquire the Notes and the applicability of the exemptions.

(f) If the Lender is an individual: the Lender has the requisite legal capacity (i) to acquire and hold the Notes, and (ii) to execute and deliver the Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note.

(g) If the Lender is an entity: (i) the Lender is duly formed, validly existing and in good standing under the laws of its jurisdiction of organization; (ii) the Lender has the power and authority to execute and deliver this Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note; (iii) the execution and delivery of each of the Note, , and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate or other action on the Lender's behalf; and (iv) the Note and other documents to which the Lender is a party are the Lender's legal, valid and binding obligations.

10. If any provision (or any part of any provision) contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note, but this Note shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal, or unenforceable.

11. No provision of this Note shall require the payment or permit the collection of interest in excess of the maximum permitted by law. If any such excess interest is so provided for, or adjudicated to be so provided for, in this Note, Borrower shall not be obligated to pay such interest in excess of the amount permitted by law, the right to demand the payment of any such excess shall be and is hereby waived, and this provision shall control over any other provision of this Note.

12. All notices, demands, and other communications between the Borrower and the Lender required or desired to be given in connection with this Note, shall be in writing and shall be deemed to have been given when personally delivered, or one day

Cadman Global, LLC Initials: ________ Lender Initials: CWE

# EXHIBIT D

**From:** **Cadman Capital** admin@cadmancapital.com
**Subject:** Cadman Global, LLC - Series XXI
**Date:** July 21, 2022 at 2:54 PM
**To:** dreamer3939now@gmail.com

CC

Dear Dr. Edwards,

Please find attached your Cadman Global, LLC - Series XXI Subscription Confirmation.

If you have any questions, please do not hesitate to contact your account manager.

Kind regards,

Cadman Capital Management

The contents of this email are intended exclusively for the addressee. If you are not the addressee you must not disclose the email content; you should notify us immediately by clicking 'Reply' and delete this email.

Cadman Capital and its affiliates monitor emails to ensure its systems operate effectively and to minimise the risk of viruses. Whilst Cadman Capital has taken reasonable steps to scan this email, it does not accept liability for any virus that may be contained in it.

CADMAN CAPITAL GROUP

| | | |
|---|---|---|
| Investor Name: | New Direction Trust Company FBO Charles Edwards, IRA 1115763 | July 21, 2022 |
| Client Reference: | 500390 | |
| Address: | 3939 Monona Dr # 302<br>Monona<br>WI 53716<br>USA | |
| Email: | dreamer3939now@gmail.com | |

**Subscription Confirmation**
**Cadman Global, LLC - Series XXI**

| | | |
|---|---|---|
| Subscription Reference: | | 30837 |
| Subscription Date: | | 4/29/2022 |
| Funds Received: | USD | 194,845.07 |
| Placement Fee: | USD | -14,613.38 |
| Subscription Value: | USD | 180,231.69 |
| Membership Interests Issued: | | 180.2317 |
| NAV per Membership Interest: | USD | 1,000.00 |

Cadman Global, LLC
c/o Corporation Service Company
251 Little Falls Drive, Wilmington, DE 19808
Email: info@cadmancapital.com
E & O Excepted

# CADMAN CAPITAL GROUP

Investor Name: Charles Edwards
Client Reference: 168511

April 5, 2022

Address:
3939 Monona Dr. # 302
Monona
WI 53716

Email: dreamer3939now@gmail.com

**Capital Account NAV Summary**
**Cadman Global, LLC - Series II**
**Summary Period: 1/1/2021 – 12/31/2021**

| | | |
|---|---|---|
| Opening | USD | 660,203.45 |
| Subscriptions | USD | - |
| Interest | USD | 19,229.23 |
| Withdrawals | USD | (19,229.23) |
| **Closing** | **USD** | **660,203.45** |
| Total Interest | USD | 80,077.89 |

Cadman Global, LLC
c/o Corporation Service Company
251 Little Falls Drive, Wilmington, DE 19808
Email: info@cadmancapital.com
Private and Confidential, E & O Excepted
©Cadman Capital 2022

# EXHIBIT E

DocuSign Envelope ID: 3F749E6E-29E9-4388-8348-6A9F3909F34C

CADMAN GLOBAL

# UNSECURED PROMISSORY NOTE

BY AND BETWEEN

SERIES VI OF CADMAN GLOBAL, LLC,
A DELAWARE SERIES LIMITED LIABILITY COMPANY

AND

Charles Edwards

**NEITHER CADMAN GLOBAL, LLC, SERIES VI (THE "BORROWER") NOR THE PROMISSORY NOTES OF THE BORROWER (THE "NOTES") DESCRIBED HEREIN AND IN THE MEMORANDUM (AS DEFINED HEREIN) HAVE BEEN OR WILL BE REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF THE UNITED STATES ("U.S.") OR ANY OTHER JURISDICTION. THIS NOTE SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOTES, NOR SHALL THERE BE ANY SALE OF IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. THE DIRECT OR INDIRECT OWNERSHIP OF NOTES BY "NON-ELIGIBLE PERSONS," AS DEFINED IN THE MEMORANDUM, IS PROHIBITED EXCEPT IN ACCORDANCE THEREWITH.**

**THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND OTHERWISE IN ACCORDANCE WITH THE MEMORANDUM. EACH LENDER WILL BE REQUIRED TO REPRESENT THAT IT IS ACQUIRING THE NOTES PURCHASED BY IT FOR INVESTMENT AND NOT WITH A VIEW TO RESALE OR DISTRIBUTION. THERE IS NO PUBLIC MARKET FOR THE NOTES AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.**


© Cadman Global, LLC 2022

# PROMISSORY NOTE

USD $49,487.80 Dated: 5/5/2023

1. FOR VALUE RECEIVED, SERIES VI OF CADMAN GLOBAL, LLC, series of a series limited liability company that is an entity in good standing under the laws of the State of Delaware (the "Borrower"), hereby promises to pay to Charles Edwards, having an address of 3939 Monona Dr. 3302, Monona, Wi. (the "Lender"), on or before the Maturity Date (hereinafter defined), in lawful money of the United States of America, the principal sum of FORTY NINE THOUSAND, FOUR HUNDRED AND EIGHTY SEVEN DOLLARS 80/100 USD ($49,487.80) (the "Principal Amount"), together with interest on the Principal Amount from the Commencement Date of this Note to maturity, (the agreed relevant rate as specified in Exhibit A on the unpaid Principal Amount ), payable as set forth in paragraph 3.

2. This unsecured promissory note (the "Note") evidences the obligation to make repayment of a loan or loans (collectively, the "Loan") of the Principal Amount made by the Lender to the Borrower pursuant to this Note.

3. The Principal Amount, together with any interest accrued thereon shall be due and payable, by way of cheque, wire transfer or as otherwise agreed to, in accordance with Exhibit A over the TWENTY FOUR (24) month term in the total amount of FIFTY SEVEN THOUSAND, TWO HUNDRED AND FIFTY SIX DOLLARS 96/100 USD ($57,256.96). The payment or payments shall be due and payable in accordance with Exhibit A on or before 12th of May, 2025 ("Maturity Date"). Unless expressly prohibited under Exhibit A, the Principal Amount may be prepaid, in whole or in part, at anytime in the sole discretion of the Borrower, together with all accrued but unpaid interest due thereon. There shall be no prepayment penalty or other payment required in connection with the prepayment of amounts owing under this Note.

4. The Lender agrees that, in the event of the occurrence of either of the Events of Default specified under paragraphs 6(b) and 6(c) (each an "Insolvency Event"), the repayment of the Principal Amount and all interest and other existing obligations under this Note (the "Note Obligations") shall thereupon become subordinated in right of payment to all obligations owed by the Borrower under any secured loan (the "Senior Debt") provided always that, and for the avoidance of doubt, repayment of the Note Obligations shall thereafter be made in priority to any distributions or other payments that may be due or owing to any member having an economic interest in the Borrower. The Lender further agrees that following an Insolvency Event: (1) it will not demand or receive

Cadman Global, LLC Initials: DS Lender Initials: DS CE

from the Borrower (and Borrower will not pay to Lender) all or any part of the Note Obligations, by way of payment, prepayment, setoff, lawsuit or otherwise, and (2) it will not exercise any remedy with respect to the Note Obligations, accelerate the Note Obligations, or commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against the Borrower, until such time any Senior Debt is paid in full (or the repayment of the Senior Debt is otherwise waived and the agreements related thereto are terminated).

5. The Lender has reviewed all financial and non-financial information necessary to make an informed decision regarding this Note, including the Borrower's Fifth Amended and Restated Information Memorandum, as it may be further amended, restated and/or supplemented from time to time (the "Memorandum"), the Portfolio Supplement for Cadman Global, LLC, Series VI and other documents related to entering into this Note (collectively, the "Offering Documents") and has been afforded the opportunity to ask questions and receive answers concerning the Lender's credit decision.

6. The occurrence of any one or more of the following events with respect to the Borrower shall constitute an event of default hereunder ("Event of Default"):

(a) If the Borrower shall fail to pay when due any payment of principal or interest on this Note and does not subsequently pay the same within twenty-eight (28) calendar days' written notice thereof from the Lender.

(b) If, pursuant to or within the meaning of the bankruptcy law or the solvency laws of any applicable jurisdiction (a "Bankruptcy Law"), the Borrower shall (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official; (iv) make an assignment for the benefit of his creditors; or (v) admit in writing its inability to pay its debts as they become due.

(c) If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for the Borrower or substantially all of the Borrower's properties, or (iii) orders the liquidation of the Borrower, and in each case the order or decree is not dismissed within 90 days.

(d) If the Borrower shall fail to comply with its undertaking in paragraph 3 or Exhibit A of this Note.

7. No direct or indirect shareholder or other Affiliate (as defined below) of the

Borrower shall have any liability for payment of the Note Obligations, interest thereon, or any other costs, expenses, or other charges due to the Lender as provided by this Note and, in the event of any Event of Default, the Lender's sole recourse shall be against the Borrower. For the purposes of this paragraph 7:

(a) "Affiliate" shall mean any Senior Employee, director or Relevant Shareholder of any member of the Group and any person who is connected with or controls any of the foregoing persons or entities;

(b) "Group" shall mean the Borrower and the Subsidiaries;

(c) "Relevant Shareholder" means any person who holds 50 per cent or more of the issued share capital of the relevant company;

(d) "Senior Employee" shall mean any management employee of the Group who has executive responsibilities in relation to a significant business unit of the Group or who is capable of influencing the policy and direction of the Group; and

(e) "Subsidiaries" shall mean a subsidiary undertaking of the Borrower within the meaning of section 1162 of the Companies Act 2006 of England and Wales.

8. The Borrower represents and warrants that all of the proceeds received by the Borrower in connection with this Note shall be used for commercial purposes, and the Borrower stipulates that the Loan shall be construed for all purposes as a commercial loan.

9. The Lender represents and warrants that it understands and acknowledges the following:

(a) The Lender has such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued Notes, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Notes, and the Lender can bear the economic risk of holding the Notes until the Maturity Date.

(b) The Note being acquired will be acquired for the Lender's own account for investment purposes only without a view to public distribution or resale, and there is no contract, undertaking, agreement, or arrangement to sell, pledge, assign, or otherwise transfer or dispose of the Note or any portion thereof to any other person or entity.

Cadman Global, LLC Initials: ______ Lender Initials: LE

Borrower shall have any liability for payment of the Note Obligations, interest thereon, or any other costs, expenses, or other charges due to the Lender as provided by this Note and, in the event of any Event of Default, the Lender's sole recourse shall be against the Borrower. For the purposes of this paragraph 7:

(a) "Affiliate" shall mean any Senior Employee, director or Relevant Shareholder of any member of the Group and any person who is connected with or controls any of the foregoing persons or entities;

(b) "Group" shall mean the Borrower and the Subsidiaries;

(c) "Relevant Shareholder" means any person who holds 50 per cent or more of the issued share capital of the relevant company;

(d) "Senior Employee" shall mean any management employee of the Group who has executive responsibilities in relation to a significant business unit of the Group or who is capable of influencing the policy and direction of the Group; and

(e) "Subsidiaries" shall mean a subsidiary undertaking of the Borrower within the meaning of section 1162 of the Companies Act 2006 of England and Wales.

8. The Borrower represents and warrants that all of the proceeds received by the Borrower in connection with this Note shall be used for commercial purposes, and the Borrower stipulates that the Loan shall be construed for all purposes as a commercial loan.

9. The Lender represents and warrants that it understands and acknowledges the following:

(a) The Lender has such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued Notes, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Notes, and the Lender can bear the economic risk of holding the Notes until the Maturity Date.

(b) The Note being acquired will be acquired for the Lender's own account for investment purposes only without a view to public distribution or resale, and there is no contract, undertaking, agreement, or arrangement to sell, pledge, assign, or otherwise transfer or dispose of the Note or any portion thereof to any other person or entity.

Cadman Global, LLC Initials: DS ______ Lender Initials: DS CE

(c) This Note has not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state thereof, or of any country or other jurisdiction, nor is any such registration contemplated, and that the Notes may not be offered, resold, pledged or otherwise transferred unless they are registered under the Securities Act and any applicable state or other securities laws unless an exemption from such registration is available.

(d) There is not a public market for the Notes and that no such market is expected to develop.

(e) The Notes are being offered and sold in reliance on specific exemptions from the registration requirements of federal and state securities laws, specifically Section 4(2) of the Securities Act, Regulation D promulgated under the Securities Act, and that the Company is relying upon the truth and accuracy of the representations of the Lender in order to determine the suitability of the Lender to acquire the Notes and the applicability of the exemptions.

(f) If the Lender is an individual: the Lender has the requisite legal capacity (i) to acquire and hold the Notes, and (ii) to execute and deliver the Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note.

(g) If the Lender is an entity: (i) the Lender is duly formed, validly existing and in good standing under the laws of its jurisdiction of organization; (ii) the Lender has the power and authority to execute and deliver this Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note; (iii) the execution and delivery of each of the Note, , and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate or other action on the Lender's behalf; and (iv) the Note and other documents to which the Lender is a party are the Lender's legal, valid and binding obligations.

10. If any provision (or any part of any provision) contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note, but this Note shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal, or unenforceable.

11. No provision of this Note shall require the payment or permit the collection

of interest in excess of the maximum permitted by law. If any such excess interest is so provided for, or adjudicated to be so provided for, in this Note, Borrower shall not be obligated to pay such interest in excess of the amount permitted by law, the right to demand the payment of any such excess shall be and is hereby waived, and this provision shall control over any other provision of this Note.

12. All notices, demands, and other communications between the Borrower and the Lender required or desired to be given in connection with this Note, shall be in writing and shall be deemed to have been given when personally delivered, or one day after the date sent by recognized overnight courier or transmitted by facsimile, which transmission by facsimile has been confirmed or three (3) days after the date sent by registered or certified mail, postage prepaid, as follows:

If to Borrower, addressed to the Borrower at:

Cadman Global, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

If to Lender, addressed to:

3939 Monona Dr. #302

Monona

Wisconsin 53716

13. This Note contains the entire agreement of the Borrower and the Lender with respect to the matters set forth herein, and all prior statements, discussions, negotiations, and agreements, oral or written, are superseded by this Note, and merged herein. All amendments to this Note must be in writing and signed by the Borrower and the Lender. The relationship between the Lender and the Borrower shall be only that of creditor and debtor. No relationship of agency, partnership, or joint- or co-venture shall be created by or inferred from this Note. The Borrower shall indemnify, save, defend, and hold the Lender harmless from and against any and all claims and demands asserted against the Lender as being the agent, partner, or joint- or co-venturer of the Borrower, and attorneys' fees, expenses, and court costs associated therewith. Any dispute or controversy arising under or in connection with this Note shall be submitted to binding arbitration in accordance with the Federal Arbitration Act and under the Commercial Rules of the American

Cadman Global, LLC Initials: ______ Lender Initials: LE

DocuSign Envelope ID: 3F749E6E-29E9-4388-8348-6A9F3909F34C

of interest in excess of the maximum permitted by law. If any such excess interest is so provided for, or adjudicated to be so provided for, in this Note, Borrower shall not be obligated to pay such interest in excess of the amount permitted by law, the right to demand the payment of any such excess shall be and is hereby waived, and this provision shall control over any other provision of this Note.

12. All notices, demands, and other communications between the Borrower and the Lender required or desired to be given in connection with this Note, shall be in writing and shall be deemed to have been given when personally delivered, or one day after the date sent by recognized overnight courier or transmitted by facsimile, which transmission by facsimile has been confirmed or three (3) days after the date sent by registered or certified mail, postage prepaid, as follows:

If to Borrower, addressed to the Borrower at:

Cadman Global, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

If to Lender, addressed to:

3939 Monona Dr. #302

Monona

Wisconsin 53716

13. This Note contains the entire agreement of the Borrower and the Lender with respect to the matters set forth herein, and all prior statements, discussions, negotiations, and agreements, oral or written, are superseded by this Note, and merged herein. All amendments to this Note must be in writing and signed by the Borrower and the Lender. The relationship between the Lender and the Borrower shall be only that of creditor and debtor. No relationship of agency, partnership, or joint- or co-venture shall be created by or inferred from this Note. The Borrower shall indemnify, save, defend, and hold the Lender harmless from and against any and all claims and demands asserted against the Lender as being the agent, partner, or joint- or co-venturer of the Borrower, and attorneys' fees, expenses, and court costs associated therewith. Any dispute or controversy arising under or in connection with this Note shall be submitted to binding arbitration in accordance with the Federal Arbitration Act and under the Commercial Rules of the American

Cadman Global, LLC Initials: DS ______ Lender Initials: DS CE

Arbitration Association. All arbitration proceedings shall be conducted in the State of Delaware, City of Wilmington before a mediator certified by the American Arbitration Association, and the arbitrator shall apply the laws of the State of Delaware (without regard to the conflicts of law). The arbitrator shall render a decision on any dispute based upon the laws of the State of Delaware within one hundred twenty (120) days after the arbitrator has been selected. Each party to an arbitration proceeding under this Section shall pay an equal portion of all arbitrators' expenses and fees, together with other expenses of arbitration, except that the parties shall bear their own respective expert witness, professional and attorneys' fees.

*[End of Agreement]*

Cadman Global, LLC Initials: ______ Lender Initials: LE

IN WITNESS WHEREOF, the Borrower has caused this Unsecured Promissory Note to be duly executed and delivered and shall take effect on the date written above.

**CADMAN GLOBAL, LLC, SERIES VI**

DocuSigned by:
79D7838B4E6843C...

By: Cadman Capital Management Limited
Its: Managing Member

By: Giles Cadman
Its: Authorized Representative

Accepted and Agreed to:

LENDER
DocuSigned by:
Charles Edwards
0F726AAF379141E...
Charles Edwards, Individually
Print Name

I accept this document signed via DocuSign as an original signature. Lender Initials: DS CE

Cadman Global, LLC Initials: DS

Lender Initials: DS CE

EXHIBIT A

**Payment Terms for Note**

| Amount of Loan (USD) | Commencement Date of Loan | Term | Installments | Annual Rate of Interest | Repayment Terms |
|---|---|---|---|---|---|
| $49,487.80 | 12th of May, 2023 | 24 months | 8 | 8% | First Payment Date: 12th of August, 2023<br><br>Maturity Date: 12th of May, 2025<br><br>[No repayments during first three months of term; 7 equal quarterly payments of Principal Amount and Interest thereafter, amounting to $1,245.15, payable at the end of each three month period, with the final balloon payment of $48,540.91, payable at the Maturity Date] |

Cadman Global, LLC Initials: ______ Lender Initials: CE

# CADMAN GLOBAL, LLC SERIES VI

## CONFIDENTIAL INVESTOR QUESTIONNAIRE FOR PROSPECTIVE PRIVATE PLACEMENT OF INTEREST IN CADMAN GLOBAL, LLC SERIES VI

I UNDERSTAND AND AGREE THAT THE INFORMATION I AM PROVIDING HEREIN WILL BE RELIED UPON BY CADMAN GLOBAL, LLC, A DELAWARE SERIES LIMITED LIABILITY COMPANY (HEREINAFTER "THE COMPANY") TO ESTABLISH THAT I MEET CERTAIN STANDARDS IMPOSED BY THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AS WELL AS STANDARDS IMPOSED BY INDIVIDUAL STATES, IN CONNECTION WITH THE ABOVE-REFERENCED OFFERING. SPECIFICALLY, I UNDERSTAND THAT THE INFORMATION I AM PROVIDING WILL BE USED, IN PART, TO DETERMINE IF I AM AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501 OF REGULATION D UNDER THE ACT.

I WARRANT TO THE COMPANY THAT THE INFORMATION I AM PROVIDING HEREIN IS COMPLETE AND ACCURATE AND MAY BE RELIED UPON BY THE COMPANY AS COMPLETE AND ACCURATE. I AGREE THAT I WILL IMMEDIATELY NOTIFY THE COMPANY OF ANY MATERIAL CHANGE IN ANY OF THE INFORMATION PROVIDED HEREIN WHICH MAY OCCUR PRIOR TO ANY PURCHASE I MAY MAKE OF THE UNITS BEING OFFERED BY CADMAN GLOBAL, LLC SERIES VI.

I UNDERSTAND AND AGREE THAT, ALTHOUGH THIS QUESTIONNAIRE WILL BE KEPT STRICTLY CONFIDENTIAL, THE COMPANY AND/OR ITS ATTORNEYS MAY PRESENT THIS QUESTIONNAIRE TO SUCH PARTIES AS THEY DEEM ADVISABLE TO ESTABLISH EXEMPTION FROM REGISTRATION OF THE PRIVATE PLACEMENT OF THE UNITS OR FOR OTHER FEDERAL AND STATE REGULATORY PURPOSES.

THIS IS NOT AN OFFER TO SELL SECURITIES BUT MERELY A REQUEST FOR INFORMATION PURSUANT TO REGULATION D AND RULE 506 OF THE SECURITIES AND EXCHANGE COMMISSION.


© Cadman Capital 2022

## A. GENERAL INFORMATION

1. Print Full Name of Investor:

| For an Individual: | Charles | Willard. | Edwards |
|---|---|---|---|
| | First | Middle | Last |

2. Mailing address for notices or payments:

Street: 3939 Monona Dr. #302

City/State/Zip: Monona Wi. 53716

3. Telephone number: 608-285-5181

4. e-Mail address: dreamer3939now@gmail.com

5. Permanent address (if different from address for notices above):

Street: ______________________

City/State/Zip: ______________________

6. Is the Investor: (a) a politically exposed person (a "PEP");
(b) an immediate family member of a PEP; or
(c) a close associate of a PEP?

*A "politically exposed person" is defined as a current or former senior official in the executive, legislative, administrative, military or judicial branches of government (whether elected on not), a senior official of a major political party, or a senior executive of a government-owned corporation. In addition, a "politically exposed person" includes any corporation, business, or other entity that has been formed by, or for the benefit of, a political figure.*
*An "Immediate family member" of a PEP typically includes such person's parents, siblings, spouse, children, and in-laws.*

*A "close associate" of a PEP is a person who is widely and publicly known to maintain an unusually close relationship with the PEP, and includes a person who is in a position to conduct substantial financial transactions on behalf of the PEP.*

___ Yes _x_ No


© Cadman Capital 2022

7. Is the Investor associated with any related person that is:

(a) a PEP;
(b) an immediate family member of a PEP; or
(c) a close associate of a PEP?

*A "Related person" means any person controlling or controlled by the Investor; if the Investor is a privately held entity, any person having a beneficial interest in the Investor; or any person for whom the Investor is acting as agent or nominee in connection with this investment.*

___ Yes ___X___ No

8. Has the Investor determined that the funds being invested by the Investor to purchase the Interest do not come from corruption?

___X___ Yes ___ No

## B. ACCREDITED INVESTOR STATUS

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501 of Regulation D under the United States Securities Act of 1933, as amended (the "Securities Act"), and has checked below next to **EACH AND EVERY** category or categories under which the Investor qualifies as an accredited investor:

**FOR INDIVIDUALS:**

__X (A) A natural person with individual net worth (or joint net worth with spouse) in excess of $1,000,000.00. For purposes of this basis for qualifying, "net worth" means the excess of total assets at fair market value (excluding (i) the fair market value of any primary residence owned by the Investor and (ii) the amount of any debt secured by the primary residence, up to the fair market value of the property), over total liabilities.

___ (B) A natural person with individual income (without including any income of the Investor's spouse) in excess of $200,000.00, or joint income with such spouse of $300,000.00, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.


© Cadman Capital 2022

## C. RELATED PARTIES

Will any other person or persons have a beneficial interest in the Interests to be acquired hereunder (other than as a shareholder, partner, or other beneficial owner of equity interests in the Investor)? By way of example, and not by limitation, "nominee" Investors would be required to check "Yes" below.

___ Yes ___X___ No

## D. RESTRICTED PERSON STATUS

*NOTE: Terms in bold are defined below.*

The Investor represents and warrants that the Investor is (check all that apply):

___ 1. A **FINRA** member firm or other broker/dealer.

___ 2. An officer, director, general partner, **associated person** or **employee of a FINRA member firm,** or any other broker/dealer (other than a **limited business broker/dealer**).

___ 3. An agent of a FINRA member firm or any other broker/dealer (other than a limited business broker/dealer) that is engaged in the investment banking or securities business.

___ 4. A person who has authority to buy or sell securities for a bank, savings and loan association, insurance company, investment company, investment adviser (whether or not registered as an investment adviser), or **collective investment account**.

___ 5. A person listed, or required to be listed, on one of the following schedules to Form BD as filed, or required to be filed, with the U.S. Securities and Exchange Commission by a broker/dealer (other than with respect to a limited business broker/dealer): (i) Schedule A, unless the person is identified by an ownership code of less than 10%; (ii) Schedule B, unless the person's listing on Schedule B relates to an ownership interest in a person that is listed on Schedule A and identified by an ownership code of less than 10%; or (iii) Schedule C, unless the person would be excluded under the percentage ownership criteria for Schedule A or B above.


© Cadman Capital 2022

___ 6. A person that directly or indirectly owns an interest, in the amounts specified below, of a public reporting company listed, or required to be listed, on Schedule A or B of Form BD relating to a broker/dealer (other than a limited business broker/dealer), unless the public reporting company is listed on a national securities exchange or is traded on the NASDAQ Global Market; (i) 10% or more of a public reporting company listed, or required to be listed, on Schedule A; or (ii) 25% or more of a public reporting company listed, or required to be listed, on Schedule B.

___ 7. A person that acts: (i) as a finder in connection with new issues, or (ii) in a fiduciary capacity to managing underwriters in connection with new issues.

___ 8. An **immediate family member** of: (i) a person specified in items 2-7 above that **materially supports,** or receives support from, that person; (ii) a person specified in items 2-3 above that is employed by or associated with a FINRA member or its affiliates, or that has an ability to control allocations of new issues; or (iii) a person specified in items 5-6 above that is an owner of a FINRA member or its affiliate, or that has an ability to control allocations of new issues.

___ 9. A collective investment account. *IF THE SUBSCRIBER IS A COLLECTIVE INVESTMENT ACCOUNT AS SPECIFIED IN ITEM 4 ABOVE, THE FOLLOWING PERCENTAGE OF THE SUBSCRIBER'S BENEFICIAL INTERESTS IS HELD BY PERSONS DESCRIBED IN ANY OF THE ITEMS 1-8 ABOVE: LESS THAN 10%*.

_X 10. None of the above.

**Definitions:**

**Associated person or employee of a FINRA member firm.** (1) Any natural person registered with FINRA and (2) any natural person, whether or not registered or exempt from registration with FINRA, who is a sole proprietor, partner, officer, director, or branch manager of a FINRA member firm, or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a FINRA member firm (for example, any employee).


© Cadman Capital 2022

**Beneficial interest.** Any economic interest, including the right to share in gains or losses, other than management- or performance-based fees for operating a collective investment account, or other fees for acting in a fiduciary capacity.

**Collective investment account**. Any hedge fund, investment partnership, investment corporation, or any other collective investment vehicle that is engaged primarily in the purchase and sale of securities, by not (1) a legal entity that is beneficially owned solely by immediate family members or (2) an investment club comprising a group of friends, neighbors, business associates or others who pool money to invest in stock or other securities and are collectively responsible for making investment decisions.

**FINRA**. The Financial Industry Regulatory Authority.

**Immediate family member**. A person's parents, mother-in-law or father-in-law, spouse, brother or sister, brother-in-law or sister-in-law, son-in-law or daughter-in-law, and children, and any other individual to whom the person provides material support.

**Limited business broker/dealer**. Any broker/dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities and direct participation program securities.

**Material support**. Directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household and deemed to be providing each other with material support.

**Attestations:**

- The Investor understands that the foregoing information will be relied upon by the Company for the purpose of determining the eligibility of the investor to purchase and own the interests. The Investor agrees to notify the manager immediately if any representation, warranty, and/or information contained in the subscription agreement, including this Investor questionnaire, becomes untrue or incomplete at any time.
- The Investor agrees to provide, if requested, any additional information and execute and deliver such documents regarding itself and all of its beneficial owners as the Company may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein, to comply with any law or regulation to which the Company may be subject, including compliance


© Cadman Capital 2022

with anti-money laundering laws and regulations, or for any other reasonable purpose.

- To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Company and each member thereof from and against any loss, damage, claim or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in the subscription agreement (including this investor questionnaire) or any other document provided by the Investor to the Company or in any agreement executed by the Investor with the Company or the manger in connection with the Investor's investment in the interests.

- The Investor attests that they have such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued membership Interests, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Interests. The Investor can bear the economic risk of holding the Interests for an indefinite period, and the Investor can afford to suffer the complete loss of its investment in the Interests.

INDIVIDUAL:

DocuSigned by:
Charles Edwards
0F726AAF379141F...

Signature

Charles Edwards

Print Name

5/5/2023

Dated

I accept this document signed via DocuSign as an original signature. Lender Initials: DS CE


© Cadman Capital 2022

DocuSign

## Certificate Of Completion

Envelope Id: 3F749E6E29E9438883486A9F3909F34C

Status: Completed

Subject: Cadman Global, LLC - Series 6 Documents - Charles Edwards

Source Envelope:

Document Pages: 16

Signatures: 3

Envelope Originator:

Certificate Pages: 5

Initials: 18

Mark Trotter

AutoNav: Enabled

mtrotter@cadmancapital.com

EnvelopeId Stamping: Enabled

IP Address: 142.115.18.190

Time Zone: (UTC-05:00) Eastern Time (US & Canada)

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>2023-05-05 I 15:42 | Holder: Mark Trotter<br>mtrotter@cadmancapital.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Charles Edwards<br>dreamer3939now@gmail.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Charles Edwards<br>0F726AAF379141F...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 172.220.76.72 | Sent: 2023-05-05 I 15:46<br>Viewed: 2023-05-05 I 22:45<br>Signed: 2023-05-05 I 23:03 |

**Electronic Record and Signature Disclosure:**
Accepted: 2023-05-05 I 22:45
ID: 58105cae-540a-46c9-865c-c8af1082a394

| | | |
|---|---|---|
| Giles Cadman<br>documentapproval@cadmancapitalmanagement.com<br>Director<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br><br>79D7838B4E6843C...<br><br>Signature Adoption: Uploaded Signature Image<br>Using IP Address: 188.39.106.50 | Sent: 2023-05-05 I 23:03<br>Viewed: 2023-05-09 I 05:09<br>Signed: 2023-05-09 I 06:50 |

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mark Trotter<br>mtrotter@cadmancapital.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 2023-05-05 I 15:46 |
| Mark Trotter<br>mtrotter@cadmancapital.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 2023-05-05 I 23:03 |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Cadman Global - Admin<br>approveddocument@cadmancapital.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 2023-05-09 I 06:50 |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2023-05-05 I 15:46 |
| Envelope Updated | Security Checked | 2023-05-05 I 15:47 |
| Certified Delivered | Security Checked | 2023-05-09 I 05:09 |
| Signing Complete | Security Checked | 2023-05-09 I 06:50 |
| Completed | Security Checked | 2023-05-09 I 06:50 |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Cadman Global LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Cadman Global LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: info@cadmancapital.com

**To advise Cadman Global LLC of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at info@cadmancapital.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Cadman Global LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to info@cadmancapital.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Cadman Global LLC**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to info@cadmancapital.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to ‘I agree to use electronic records and signatures’ before clicking ‘CONTINUE’ within the DocuSign system.

By selecting the check-box next to ‘I agree to use electronic records and signatures’, you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Cadman Global LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Cadman Global LLC during the course of your relationship with Cadman Global LLC.

Promissory Note
8-27-2020

Personal Loan
NOT IRA
checks will be
mailed to me

CADMAN GLOBAL

UNSECURED PROMISSORY NOTE

BY AND BETWEEN

SERIES VI OF CADMAN GLOBAL, LLC,
A DELAWARE SERIES LIMITED LIABILITY COMPANY

AND

Charles W. Edwards

Cadman Global, LLC Initials: [signature] Lender Initials: CWE

NEITHER CADMAN GLOBAL, LLC, SERIES VI (THE "BORROWER") NOR THE PROMISSORY NOTES OF THE BORROWER (THE "NOTES") DESCRIBED HEREIN AND IN THE MEMORANDUM (AS DEFINED HEREIN) HAVE BEEN OR WILL BE REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF THE UNITED STATES ("U.S.") OR ANY OTHER JURISDICTION. THIS NOTE SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOTES, NOR SHALL THERE BE ANY SALE OF IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. THE DIRECT OR INDIRECT OWNERSHIP OF NOTES BY "NON-ELIGIBLE PERSONS," AS DEFINED IN THE MEMORANDUM, IS PROHIBITED EXCEPT IN ACCORDANCE THEREWITH.

THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND OTHERWISE IN ACCORDANCE WITH THE MEMORANDUM. EACH LENDER WILL BE REQUIRED TO REPRESENT THAT IT IS ACQUIRING THE NOTES PURCHASED BY IT FOR INVESTMENT AND NOT WITH A VIEW TO RESALE OR DISTRIBUTION. THERE IS NO PUBLIC MARKET FOR THE NOTES AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.

Cadman Global, LLC Initials: ________ Lender Initials: CWE

USD $34,221.47

# PROMISSORY NOTE

Dated: 5-26-2020

1. FOR VALUE RECEIVED, SERIES VI OF CADMAN GLOBAL, LLC, series of a series limited liability company that is an entity in good standing under the laws of the State of Delaware (the "Borrower"), hereby promises to pay to Charles W. Edwards, having an address of 3939 Monona Dr. #302 Monona WI 53716 (the "Lender"), on or before the Maturity Date (hereinafter defined), in lawful money of the United States of America, the principal sum of THIRTY FOUR THOUSAND, TWO HUNDRED AND TWENTY ONE DOLLARS 47/100 USD ($34,221.47) (the "Principal Amount"), together with interest on the Principal Amount from the Commencement Date of this Note to maturity, (the agreed relevant rate as specified in Exhibit A on the unpaid Principal Amount ), payable as set forth in paragraph 3.

2. This unsecured promissory note (the "Note") evidences the obligation to make repayment of a loan or loans (collectively, the "Loan") of the Principal Amount made by the Lender to the Borrower pursuant to this Note.

3. The Principal Amount, together with any interest accrued thereon shall be due and payable, by way of cheque, wire transfer or as otherwise agreed to, in accordance with Exhibit A over the EIGHTEEN (18) month term in the total amount of THIRTY EIGHT THOUSAND, SIXTY SEVEN DOLLARS 49/100 USD ($38,067.49). The payment or payments shall be due and payable in accordance with Exhibit A on or before 1st of January, 2022 ("Maturity Date"). Unless expressly prohibited under Exhibit A, the Principal Amount may be prepaid, in whole or in part, at anytime in the sole discretion of the Borrower, together with all accrued but unpaid interest due thereon. There shall be no prepayment penalty or other payment required in connection with the prepayment of amounts owing under this Note.

4. The Lender agrees that, in the event of the occurrence of either of the Events of Default specified under paragraphs 6(b) and 6(c) (each an "Insolvency Event"), the repayment of the Principal Amount and all interest and other existing obligations under this Note (the "Note Obligations") shall thereupon become subordinated in right of payment to all obligations owed by the Borrower under any secured loan (the "Senior Debt") provided always that, and for the avoidance of doubt, repayment of the Note Obligations shall thereafter be made in priority to any distributions or other payments that may be due or owing to any member having an economic interest in the Borrower. The Lender further agrees that following an Insolvency Event: (1) it will not demand or receive from the Borrower (and Borrower will not pay to Lender) all or any part of the Note Obligations, by way of payment, prepayment, setoff, lawsuit or otherwise, and (2) it will not exercise any remedy with respect to the Note Obligations, accelerate the Note Obligations, or commence, or cause to commence, prosecute or participate in any

Cadman Global, LLC Initials: [signature] Lender Initials: CWE

administrative, legal or equitable action against the Borrower, until such time any Senior Debt is paid in full (or the repayment of the Senior Debt is otherwise waived and the agreements related thereto are terminated).

5. The Lender has reviewed all financial and non-financial information necessary to make an informed decision regarding this Note, including the Borrower's Third Amended and Restated Information Memorandum, as it may be further amended, restated and/or supplemented from time to time (the "Memorandum"), the Portfolio Supplement for Cadman Global, LLC, Series VI and other documents related to entering into this Note (collectively, the "Offering Documents") and has been afforded the opportunity to ask questions and receive answers concerning the Lender's credit decision.

6. The occurrence of any one or more of the following events with respect to the Borrower shall constitute an event of default hereunder ("Event of Default"):

(a) If the Borrower shall fail to pay when due any payment of principal or interest on this Note and does not subsequently pay the same within twenty-eight (28) calendar days' written notice thereof from the Lender.

(b) If, pursuant to or within the meaning of the bankruptcy law or the solvency laws of any applicable jurisdiction (a "Bankruptcy Law"), the Borrower shall (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official; (iv) make an assignment for the benefit of his creditors; or (v) admit in writing its inability to pay its debts as they become due.

(c) If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for the Borrower or substantially all of the Borrower's properties, or (iii) orders the liquidation of the Borrower, and in each case the order or decree is not dismissed within 90 days.

(d) If the Borrower shall fail to comply with its undertaking in paragraph 3 or Exhibit A of this Note.

7. No direct or indirect shareholder or other Affiliate (as defined below) of the Borrower shall have any liability for payment of the Note Obligations, interest thereon, or any other costs, expenses, or other charges due to the Lender as provided by this Note and, in the event of any Event of Default, the Lender's sole recourse shall be against the Borrower. For the purposes of this paragraph 7:

Cadman Global, LLC Initials: [signature] Lender Initials: CWE

(a) "Affiliate" shall mean any Senior Employee, director or Relevant Shareholder of any member of the Group and any person who is connected with or controls any of the foregoing persons or entities;

(b) "Group" shall mean the Borrower and the Subsidiaries;

(c) "Relevant Shareholder" means any person who holds 50 per cent or more of the issued share capital of the relevant company;

(d) "Senior Employee" shall mean any management employee of the Group who has executive responsibilities in relation to a significant business unit of the Group or who is capable of influencing the policy and direction of the Group; and

(e) "Subsidiaries" shall mean a subsidiary undertaking of the Borrower within the meaning of section 1162 of the Companies Act 2006 of England and Wales.

8. The Borrower represents and warrants that all of the proceeds received by the Borrower in connection with this Note shall be used for commercial purposes, and the Borrower stipulates that the Loan shall be construed for all purposes as a commercial loan.

9. The Lender represents and warrants that it understands and acknowledges the following:

(a) The Lender has such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued Notes, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Notes, and the Lender can bear the economic risk of holding the Notes until the Maturity Date.

(b) The Note being acquired will be acquired for the Lender's own account for investment purposes only without a view to public distribution or resale, and there is no contract, undertaking, agreement, or arrangement to sell, pledge, assign, or otherwise transfer or dispose of the Note or any portion thereof to any other person or entity.

(c) This Note has not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state thereof, or of any country or other jurisdiction, nor is any such registration contemplated, and that the Notes may not be offered, resold, pledged or otherwise transferred unless they are registered under the Securities Act and any applicable state or other securities laws unless an exemption from

Cadman Global, LLC Initials: [signature] Lender Initials: CWE

after the date sent by recognized overnight courier or transmitted by facsimile, which transmission by facsimile has been confirmed or three (3) days after the date sent by registered or certified mail, postage prepaid, as follows:

If to Borrower, addressed to the Borrower at:

Cadman Global, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

If to Lender, addressed to:

3939 Monona Dr. #302
Monona Wi 53716

13. This Note contains the entire agreement of the Borrower and the Lender with respect to the matters set forth herein, and all prior statements, discussions, negotiations, and agreements, oral or written, are superseded by this Note, and merged herein. All amendments to this Note must be in writing and signed by the Borrower and the Lender. The relationship between the Lender and the Borrower shall be only that of creditor and debtor. No relationship of agency, partnership, or joint- or co-venture shall be created by or inferred from this Note. The Borrower shall indemnify, save, defend, and hold the Lender harmless from and against any and all claims and demands asserted against the Lender as being the agent, partner, or joint- or co-venturer of the Borrower, and attorneys' fees, expenses, and court costs associated therewith. Any dispute or controversy arising under or in connection with this Note shall be submitted to binding arbitration in accordance with the Federal Arbitration Act and under the Commercial Rules of the American Arbitration Association. All arbitration proceedings shall be conducted in the State of Delaware, City of Wilmington before a mediator certified by the American Arbitration Association, and the arbitrator shall apply the laws of the State of Delaware (without regard to the conflicts of law). The arbitrator shall render a decision on any dispute based upon the laws of the State of Delaware within one hundred twenty (120) days after the arbitrator has been selected. Each party to an arbitration proceeding under this Section shall pay an equal portion of all arbitrators' expenses and fees, together with other expenses of arbitration, except that the parties shall bear their own respective expert witness, professional and attorneys' fees.

*[End of Agreement]*

[Signatures on following page]

Cadman Global, LLC Initials: [signature] Lender Initials: CWE

IN WITNESS WHEREOF, the Borrower has caused this Unsecured Promissory Note to be duly executed and delivered and shall take effect on the date written above.

**CADMAN GLOBAL, LLC, SERIES VI**

______________________________

By: Cadman Capital Management Limited
Its: Managing Member

By: Giles Cadman
Its: Authorized Representative

Accepted and Agreed to:

LENDER

Charles W. Edwards
______________________________

Charles W. Edwards, Individually
______________________________
Print Name

Cadman Global, LLC Initials: ______ Lender Initials: CWE



[Signature Page to Series VI, Cadman Global, LLC Promissory Note]
E & O Excepted

EXHIBIT A

**Payment Terms for Note**

| Amount of Loan (USD) | Commencement Date of Loan | Term | Installments | Annual Rate of Interest | Repayment Terms |
|---|---|---|---|---|---|
| $34,221.47 | 1st of July, 2020 | 18 months | 6 | 8.00% | First Payment Date: 1st of October, 2020<br><br>Maturity Date: 1st of January, 2022<br><br>[No repayments during first 3 months of term; 5 equal quarterly payments of Principal Amount and Interest thereafter, amounting to $1,574.19, payable at the end of each three month period, with the final balloon payment of $30,196.54, payable at the Maturity Date] |

x5

Cadman Global, LLC Initials: ____

Lender Initials: CWE



E & O Excepted

*[Exhibit A to Series VI, Cadman Global, LLC Promissory Note]*

such registration is available.

(d) There is not a public market for the Notes and that no such market is expected to develop.

(e) The Notes are being offered and sold in reliance on specific exemptions from the registration requirements of federal and state securities laws, specifically Section 4(2) of the Securities Act, Regulation D promulgated under the Securities Act, and that the Company is relying upon the truth and accuracy of the representations of the Lender in order to determine the suitability of the Lender to acquire the Notes and the applicability of the exemptions.

(f) If the Lender is an individual: the Lender has the requisite legal capacity (i) to acquire and hold the Notes, and (ii) to execute and deliver the Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note.

(g) If the Lender is an entity: (i) the Lender is duly formed, validly existing and in good standing under the laws of its jurisdiction of organization; (ii) the Lender has the power and authority to execute and deliver this Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note; (iii) the execution and delivery of each of the Note, , and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate or other action on the Lender's behalf; and (iv) the Note and other documents to which the Lender is a party are the Lender's legal, valid and binding obligations.

10. If any provision (or any part of any provision) contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note, but this Note shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal, or unenforceable.

11. No provision of this Note shall require the payment or permit the collection of interest in excess of the maximum permitted by law. If any such excess interest is so provided for, or adjudicated to be so provided for, in this Note, Borrower shall not be obligated to pay such interest in excess of the amount permitted by law, the right to demand the payment of any such excess shall be and is hereby waived, and this provision shall control over any other provision of this Note.

12. All notices, demands, and other communications between the Borrower and the Lender required or desired to be given in connection with this Note, shall be in writing and shall be deemed to have been given when personally delivered, or one day

Cadman Global, LLC Initials: ______ Lender Initials: CWE

*Mary S. Edwards*

Promissory Note
8-27-2022

Personal Loan
not IRA
checks will be mailed
to me

# CADMAN GLOBAL

UNSECURED PROMISSORY NOTE

BY AND BETWEEN

SERIES VI OF CADMAN GLOBAL, LLC,
A DELAWARE SERIES LIMITED LIABILITY COMPANY

AND

Charles W. Edwards

Cadman Global, LLC Initials: [signature] Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

NEITHER CADMAN GLOBAL, LLC, SERIES VI (THE "BORROWER") NOR THE PROMISSORY NOTES OF THE BORROWER (THE "NOTES") DESCRIBED HEREIN AND IN THE MEMORANDUM (AS DEFINED HEREIN) HAVE BEEN OR WILL BE REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF THE UNITED STATES ("U.S.") OR ANY OTHER JURISDICTION. THIS NOTE SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOTES, NOR SHALL THERE BE ANY SALE OF IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. THE DIRECT OR INDIRECT OWNERSHIP OF NOTES BY "NON-ELIGIBLE PERSONS," AS DEFINED IN THE MEMORANDUM, IS PROHIBITED EXCEPT IN ACCORDANCE THEREWITH.

THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND OTHERWISE IN ACCORDANCE WITH THE MEMORANDUM. EACH LENDER WILL BE REQUIRED TO REPRESENT THAT IT IS ACQUIRING THE NOTES PURCHASED BY IT FOR INVESTMENT AND NOT WITH A VIEW TO RESALE OR DISTRIBUTION. THERE IS NO PUBLIC MARKET FOR THE NOTES AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.

Cadman Global, LLC Initials: ________ Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

Mary S. Edwards

**PROMISSORY NOTE**

USD $25,407.33 Dated: 5-26-2020

1. FOR VALUE RECEIVED, SERIES VI OF CADMAN GLOBAL, LLC, series of a series limited liability company that is an entity in good standing under the laws of the State of Delaware (the "Borrower"), hereby promises to pay to Charles W. Edwards, having an address of 3939 Monona Dr. #302 Monona Wi 53716 (the "Lender"), on or before the Maturity Date (hereinafter defined), in lawful money of the United States of America, the principal sum of TWENTY FIVE THOUSAND, FOUR HUNDRED AND SEVEN DOLLARS 33/100 USD ($25,407.33) (the "Principal Amount"), together with interest on the Principal Amount from the Commencement Date of this Note to maturity, (the agreed relevant rate as specified in Exhibit A on the unpaid Principal Amount ), payable as set forth in paragraph 3.

2. This unsecured promissory note (the "Note") evidences the obligation to make repayment of a loan or loans (collectively, the "Loan") of the Principal Amount made by the Lender to the Borrower pursuant to this Note.

3. The Principal Amount, together with any interest accrued thereon shall be due and payable, by way of cheque, wire transfer or as otherwise agreed to, in accordance with Exhibit A over the TWENTY FOUR (24) month term in the total amount of TWENTY EIGHT THOUSAND, FOUR HUNDRED AND FIFTY TWO DOLLARS 62/100 USD ($28,452.62). The payment or payments shall be due and payable in accordance with Exhibit A on or before 1st of July, 2022 ("Maturity Date"). Unless expressly prohibited under Exhibit A, the Principal Amount may be prepaid, in whole or in part, at anytime in the sole discretion of the Borrower, together with all accrued but unpaid interest due thereon. There shall be no prepayment penalty or other payment required in connection with the prepayment of amounts owing under this Note.

4. The Lender agrees that, in the event of the occurrence of either of the Events of Default specified under paragraphs 6(b) and 6(c) (each an "Insolvency Event"), the repayment of the Principal Amount and all interest and other existing obligations under this Note (the "Note Obligations") shall thereupon become subordinated in right of payment to all obligations owed by the Borrower under any secured loan (the "Senior Debt") provided always that, and for the avoidance of doubt, repayment of the Note Obligations shall thereafter be made in priority to any distributions or other payments that may be due or owing to any member having an economic interest in the Borrower. The Lender further agrees that following an Insolvency Event: (1) it will not demand or receive from the Borrower (and Borrower will not pay to Lender) all or any part of the Note Obligations, by way of payment, prepayment, setoff, lawsuit or otherwise, and (2) it will not exercise any remedy with respect to the Note Obligations, accelerate the Note

Cadman Global, LLC Initials: [signature] Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

Obligations, or commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against the Borrower, until such time any Senior Debt is paid in full (or the repayment of the Senior Debt is otherwise waived and the agreements related thereto are terminated).

5. The Lender has reviewed all financial and non-financial information necessary to make an informed decision regarding this Note, including the Borrower's Third Amended and Restated Information Memorandum, as it may be further amended, restated and/or supplemented from time to time (the "Memorandum"), the Portfolio Supplement for Cadman Global, LLC, Series VI and other documents related to entering into this Note (collectively, the "Offering Documents") and has been afforded the opportunity to ask questions and receive answers concerning the Lender's credit decision.

6. The occurrence of any one or more of the following events with respect to the Borrower shall constitute an event of default hereunder ("Event of Default"):

(a) If the Borrower shall fail to pay when due any payment of principal or interest on this Note and does not subsequently pay the same within twenty-eight (28) calendar days' written notice thereof from the Lender.

(b) If, pursuant to or within the meaning of the bankruptcy law or the solvency laws of any applicable jurisdiction (a "Bankruptcy Law"), the Borrower shall (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official; (iv) make an assignment for the benefit of his creditors; or (v) admit in writing its inability to pay its debts as they become due.

(c) If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for the Borrower or substantially all of the Borrower's properties, or (iii) orders the liquidation of the Borrower, and in each case the order or decree is not dismissed within 90 days.

(d) If the Borrower shall fail to comply with its undertaking in paragraph 3 or Exhibit A of this Note.

7. No direct or indirect shareholder or other Affiliate (as defined below) of the Borrower shall have any liability for payment of the Note Obligations, interest thereon, or any other costs, expenses, or other charges due to the Lender as provided by this Note and, in the event of any Event of Default, the Lender's sole recourse shall be against the Borrower. For the purposes of this paragraph 7:

Cadman Global, LLC Initials: [signature] Lender Initials: CWE

(a) "Affiliate" shall mean any Senior Employee, director or Relevant Shareholder of any member of the Group and any person who is connected with or controls any of the foregoing persons or entities;

(b) "Group" shall mean the Borrower and the Subsidiaries;

(c) "Relevant Shareholder" means any person who holds 50 per cent or more of the issued share capital of the relevant company;

(d) "Senior Employee" shall mean any management employee of the Group who has executive responsibilities in relation to a significant business unit of the Group or who is capable of influencing the policy and direction of the Group; and

(e) "Subsidiaries" shall mean a subsidiary undertaking of the Borrower within the meaning of section 1162 of the Companies Act 2006 of England and Wales.

8. The Borrower represents and warrants that all of the proceeds received by the Borrower in connection with this Note shall be used for commercial purposes, and the Borrower stipulates that the Loan shall be construed for all purposes as a commercial loan.

9. The Lender represents and warrants that it understands and acknowledges the following:

(a) The Lender has such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued Notes, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Notes, and the Lender can bear the economic risk of holding the Notes until the Maturity Date.

(b) The Note being acquired will be acquired for the Lender's own account for investment purposes only without a view to public distribution or resale; and there is no contract, undertaking, agreement, or arrangement to sell, pledge, assign, or otherwise transfer or dispose of the Note or any portion thereof to any other person or entity.

(c) This Note has not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state thereof, or of any country or other jurisdiction, nor is any such registration contemplated, and that the Notes may not be offered, resold, pledged or otherwise transferred unless they are registered under the Securities

Cadman Global, LLC Initials: ______ Lender Initials: CWE



54 Park Place
Appleton, Wisconsin 54915
414-735-9499

Act and any applicable state or other securities laws unless an exemption from such registration is available.

(d) There is not a public market for the Notes and that no such market is expected to develop.

(e) The Notes are being offered and sold in reliance on specific exemptions from the registration requirements of federal and state securities laws, specifically Section 4(2) of the Securities Act, Regulation D promulgated under the Securities Act, and that the Company is relying upon the truth and accuracy of the representations of the Lender in order to determine the suitability of the Lender to acquire the Notes and the applicability of the exemptions.

(f) If the Lender is an individual: the Lender has the requisite legal capacity (i) to acquire and hold the Notes, and (ii) to execute and deliver the Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note.

(g) If the Lender is an entity: (i) the Lender is duly formed, validly existing and in good standing under the laws of its jurisdiction of organization; (ii) the Lender has the power and authority to execute and deliver this Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note; (iii) the execution and delivery of each of the Note, , and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate or other action on the Lender's behalf; and (iv) the Note and other documents to which the Lender is a party are the Lender's legal, valid and binding obligations.

10. If any provision (or any part of any provision) contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note, but this Note shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal, or unenforceable.

11. No provision of this Note shall require the payment or permit the collection of interest in excess of the maximum permitted by law. If any such excess interest is so provided for, or adjudicated to be so provided for, in this Note, Borrower shall not be obligated to pay such interest in excess of the amount permitted by law, the right to demand the payment of any such excess shall be and is hereby waived, and this provision shall control over any other provision of this Note.

12. All notices, demands, and other communications between the Borrower and the Lender required or desired to be given in connection with this Note, shall be in

Cadman Global, LLC Initials: ________ Lender Initials: CWE

writing and shall be deemed to have been given when personally delivered, or one day after the date sent by recognized overnight courier or transmitted by facsimile, which transmission by facsimile has been confirmed or three (3) days after the date sent by registered or certified mail, postage prepaid, as follows:

If to Borrower, addressed to the Borrower at:

Cadman Global, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

If to Lender, addressed to:

3939 Monona Dr. #302
Monona Wi 53716

13. This Note contains the entire agreement of the Borrower and the Lender with respect to the matters set forth herein, and all prior statements, discussions, negotiations, and agreements, oral or written, are superseded by this Note, and merged herein. All amendments to this Note must be in writing and signed by the Borrower and the Lender. The relationship between the Lender and the Borrower shall be only that of creditor and debtor. No relationship of agency, partnership, or joint- or co-venture shall be created by or inferred from this Note. The Borrower shall indemnify, save, defend, and hold the Lender harmless from and against any and all claims and demands asserted against the Lender as being the agent, partner, or joint- or co-venturer of the Borrower, and attorneys' fees, expenses, and court costs associated therewith. Any dispute or controversy arising under or in connection with this Note shall be submitted to binding arbitration in accordance with the Federal Arbitration Act and under the Commercial Rules of the American Arbitration Association. All arbitration proceedings shall be conducted in the State of Delaware, City of Wilmington before a mediator certified by the American Arbitration Association, and the arbitrator shall apply the laws of the State of Delaware (without regard to the conflicts of law). The arbitrator shall render a decision on any dispute based upon the laws of the State of Delaware within one hundred twenty (120) days after the arbitrator has been selected. Each party to an arbitration proceeding under this Section shall pay an equal portion of all arbitrators' expenses and fees, together with other expenses of arbitration, except that the parties shall bear their own respective expert witness, professional and attorneys' fees.

***[End of Agreement]***

[Signatures on following page]

Cadman Global, LLC Initials: [signature] Lender Initials: [initials]

Mary S. Edwards

IN WITNESS WHEREOF, the Borrower has caused this Unsecured Promissory Note to be duly executed and delivered and shall take effect on the date written above.

**CADMAN GLOBAL, LLC, SERIES VI**

______________________________

By: Cadman Capital Management Limited
Its: Managing Member

By: Giles Cadman
Its: Authorized Representative

Accepted and Agreed to:

LENDER

Charles W. Edwards
______________________________

Charles W. Edwards, Individually
Print Name

Cadman Global, LLC Initials: ______ Lender Initials: CWE



[Signature Page to Series VI, Cadman Global, LLC Promissory Note]
E & O Excepted

Mary S. Edwards

EXHIBIT A

**Payment Terms for Note**

| Amount of Loan (USD) | Commencement Date of Loan | Term | Installments | Annual Rate of Interest | Repayment Terms |
|---|---|---|---|---|---|
| $25,407.33 | 1st of July, 2020 | 24 months | 8 | 6.50% | First Payment Date: 1st of October, 2020<br><br>Maturity Date: 1st of July, 2022<br><br>[No repayments during first three months of term; 7 equal quarterly payments of Principal Amount and Interest thereafter, amounting to $965.48, payable at the end of each three month period, with the final balloon payment of $21,694.26, payable at the Maturity Date] |

x 7

final payment

Cadman Global, LLC Initials: [signature]

Lender Initials: CWE



[Exhibit A to Series VI, Cadman Global, LLC Promissory Note]
E & O Excepted

54 Park Place
Appleton, Wisconsin 54915
414-735-9499

# EXHIBIT F

DocuSign Envelope ID: 147C057D-4637-49C5-8253-2506AEA67D10

CADMAN GLOBAL

# UNSECURED PROMISSORY NOTE

BY AND BETWEEN

SERIES XX OF CADMAN GLOBAL, LLC,
A DELAWARE SERIES LIMITED LIABILITY COMPANY

AND

Charles Edwards

NEITHER CADMAN GLOBAL, LLC, SERIES XX (THE "BORROWER") NOR THE PROMISSORY NOTES OF THE BORROWER (THE "NOTES") DESCRIBED HEREIN AND IN THE MEMORANDUM (AS DEFINED HEREIN) HAVE BEEN OR WILL BE REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF THE UNITED STATES ("U.S.") OR ANY OTHER JURISDICTION. THIS NOTE SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOTES, NOR SHALL THERE BE ANY SALE OF IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. THE DIRECT OR INDIRECT OWNERSHIP OF NOTES BY "NON-ELIGIBLE PERSONS," AS DEFINED IN THE MEMORANDUM, IS PROHIBITED EXCEPT IN ACCORDANCE THEREWITH.

THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND OTHERWISE IN ACCORDANCE WITH THE MEMORANDUM. EACH LENDER WILL BE REQUIRED TO REPRESENT THAT IT IS ACQUIRING THE NOTES PURCHASED BY IT FOR INVESTMENT AND NOT WITH A VIEW TO RESALE OR DISTRIBUTION. THERE IS NO PUBLIC MARKET FOR THE NOTES AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.


© Cadman Global, LLC 2023

# PROMISSORY NOTE

USD $250,000.00 Dated: 4/27/2023

1. FOR VALUE RECEIVED, SERIES XX OF CADMAN GLOBAL, LLC, series of a series limited liability company that is an entity in good standing under the laws of the State of Delaware (the "Borrower"), hereby promises to pay to Charles Edwards, having an address of 3939 Monona Dr. #302 Monona Wisconsin 53716 (the "Lender"), on or before the Maturity Date (hereinafter defined), in lawful money of the United States of America, the principal sum of TWO HUNDRED AND FIFTY THOUSAND DOLLARS 00/100 USD ($250,000.00) (the "Principal Amount"), together with interest on the Principal Amount from the Commencement Date of this Note to maturity, (the agreed relevant rate as specified in Exhibit A on the unpaid Principal Amount ), payable as set forth in paragraph 3.

2. This unsecured promissory note (the "Note") evidences the obligation to make repayment of a loan or loans (collectively, the "Loan") of the Principal Amount made by the Lender to the Borrower pursuant to this Note.

3. The Principal Amount, together with any interest accrued thereon shall be due and payable, by way of cheque, wire transfer or as otherwise agreed to, in accordance with Exhibit A over the TWENTY FOUR (24) month term in the total amount of THREE HUNDRED AND NINETEEN THOUSAND, THREE HUNDRED AND SEVENTY TWO DOLLARS 96/100 USD ($319,372.96). The payment or payments shall be due and payable in accordance with Exhibit A on or before 5th of May, 2025 ("Maturity Date"). Unless expressly prohibited under Exhibit A, the Principal Amount may be prepaid, in whole or in part, at anytime in the sole discretion of the Borrower, together with all accrued but unpaid interest due thereon. There shall be no prepayment penalty or other payment required in connection with the prepayment of amounts owing under this Note.

4. The Lender agrees that, in the event of the occurrence of either of the Events of Default specified under paragraphs 6(b) and 6(c) (each an "Insolvency Event"), the repayment of the Principal Amount and all interest and other existing obligations under this Note (the "Note Obligations") shall thereupon become subordinated in right of payment to all obligations owed by the Borrower under any secured loan (the "Senior Debt") provided always that, and for the avoidance of doubt, repayment of the Note Obligations shall thereafter be made in priority to any distributions or other payments that may be due or owing to any member having an economic interest in the Borrower. The Lender further agrees that following an Insolvency Event: (1) it will not demand or receive

Cadman Global, LLC Initials: [initials] Lender Initials: CE


© Cadman Capital 2023

EXHIBIT A

**Payment Terms for Note**

| Amount of Loan (USD) | Commencement Date of Loan | Term | Installments | Annual Rate of Interest | Repayment Terms |
|---|---|---|---|---|---|
| $250,000.00 | 5th of May, 2023 | 24 months | 8 | 14% | First Payment Date: 5th of August, 2023<br><br>Maturity Date: 5th of May, 2025<br><br>[No repayments during first three months of term; 7 equal quarterly payments of Principal Amount and Interest thereafter, amounting to $9,346.22, payable at the end of each three month period, with the final balloon payment of $253,949.42, payable at the Maturity Date] |

Cadman Global, LLC Initials: [initials] Lender Initials: CE



© Cadman Capital 2023

# CADMAN GLOBAL, LLC SERIES XX

## CONFIDENTIAL INVESTOR QUESTIONNAIRE FOR PROSPECTIVE PRIVATE PLACEMENT OF INTEREST IN CADMAN GLOBAL, LLC SERIES XX

I UNDERSTAND AND AGREE THAT THE INFORMATION I AM PROVIDING HEREIN WILL BE RELIED UPON BY CADMAN GLOBAL, LLC, A DELAWARE SERIES LIMITED LIABILITY COMPANY (HEREINAFTER "THE COMPANY") TO ESTABLISH THAT I MEET CERTAIN STANDARDS IMPOSED BY THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AS WELL AS STANDARDS IMPOSED BY INDIVIDUAL STATES, IN CONNECTION WITH THE ABOVE-REFERENCED OFFERING. SPECIFICALLY, I UNDERSTAND THAT THE INFORMATION I AM PROVIDING WILL BE USED, IN PART, TO DETERMINE IF I AM AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501 OF REGULATION D UNDER THE ACT.

I WARRANT TO THE COMPANY THAT THE INFORMATION I AM PROVIDING HEREIN IS COMPLETE AND ACCURATE AND MAY BE RELIED UPON BY THE COMPANY AS COMPLETE AND ACCURATE. I AGREE THAT I WILL IMMEDIATELY NOTIFY THE COMPANY OF ANY MATERIAL CHANGE IN ANY OF THE INFORMATION PROVIDED HEREIN WHICH MAY OCCUR PRIOR TO ANY PURCHASE I MAY MAKE OF THE UNITS BEING OFFERED BY CADMAN GLOBAL, LLC SERIES XX.

I UNDERSTAND AND AGREE THAT, ALTHOUGH THIS QUESTIONNAIRE WILL BE KEPT STRICTLY CONFIDENTIAL, THE COMPANY AND/OR ITS ATTORNEYS MAY PRESENT THIS QUESTIONNAIRE TO SUCH PARTIES AS THEY DEEM ADVISABLE TO ESTABLISH EXEMPTION FROM REGISTRATION OF THE PRIVATE PLACEMENT OF THE UNITS OR FOR OTHER FEDERAL AND STATE REGULATORY PURPOSES.

THIS IS NOT AN OFFER TO SELL SECURITIES BUT MERELY A REQUEST FOR INFORMATION PURSUANT TO REGULATION D AND RULE 506 OF THE SECURITIES AND EXCHANGE COMMISSION.


© Cadman Capital 2023

from the Borrower (and Borrower will not pay to Lender) all or any part of the Note Obligations, by way of payment, prepayment, setoff, lawsuit or otherwise, and (2) it will not exercise any remedy with respect to the Note Obligations, accelerate the Note Obligations, or commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against the Borrower, until such time any Senior Debt is paid in full (or the repayment of the Senior Debt is otherwise waived and the agreements related thereto are terminated).

5. The Lender has reviewed all financial and non-financial information necessary to make an informed decision regarding this Note, including the Borrower's Fifth Amended and Restated Information Memorandum, as it may be further amended, restated and/or supplemented from time to time (the "Memorandum"), the Portfolio Supplement for Cadman Global, LLC, Series XX and other documents related to entering into this Note (collectively, the "Offering Documents") and has been afforded the opportunity to ask questions and receive answers concerning the Lender's credit decision.

6. The occurrence of any one or more of the following events with respect to the Borrower shall constitute an event of default hereunder ("Event of Default"):

(a) If the Borrower shall fail to pay when due any payment of principal or interest on this Note and does not subsequently pay the same within twenty-eight (28) calendar days' written notice thereof from the Lender.

(b) If, pursuant to or within the meaning of the bankruptcy law or the solvency laws of any applicable jurisdiction (a "Bankruptcy Law"), the Borrower shall (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official; (iv) make an assignment for the benefit of his creditors; or (v) admit in writing its inability to pay its debts as they become due.

(c) If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, (ii) appoints a trustee, receiver, assignee, liquidator or similar official for the Borrower or substantially all of the Borrower's properties, or (iii) orders the liquidation of the Borrower, and in each case the order or decree is not dismissed within 90 days.

(d) If the Borrower shall fail to comply with its undertaking in paragraph 3 or Exhibit A of this Note.

Cadman Global, LLC Initials: ______ Lender Initials: CE


© Cadman Capital 2023

7. No direct or indirect shareholder or other Affiliate (as defined below) of the Borrower shall have any liability for payment of the Note Obligations, interest thereon, or any other costs, expenses, or other charges due to the Lender as provided by this Note and, in the event of any Event of Default, the Lender's sole recourse shall be against the Borrower. For the purposes of this paragraph 7:

(a) "Affiliate" shall mean any Senior Employee, director or Relevant Shareholder of any member of the Group and any person who is connected with or controls any of the foregoing persons or entities;

(b) "Group" shall mean the Borrower and the Subsidiaries;

(c) "Relevant Shareholder" means any person who holds 50 per cent or more of the issued share capital of the relevant company;

(d) "Senior Employee" shall mean any management employee of the Group who has executive responsibilities in relation to a significant business unit of the Group or who is capable of influencing the policy and direction of the Group; and

(e) "Subsidiaries" shall mean a subsidiary undertaking of the Borrower within the meaning of section 1162 of the Companies Act 2006 of England and Wales.

8. The Borrower represents and warrants that all of the proceeds received by the Borrower in connection with this Note shall be used for commercial purposes, and the Borrower stipulates that the Loan shall be construed for all purposes as a commercial loan.

9. The Lender represents and warrants that it understands and acknowledges the following:

(a) The Lender has such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued Notes, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Notes, and the Lender can bear the economic risk of holding the Notes until the Maturity Date.

(b) The Note being acquired will be acquired for the Lender's own account for investment purposes only without a view to public distribution or resale, and there is no contract, undertaking, agreement, or arrangement to sell,

Cadman Global, LLC Initials: ____ Lender Initials: CE


© Cadman Capital 2023

pledge, assign, or otherwise transfer or dispose of the Note or any portion thereof to any other person or entity.

(c) This Note has not been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state thereof, or of any country or other jurisdiction, nor is any such registration contemplated, and that the Notes may not be offered, resold, pledged or otherwise transferred unless they are registered under the Securities Act and any applicable state or other securities laws unless an exemption from such registration is available.

(d) There is not a public market for the Notes and that no such market is expected to develop.

(e) The Notes are being offered and sold in reliance on specific exemptions from the registration requirements of federal and state securities laws, specifically Section 4(2) of the Securities Act, Regulation D promulgated under the Securities Act, and that the Company is relying upon the truth and accuracy of the representations of the Lender in order to determine the suitability of the Lender to acquire the Notes and the applicability of the exemptions.

(f) If the Lender is an individual: the Lender has the requisite legal capacity (i) to acquire and hold the Notes, and (ii) to execute and deliver the Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note.

(g) If the Lender is an entity: (i) the Lender is duly formed, validly existing and in good standing under the laws of its jurisdiction of organization; (ii) the Lender has the power and authority to execute and deliver this Notes and each of the other instruments executed and delivered by the Lender in connection with its investment in the Note; (iii) the execution and delivery of each of the Note, , and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate or other action on the Lender's behalf; and (iv) the Note and other documents to which the Lender is a party are the Lender's legal, valid and binding obligations.

10. If any provision (or any part of any provision) contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note, but this Note shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had never been contained herein, but only to

Cadman Global, LLC Initials: DS ______ Lender Initials: DS CE


© Cadman Capital 2023

the extent it is invalid, illegal, or unenforceable.

11. No provision of this Note shall require the payment or permit the collection of interest in excess of the maximum permitted by law. If any such excess interest is so provided for, or adjudicated to be so provided for, in this Note, Borrower shall not be obligated to pay such interest in excess of the amount permitted by law, the right to demand the payment of any such excess shall be and is hereby waived, and this provision shall control over any other provision of this Note.

12. All notices, demands, and other communications between the Borrower and the Lender required or desired to be given in connection with this Note, shall be in writing and shall be deemed to have been given when personally delivered, or one day after the date sent by recognized overnight courier or transmitted by facsimile, which transmission by facsimile has been confirmed or three (3) days after the date sent by registered or certified mail, postage prepaid, as follows:

If to Borrower, addressed to the Borrower at:

Cadman Global, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

If to Lender, addressed to:

3939 Monona Dr. #302

Monona

Wisconsin 53716

13. This Note contains the entire agreement of the Borrower and the Lender with respect to the matters set forth herein, and all prior statements, discussions, negotiations, and agreements, oral or written, are superseded by this Note, and merged herein. All amendments to this Note must be in writing and signed by the Borrower and the Lender. The relationship between the Lender and the Borrower shall be only that of creditor and debtor. No relationship of agency, partnership, or joint- or co-venture shall be created by or inferred from this Note. The Borrower shall indemnify, save, defend, and hold the Lender harmless from and against any and all claims and demands asserted against the Lender as

Cadman Global, LLC Initials: DS _______ Lender Initials: DS CE


© Cadman Capital 2023

being the agent, partner, or joint- or co-venturer of the Borrower, and attorneys' fees, expenses, and court costs associated therewith. Any dispute or controversy arising under or in connection with this Note shall be submitted to binding arbitration in accordance with the Federal Arbitration Act and under the Commercial Rules of the American Arbitration Association. All arbitration proceedings shall be conducted in the State of Delaware, City of Wilmington before a mediator certified by the American Arbitration Association, and the arbitrator shall apply the laws of the State of Delaware (without regard to the conflicts of law). The arbitrator shall render a decision on any dispute based upon the laws of the State of Delaware within one hundred twenty (120) days after the arbitrator has been selected. Each party to an arbitration proceeding under this Section shall pay an equal portion of all arbitrators' expenses and fees, together with other expenses of arbitration, except that the parties shall bear their own respective expert witness, professional and attorneys' fees.

*[End of Agreement]*


© Cadman Capital 2023

IN WITNESS WHEREOF, the Borrower has caused this Unsecured Promissory Note to be duly executed and delivered and shall take effect on the date written above.

**CADMAN GLOBAL, LLC, SERIES XX**

DocuSigned by:

79D7836B4E6843C...

By: Cadman Capital Management Limited
Its: Managing Member

By: Giles Cadman
Its: Authorized Representative

Accepted and Agreed to:

LENDER

DocuSigned by:

Charles Edwards

0F726AAF379141F...

Charles Edwards, Individually
Print Name

I accept this document signed via DocuSign as an original signature. Lender Initials: DS CE

Cadman Global, LLC Initials: DS

Lender Initials: DS CE





© Cadman Capital 2023

## A. GENERAL INFORMATION

1. Print Full Name of Investor:

For an Individual: Charles Willard Edwards

First Middle Last

2. Mailing address for notices or payments:

Street 3939 Monona Dr. #302

City/State/Zip Monona, Wi. 53716

3. Telephone number: 608-285-5181

4. e-Mail address: dreamer3939now@gmail.com

5. Permanent address (if different from address for notices above):

Street: ______________________

City/State/Zip: ______________________

6. Is the Investor: (a) a politically exposed person (a "PEP");
(b) an immediate family member of a PEP; or
(c) a close associate of a PEP?

*A "politically exposed person" is defined as a current or former senior official in the executive, legislative, administrative, military or judicial branches of government (whether elected on not), a senior official of a major political party, or a senior executive of a government-owned corporation. In addition, a "politically exposed person" includes any corporation, business, or other entity that has been formed by, or for the benefit of, a political figure.*
*An "Immediate family member" of a PEP typically includes such person's parents, siblings, spouse, children, and in-laws.*

*A "close associate" of a PEP is a person who is widely and publicly known to maintain an unusually close relationship with the PEP, and includes a person who is in a position to conduct substantial financial transactions on behalf of the PEP.*

___ Yes _x_ No


© Cadman Capital 2023

7. Is the Investor associated with any related person that is:

(a) a PEP;
(b) an immediate family member of a PEP; or
(c) a close associate of a PEP?

*A "Related person" means any person controlling or controlled by the Investor; if the Investor is a privately held entity, any person having a beneficial interest in the Investor; or any person for whom the Investor is acting as agent or nominee in connection with this investment.*

___ Yes ___X___ No

8. Has the Investor determined that the funds being invested by the Investor to purchase the Interest do not come from corruption?

___ Yes ___X___ No

## B. ACCREDITED INVESTOR STATUS

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501 of Regulation D under the United States Securities Act of 1933, as amended (the "Securities Act"), and has checked below next to **EACH AND EVERY** category or categories under which the Investor qualifies as an accredited investor:

**FOR INDIVIDUALS:**

__X (A) A natural person with individual net worth (or joint net worth with spouse) in excess of $1,000,000.00. For purposes of this basis for qualifying, "net worth" means the excess of total assets at fair market value (excluding (i) the fair market value of any primary residence owned by the Investor and (ii) the amount of any debt secured by the primary residence, up to the fair market value of the property), over total liabilities.

___ (B) A natural person with individual income (without including any income of the Investor's spouse) in excess of $200,000.00, or joint income with such spouse of $300,000.00, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.


© Cadman Capital 2023

## C. RELATED PARTIES

Will any other person or persons have a beneficial interest in the Interests to be acquired hereunder (other than as a shareholder, partner, or other beneficial owner of equity interests in the Investor)? By way of example, and not by limitation, "nominee" Investors would be required to check "Yes" below.

___ Yes        _X_ No

## D. RESTRICTED PERSON STATUS

*NOTE: Terms in bold are defined below.*

The Investor represents and warrants that the Investor is (check all that apply):

___ 1. A **FINRA** member firm or other broker/dealer.

___ 2. An officer, director, general partner, **associated person** or **employee of a FINRA member firm,** or any other broker/dealer (other than a **limited business broker/dealer**).

___ 3. An agent of a FINRA member firm or any other broker/dealer (other than a limited business broker/dealer) that is engaged in the investment banking or securities business.

___ 4. A person who has authority to buy or sell securities for a bank, savings and loan association, insurance company, investment company, investment adviser (whether or not registered as an investment adviser), or **collective investment account**.

___ 5. A person listed, or required to be listed, on one of the following schedules to Form BD as filed, or required to be filed, with the U.S. Securities and Exchange Commission by a broker/dealer (other than with respect to a limited business broker/dealer): (i) Schedule A, unless the person is identified by an ownership code of less than 10%; (ii) Schedule B, unless the person's listing on Schedule B relates to an ownership interest in a person that is listed on Schedule A and identified by an ownership code of less than 10%; or (iii) Schedule C, unless the person would be excluded under the percentage ownership criteria for Schedule A or B above.


© Cadman Capital 2023

___ 6. A person that directly or indirectly owns an interest, in the amounts specified below, of a public reporting company listed, or required to be listed, on Schedule A or B of Form BD relating to a broker/dealer (other than a limited business broker/dealer), unless the public reporting company is listed on a national securities exchange or is traded on the NASDAQ Global Market; (i) 10% or more of a public reporting company listed, or required to be listed, on Schedule A; or (ii) 25% or more of a public reporting company listed, or required to be listed, on Schedule B.

___ 7. A person that acts: (i) as a finder in connection with new issues, or (ii) in a fiduciary capacity to managing underwriters in connection with new issues.

___ 8. An **immediate family member** of: (i) a person specified in items 2-7 above that **materially supports,** or receives support from, that person; (ii) a person specified in items 2-3 above that is employed by or associated with a FINRA member or its affiliates, or that has an ability to control allocations of new issues; or (iii) a person specified in items 5-6 above that is an owner of a FINRA member or its affiliate, or that has an ability to control allocations of new issues.

___ 9. A collective investment account. *IF THE SUBSCRIBER IS A COLLECTIVE INVESTMENT ACCOUNT AS SPECIFIED IN ITEM 4 ABOVE, THE FOLLOWING PERCENTAGE OF THE SUBSCRIBER'S BENEFICIAL INTERESTS IS HELD BY PERSONS DESCRIBED IN ANY OF THE ITEMS 1-8 ABOVE: LESS THAN 10%.*

_X 10. None of the above.

**Definitions:**

**Associated person or employee of a FINRA member firm.** (1) Any natural person registered with FINRA and (2) any natural person, whether or not registered or exempt from registration with FINRA, who is a sole proprietor, partner, officer, director, or branch manager of a FINRA member firm, or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a FINRA member firm (for example, any employee).


© Cadman Capital 2023

**Beneficial interest.** Any economic interest, including the right to share in gains or losses, other than management- or performance-based fees for operating a collective investment account, or other fees for acting in a fiduciary capacity.

**Collective investment account**. Any hedge fund, investment partnership, investment corporation, or any other collective investment vehicle that is engaged primarily in the purchase and sale of securities, by not (1) a legal entity that is beneficially owned solely by immediate family members or (2) an investment club comprising a group of friends, neighbors, business associates or others who pool money to invest in stock or other securities and are collectively responsible for making investment decisions.

**FINRA**. The Financial Industry Regulatory Authority.

**Immediate family member**. A person's parents, mother-in-law or father-in-law, spouse, brother or sister, brother-in-law or sister-in-law, son-in-law or daughter-in-law, and children, and any other individual to whom the person provides material support.

**Limited business broker/dealer**. Any broker/dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities and direct participation program securities.

**Material support**. Directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household and deemed to be providing each other with material support.

**Attestations:**

- The Investor understands that the foregoing information will be relied upon by the Company for the purpose of determining the eligibility of the investor to purchase and own the interests. The Investor agrees to notify the manager immediately if any representation, warranty, and/or information contained in the subscription agreement, including this Investor questionnaire, becomes untrue or incomplete at any time.

- The Investor agrees to provide, if requested, any additional information and execute and deliver such documents regarding itself and all of its beneficial owners as the Company may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein, to comply with any law or regulation to which the Company may be subject, including compliance


© Cadman Capital 2023

with anti-money laundering laws and regulations, or for any other reasonable purpose.

- To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Company and each member thereof from and against any loss, damage, claim or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in the subscription agreement (including this investor questionnaire) or any other document provided by the Investor to the Company or in any agreement executed by the Investor with the Company or the manger in connection with the Investor's investment in the interests.

- The Investor attests that they have such knowledge and experience in financial and business matters, including the analysis of or participation in offerings of privately issued membership Interests, as to be capable of assessing the merits and risks of purchasing, and other considerations relating to, the Interests. The Investor can bear the economic risk of holding the Interests for an indefinite period, and the Investor can afford to suffer the complete loss of its investment in the Interests.

INDIVIDUAL:

DocuSigned by:
Charles Edwards
0F726AAF379141F...

Signature

Charles Edwards

Print Name

4/27/2023

Dated

I accept this document signed via DocuSign as an original signature. Lender Initials: DS CE


© Cadman Capital 2023

DocuSign

## Certificate Of Completion

Envelope Id: 147C057D463749C582532506AEA67D10 — Status: Completed

Subject: Cadman Global, LLC - Series 20 Documents - Charles Edwards

Source Envelope:

Document Pages: 16 — Signatures: 3 — Envelope Originator:

Certificate Pages: 5 — Initials: 18 — Mark Trotter

AutoNav: Enabled — mtrotter@cadmancapital.com

EnvelopeId Stamping: Enabled — IP Address: 142.115.18.190

Time Zone: (UTC-05:00) Eastern Time (US & Canada)

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>2023-04-27 I 17:49 | Holder: Mark Trotter<br>mtrotter@cadmancapital.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Charles Edwards<br>dreamer3939now@gmail.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Charles Edwards<br>0F726AAF379141F...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 172.220.76.72 | Sent: 2023-04-27 I 17:51<br>Viewed: 2023-04-27 I 19:29<br>Signed: 2023-04-27 I 20:15 |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 2023-04-27 I 19:29<br>ID: 9da7ffda-b791-4306-9fc5-f32b9181e13a | | |
| Giles Cadman<br>documentapproval@cadmancapitalmanagement.com<br>Director<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>79D7838B4E6843C...<br><br>Signature Adoption: Uploaded Signature Image<br>Using IP Address: 188.39.106.50 | Sent: 2023-04-27 I 20:15<br>Viewed: 2023-04-28 I 03:02<br>Signed: 2023-04-28 I 06:46 |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mark Trotter<br>mtrotter@cadmancapital.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 2023-04-27 I 17:51 |
| Mark Trotter<br>mtrotter@cadmancapital.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 2023-04-27 I 20:15 |

| Carbon Copy Events | Status | Timestamp |
| --- | --- | --- |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Cadman Global - Admin<br>approveddocument@cadmancapital.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 2023-04-28 I 06:46 |

| Witness Events | Signature | Timestamp |
| --- | --- | --- |

| Notary Events | Signature | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 2023-04-27 I 17:51 |
| Certified Delivered | Security Checked | 2023-04-28 I 03:02 |
| Signing Complete | Security Checked | 2023-04-28 I 06:46 |
| Completed | Security Checked | 2023-04-28 I 06:46 |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Cadman Global LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Cadman Global LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: info@cadmancapital.com

**To advise Cadman Global LLC of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at info@cadmancapital.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Cadman Global LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to info@cadmancapital.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Cadman Global LLC**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to info@cadmancapital.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Cadman Global LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Cadman Global LLC during the course of your relationship with Cadman Global LLC.